UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>ARTHUR GIANELLI, )<br>JOSEPH YERARDI, JR., )<br>DENNIS ALBERTELLI A/K/A "FISH," )<br>PHILIP PUOPOLO, )<br>SALVATORE RAMASCI A/K/A "LEFTY," )<br>FRANK IACABONI, )<br>RANDY ALBERTELLI, )<br>STEPHEN RUSSO A/K/A "MOON," )<br>MICHAEL PINIALIS A/K/A "MAX," )<br>ENEYDA GONZALEZ RODRIGUEZ, )<br>MARY ANN GIANELLI, )<br>GISELE ALBERTELLI, and )<br>RAFIA FEGHI A/K/A RAFIA YERARDI, )<br>)<br>Defendants. ) | Crim. No. 05-10003-NMG |

### AFFIDAVIT OF NUNZIO ORLANDO IN SUPPORT OF
### PRETRIAL DETENTION OF PHILIP PUOPOLO

I, Nunzio S. Orlando, under penalty of perjury, state:

1.   Since June 1993, I have been employed by the Massachusetts State Police ("MSP") as a State Police Trooper. Since February 1997, I have been assigned to the Special Service Section of the Massachusetts State Police, which is a state-wide unit specializing in the investigation of traditional and non-traditional organized crime.

2.   I have participated in numerous state and federal criminal investigations, and I have conducted witness interviews, physical surveillance, undercover assignments, execution of search warrants, monitoring of court-authorized electronic surveillance, and arrests of people for federal and state crimes.

3. I have been the affiant for applications that have resulted in court-ordered authorization to utilize electronic surveillance, and I have also been the affiant for numerous search warrants.

4. I have testified as a witness in the United States District Court for the District of Massachusetts as well as in courts of the Commonwealth of Massachusetts. In addition, I have testified as a witness before federal and state grand juries.

5. I have participated for more than two years in the investigation that has led to the instant superseding indictment. As part of this investigation, I have taken part in witness interviews, physical surveillance, state court authorized electronic surveillance, and the execution of federal and state search warrants.

6. I make this affidavit in support of the government's motion for detention pursuant to 18 U.S.C. §§ 3142(f)(1)(A) (in that this case involves crimes of violence), 3142(f)(2)(A) (serious risk of flight), and 3142(f)(2)(B) (serious risk of obstruction of justice and witness tampering).

## Introduction

7. Defendant Philip Puopolo is a bookmaker, a loanshark, and a "strong arm," who has developed and utilized his intimidating reputation.

8. Puopolo's "rap sheet" reflects a series of incidents involving violence, including the following:

    a. 1983: Assault and battery with a dangerous weapon and malicious destruction of property;

    b. 1984: Assault and battery;

    c. 1990: Assault and battery, threatening, and attempted extortion; and

d. 2000: Order to refrain from abuse, to avoid contact, and to stay at least 100 yards away from a named individual.

9. While none of the above situations resulted in Puopolo receiving any prison sentence, I am aware from my training and experience that victims of beatings, threats, and extortion often are so fearful of further harm that they (a) choose not to report those crimes; (b) refuse to testify against their tormentors who have been arrested, thereby requiring the charges to be dismissed; or (c) perjure themselves, falsely exonerating the thugs who have attacked or threatened them.

10. Moreover, to insure that certain individuals would not inculpate him in the present investigation, Puopolo has engaged in witness tampering.

11. Nonetheless, a number of Puopolo's victims have provided evidence that has resulted in Puopolo being indicted in this case.

## Summary and Strength of the Case

12. Philip Puopolo is charged in nineteen (19) felony counts in the pending superseding indictment:

    a. Racketeering (RICO) conspiracy: 1 count (Count 1); maximum prison term: <u>20 years</u>;

    b. Racketeering (RICO) substantive: 1 count (Count 2); maximum prison term: <u>20 years</u>;

    c. Extortionate extension of credit: 1 count (Count 508); maximum prison term: <u>20 years</u>;

    d. Extortionate collection of credit conspiracy: 5 counts (Counts 509, 512, 514, 516, and 518); maximum prison term: <u>20 years per count</u>;

  e. Extortionate collection of credit substantive: 5 counts (Counts 510, 513, 515, 517, and 519); maximum prison term: <u>20 years per count</u>;

  f. Witness tampering: 2 counts (Counts 511 and 520); maximum prison term: <u>10 years per count</u>;

  g. Illegal gambling business: 2 counts (Counts 3 and 4); maximum prison term: <u>5 years per count</u>; and

  h. Use of wire communication facility to transmit wagering information: 2 counts (Counts 6 and 7); maximum prison term: <u>2 years per count</u>.

13. Moreover, within the racketeering (RICO) counts, Puopolo is charged not only with the racketeering acts listed in the previous paragraph, but also with collections of fourteen (14) separate unlawful debts.

14. Thus, Puopolo is facing a substantial sentence under the pending superseding indictment. A conservative calculation under the Sentencing Guidelines indicates that Puopolo's criminal conduct would result in an Offense Level of 29 and a Criminal History category of I, which would result in a Guidelines sentencing range of between 87 and 108 months' incarceration.

15. Since Puopolo has been indicted, there already has been a finding of probable cause by the grand jury, and it is apparent from the face of the indictment that there will be many witnesses testifying against Puopolo. (See, for example, pages 49-57 of the indictment.)

16. The evidence against Puopolo will include testimony from a series of witnesses who were (a) agents and/or customers of Puopolo's illegal gambling businesses; (b) people who obtained loans from Puopolo at grossly usurious rates as high as 3% or 4% interest *per week* (which computes to an annual interest rate of 156% or 208%); (c) people who were victims of Puopolo's intimidating

collection tactics; and (d) an individual who was hired by Puopolo specifically for the purpose of intimidating victims to pay actual or alleged debts.

17. Witness testimony against Puopolo will be corroborated by recordings -- obtained pursuant to state court authorized wiretaps or with a victim's consent -- of conversations of Puopolo, co-defendant Stephen Russo, a/k/a "Moon," separately indicted defendant Joseph Mercurio, a/k/a "Rico," and others.

18. In addition, extensive gambling records were seized pursuant to search warrants of Russo's home/office, with additional gambling records being seized from the Revere Businessmen's Association ("RBA"), which Puopolo operates, providing still another layer of corroboration.

19. For example, the government will prove that John Mousis is a businessman who allegedly owed money to Arthur Gianelli, one of Puopolo's co-defendants in this case. On November 10, 2005, after Gianelli was ordered detained on a prior version of this indictment, Puopolo and Joseph Mercurio, a/k/a "Rico," made an unannounced visit to Mousis's place of business and stated that Mousis was going to have to make payments to them, on Mousis's alleged debt to Gianelli. Both Puopolo and Mercurio present an intimidating physical appearance.

20. On December 21, 2005, Mercurio returned to Mousis's business and demanded that Mousis immediately hand Mercurio $4,500 in cash on that alleged debt. Mercurio insisted that he would not leave without the cash. Mousis was intimidated, and therefore went to his bank, withdrew $4,000 in cash, returned to his business, and handed the $4,000 to Mercurio.

21. After Mercurio collected the $4,000 in cash from Mousis on December 21, 2005, he handed it to Puopolo at the RBA. Puopolo paid Mercurio for making the extortionate collection.

22.    Mercurio returned to Palace Pizza on December 30, 2005, but Mousis was not there. Mercurio insisted that the employees contact Mousis immediately (which they did), and Mercurio then demanded that Mousis come to the store to meet with Mercurio.

23.    Mousis did come to the store, but was accompanied this time by MSP Trooper Pasquale Russolillo, who acted in an undercover capacity, pretending to be a tough guy named "Anthony."

24.    When Mousis and "Anthony" (Trooper Russolillo) met with Mercurio, "Anthony" (Trooper Russolillo) said that Mousis was not going to be paying money any more to Mercurio, and that if anybody was going to get paid, it would be "Anthony." Mercurio replied that he would not leave unless he received money, and added that he had been in prison before. "Anthony" (Trooper Russolillo) -- who himself has an obviously impressive physique -- then asked Mercurio, "Are you trying to intimidate me? What are you going to do? Break my legs or burn the place down?" Mercurio replied, "I'll do whatever those guys tell me to do."

25.    As "Anthony" (Trooper Russolillo) maintained his position that Mousis would not pay any more money to Mercurio, Mercurio asked whether "Anthony" knows "Phil" [Puopolo] from Revere. "Anthony" (Trooper Russolillo) pretended not to know Puopolo, and Mercurio said he would arrange for Phil to call "Anthony." Before Mercurio finally departed, he remarked: "I'll leave when I'm ready to leave, and you haven't seen me get upset yet."

26.    In order to determine Mercurio's true identity, the MSP stopped his car shortly after it drove away. At that point, Mercurio realized that "Anthony" may have been an undercover police officer.

27. On the following day, December 31, 2005, Russolillo (as "Anthony") called Mercurio, who asserted that he believed that "Anthony" was a cop, and added that they could not protect Mousis 24 hours a day. Mercurio said that Phil [Puopolo] and his people are serious.

28. Later on December 31, 2005, Mercurio telephoned Mousis. During that call, Mercurio attempted to portray himself as just a little guy in the picture who was just trying to do a favor for some people, and he indicated that he was upset that he had been set up. However, as Mousis gave a series of non-responsive replies, Mercurio criticized Mousis for having gotten "involved with these type of people" (referring to Puopolo and his associates), adding that doing so was "not fair to your wife and kids." Mercurio also told Mousis:

> The police, they're not watching out for you. *** You shouldn't trust them [the police]. They don't care about you, all they want is the big fish. *** And they're not going to protect you. They're not going to be there every day for you for the rest of your life. *** So why should you help them either?

29. The government will also prove that Puopolo utilized Mercurio to intimidate William Meehan to make payments on a debt.

30. The government will prove Puopolo's illegal gambling operations by testimony from witnesses, recordings of lawfully intercepted telephone conversations, and documents seized pursuant to search warrants.

31. Puopolo's co-defendant Arthur Gianelli was arrested on the evening of January 6, 2005, on the original indictment in this case, which only charged four arson-related counts.

32. Nonetheless, on the following day, January 7, 2005, at 6:04 p.m., Stephen Russo, a/k/a "Moon," who worked in Puopolo's illegal bookmaking business, told a betting "agent" (in an intercepted telephone call) that Gianelli had been arrested and that the agent should tell his customers

Page 8 of 14

not to continue using the offshore gambling website that the Gianelli operation had provided, and that the bettors instead should place their bets by calling Russo at the local telephone number.

33.   In an intercepted conversation on February 7, 2005, at 6:09 p.m. Stephen Russo, a/k/a "Moon," complained to a betting "agent" that one of that agent's customers had called Russo and used the agent's full name over the phone. Russo exclaimed, "What do they think this is? A legal business?!"

34.   In addition, the government will prove that Puopolo personally acted as an intimidating presence to assist a different illegal bookmaking operation (run by Scott Martinelli, James Viglione, and Robert Romboli) in attempting to collect a debt. The Martinelli-Viglione-Romboli gambling operation wanted to be perceived as having "muscle" behind it, and paid Puopolo in cash and by transferring a portion of its business to Puopolo.

35.   The government will also prove that Puopolo illegally operated a video gambling machine business at the RBA. For example, the government will offer witness testimony about cash being paid to winners on the video gambling machines at the RBA (which makes their operation illegal). The testimony will be corroborated by wiretap recordings and documents.

36.   In addition, the government will also prove that Puopolo has engaged in witness tampering with at least two witnesses, at least one of whom lied at Puopolo's request.

Page 9 of 14

## Danger to the Community

37. I understand that Title 18, United States Code, Section 16 defines "crime of violence" as "(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force may be used in the course of committing the offense."

38. Accordingly, the pending indictment charges Puopolo with numerous crimes of violence:

    a. Counts 1 and 2 (conspiracy and substantive racketeering charges);

    b. Count 508 (extortionate extension of credit charge); and

    c. Counts 509, 510, 512, 513, 514, 515, 516, 517, 518, and 519 (conspiracy and substantive extortionate collection of credit charges).

39. Puopolo's violent temperament has been displayed in numerous telephone calls intercepted pursuant to state court authorized wiretap orders.

40. Puopolo has a long history of violence and danger to the community. For example, Puopolo was arrested in 1990 for attempted extortion, threatening, and assault and battery. The victim was a contractor who had engaged a masonry company that did not perform adequately on a job. The contractor paid the masonry company for the work it had done, and then invoked a contractual provision to terminate the masonry company from working on the remainder of the job.

41. Two men then came to the contractor's office, demanded that he pay the masonry company the approximately $60,000 that it would have received if it had worked on the rest of the job, and made threats about what would happen if he did not pay. The contractor was not willing

to pay, and on March 1, 1990, while the contractor was sitting in his car waiting for others to arrive at the job site, Philip Puopolo and another large male walked up to the victim's car. Without warning, Puopolo reached inside the car and hit the victim so hard that the victim's eyeglasses flew into the back seat. Puopolo hit the victim hard again, and as the victim tried to move to the passenger side of his car, the other man opened the passenger door, got into the car, and hit the victim. Puopolo demanded that the victim pay the masonry company, and warned that he knew where the victim lived, knew that the victim had a young child, and knew that the victim's wife was pregnant. Puopolo hit the victim again, cutting open the victim's lip.

42.     When Puopolo and the other male finally walked away, the victim waited briefly and then drove his car in the direction that Puopolo and the other man had walked, in order to see and write down the license plate number on their car. The men saw him, and began following him in their car (which was registered to Puopolo), but the victim drove to the nearest police station, at which point Puopolo drove away. Puopolo was arrested for this incident, and was sentenced to probation including an anger management course.

43.     On July 21, 1998, George Paone was attacked by two individuals, one of whom stabbed Paone. Although Paone knew the two men who attacked him, Paone was uncooperative with the police officers who responded and therefore were unable to make any arrests.

44.     During the course of the current investigation, we learned the identities of the two men who had stabbed Paone. Further, we learned that Philip Puopolo had hired them to shoot Paone in the buttocks, but that when one of the men tried to shoot Paone, his gun misfired, at which point the other assailant stabbed Paone. We further learned that Puopolo paid the assailants for assaulting Paone.

45.    The pending indictment charges Arthur Gianelli and several other defendants -- *not* including Puopolo -- with crimes related to the November 13, 2003 arson near the Big Dog Sports Grille in North Reading, Massachusetts. We are continuing to investigate four as yet uncharged arsons that occurred on November 26, 2003, December 3, 2003, December 6, 2003, and January 15, 2004.

46.    I am aware of intercepted telephone conversations that suggest that Philip Puopolo was involved in one or more of those four uncharged arsons.

47.    During 2005, the federal grand jury investigating those four uncharged arsons subpoenaed Tony Raymond, a close associate of Philip Puopolo, and sought Raymond's testimony about those uncharged arsons. We believe that Raymond was involved in one or more of those arsons, along with Puopolo. The government obtained a court order providing Tony Raymond with statutory use and derivative use immunity, but Raymond refused to testify, even after being held in civil contempt of court. Raymond was eventually indicted and convicted of criminal contempt for defying the Court's order to testify.

48.    Puopolo has been subject since May 17, 2000 to a permanent restraining order that prohibits him from abusing, contacting, or coming within 100 yards of a child that Puopolo fathered in 1999. Puopolo was very upset that the child was not aborted, and became verbally abusive to the mother and the child.

## Witness Tampering

49.   Puopolo already is charged in the indictment with two (2) counts of witness tampering.

50.   Certain other witnesses who provided testimony in the grand jury that was implausible and/or inconsistent with other credible evidence admitted that they had discussed with Philip Puopolo how they should testify in the grand jury. I believe that these witnesses' testimony was influenced by Puopolo.

51.   Because of Puopolo's intimidating appearance and reputation, and because he had already illegally tampered with at least two witnesses, I believe that he will engage in further witness tampering if released pending trial of this case.

## Risk of Flight

52.   Puopolo poses a substantial risk of flight. He is facing substantial prison time, with strong evidence against him.

53.   Puopolo is not married, and lives alone.

54.   Puopolo has earned all or at least most of his income illegally and has bragged about never having done a day of (lawful) work.

55.   I am not aware of Puopolo having any lawful income.

## Inadequacy and Disobedience of Conditions of Release

56.     It is clear that defendant Philip Puopolo will disobey any Court orders regarding Conditions of Release.

57.     Puopolo has closely followed the prosecution thus far of Arthur Gianelli, and has stated that he (Puopolo) expected to be arrested as well. Nonetheless, evidence seized incident to Puopolo's arrest on September 19, 2006 shows that Puopolo has continued his illegal activities right up to the time of his arrest. Among the items found were $2,577 in cash -- including twenty-four (24) $100 bills -- and a document containing what obviously are entries related to Puopolo's illegal bookmaking business.

58.     Puopolo has a history of disobeying court orders and failing to appear when required in court, and he has been and currently is committing contempt of court by failing to pay child support ($150 per week) to a child that he fathered. In fact, just a week or two before his September 19, 2006 arrest on the indictment in this case, Puopolo paid $2,000 in cash toward his child support arrearage, but still owed approximately $1,000. He agreed to immediately resume paying $150 per week and to pay the outstanding $1,000 at the next scheduled court date of December 12, 2006. However, Puopolo promptly reneged on making the weekly child support payments and now owes more than $1,400.

59.     Although Puopolo has been failing to make his weekly $150 child support payments, Puopolo had more than $2,500 -- including twenty-four (24) $100 bills -- in his pocket when he was arrested on this indictment on September 19, 2006.

60.     Because of Puopolo's failures to appear and arrearages, his driver's license was suspended.

61.   I have confirmed that the suspension of Puopolo's license continues to the present.

62.   Nonetheless, on September 19, 2006, when I waited by a social club that Puopolo frequents, in order to arrest him on the arrest warrant in this case, I observed Puopolo arrive, driving a white Cadillac registered to him.

63.   In sum, I fully expect that just as his co-defendant Arthur Gianelli did earlier in this prosecution, Puopolo will violate release conditions if he is not ordered detained.

## Conclusion

64.   For the foregoing reasons, I believe that there is no condition or combination of conditions for defendant Philip Puopolo that will ensure his appearance at trial, that will ensure the safety of witnesses and the community, and that will ensure that defendant Puopolo does not engage in further witness tampering and other efforts to obstruct justice.

65.   Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 21, 2006.

Trooper Nunzio S. Orlando
Massachusetts State Police