UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| V. | ) |
| | ) |
| ARTHUR GIANELLI, | ) |
| MARYANN GIANELLI, | ) |
| FRANK IACOBONI, | )    Criminal No: 05-10003-NMG |
| PHILIP PUOPOLO, | ) |
| DENNIS ALBERTELLI, | ) |
| RANDY ALBERTELLI, | ) |
| GISELE ALBERTELLI, | ) |
| SALVATORE RAMASCI, | ) |
| RAFIA FEGHI, and | ) |
| JOSEPH YERARDI. | ) |

_____)

## MOTION TO SUPPRESS FRUITS OF WIRETAP WARRANTS AND MEMORANDUM OF LAW[1]

"By its very nature eavesdropping involves an intrusion on privacy that is broad in scope [and] indiscriminate use of such devices raises grave constitutional questions under the Fourth and Fifth Amendments, and imposes a heavier responsibility on this Court in its supervision of the fairness of the procedures…." Berger v. New York, 388 U.S. 41, 56 (1967)(citation and internal quotation marks omitted). In light of this vast intrusion, neither statutory nor constitutional law permits wiretapping in ordinary investigations. Instead, the government may obtain a warrant for electronic surveillance only in an appropriate – i.e., rare -- case. See United States v. Hoffman, 832 F.2d 1299, 1307 (1st Cir. 1987)("in a society which values privacy and the rights of the individual, wiretapping is to be distinctly the exception and not the rule.")

_____

[1] Defendants will file a hard-copy courtesy copy to His Honor along with hard-copies of all exhibits.

Nevertheless, in the investigation leading up to the pending indictments,[2] investigators, short on probable cause, launched far too quickly into this most invasive type of investigation.  For a variety of reasons discussed in more detail below, Defendants Arthur Gianelli, Maryann Gianelli, Frank Iacoboni, Philip Puopolo, Dennis Albertelli, Randy Albertelli, Gisele Albertelli, Salvatore Ramasci, Rafia Feghi and Joseph Yerardi respectfully request that this Honorable Court order that the fruits of those wiretaps be suppressed.

## I. <u>STANDARD TO OBTAIN WIRETAP</u>

Before turning to the facts of this particular case, Defendants set forth the standards police must meet before obtaining a wiretap warrant.

Federal law sets the minimum standards for the issuance of wiretap warrants. Specifically, Title III of the Omnibus Crime Control and Safe Streets Act, codified at 18 U.S.C. § 2510, <u>et</u> <u>seq.</u> ("Title III"), generally prohibits the use of electronic surveillance except under expressly delineated exceptions, and even then, only upon judicial approval. <u>See</u> <u>United States v. Giordano</u>, 416 U.S. 505, 514 (1976).  The Supreme Judicial Court has held that the Section 99 is more stringent than the federal statute.  <u>Commonwealth v.</u> <u>Vitello</u>, 367 Mass. 224, 251 n.15 (1975).

Before wiretap evidence may be admitted in any proceeding, the wiretap order must have complied with Title III, 18 U.S.C. §§ 2510, et seq.  Section 2515 states that neither intercepted communications nor evidence derived therefrom may be admitted into evidence "if the disclosure of that information would be in violation of [the federal

---

[2] The Second Superseding Indictment alleges that Defendants committed a number of offenses, including RICO, RICO conspiracy, illegal gaming, money laundering, extortion, and arson.

wiretap statute]."  18 U.S.C. § 2515.  Disclosure is permitted only where communications

or evidence were "intercepted in accordance with the provisions of [Title III]."[3]  Title III

outlines the requirements for obtaining a State court wiretap order at 18 U.S.C. § 2516(2).

The requirements include that the state court judge issue the order only if the application

conforms to both 18 U.S.C. §2518 **and** "the applicable State statute."  18 U.S.C. §

2516(2).[4]  Compliance with the applicable State statute is particularly important where

---

[3] 18 U.S.C. § 2517(3) states:

> Any person who has received, by any means authorized by this chapter,
> any information concerning a wire, oral, or electronic communication, or
> evidence derived therefrom intercepted in accordance with the provisions
> of this chapter may disclose the contents of that communication or such
> derivative evidence while giving testimony under oath or affirmation in
> any proceeding held under the authority of the United States or of any
> State or political subdivision thereof.

[4] Paragraph (2) states in full:

> The principal prosecuting attorney of any State, or the principal
> prosecuting attorney of any political subdivision thereof, if such attorney
> is authorized by a statute of that State to make application to a State court
> judge of competent jurisdiction for an order authorizing or approving the
> interception of wire, oral, or electronic communications, may apply to
> such judge for, and *such judge may grant in conformity with section
> 2518 of this chapter and with the applicable State statute* an order
> authorizing, or approving the interception of wire, oral or electronic
> communications by investigative or law enforcement officers having
> responsibility for the investigation of the offense as to which the
> application is made, when such interception may provide or has provided
> evidence of the commission of the offense of murder, kidnapping,
> gambling, robbery, bribery, extortion, or dealing in narcotic drugs,
> marihuana or other dangerous drugs, or other crime dangerous to life,
> limb, or property, and punishable by imprisonment for more than one year,
> designated in any applicable State statute authorizing such interception, or
> any conspiracy to commit any of the foregoing offenses.

18 U.S.C. § 2516(2)(emphasis added).

the State statute is more stringent than Title III.[5]  Here, the wiretap order did not conform

to the applicable State statute and, therefore, was unlawful.

Title III permits states to pass legislation authorizing wiretap warrants; a state

may not, however, adopt standards that are more lenient than those in Title III.  See 18

U.S.C. § 2516(2) (outlining requirements for detaining wiretap warrant issued by state

court) Commonwealth v. Vitello, 367 Mass. 224, 247 (1975).  The Massachusetts wiretap

statute is codified at 272 M.G.L. § 99 ("Section 99").  Like Title III, Section 99

proscribes the warrantless interception of certain communications except in explicit

statutory circumstances, and only upon judicial approval.  See id.

Title III requires that an application for a wiretap warrant conforms to both Title

III *and* "the applicable State statute." 18 U.S.C. § 2516(2).  Both Title III and Section 99

command that wiretap applicants strictly comply with a number of statutory and

constitutional requirements, several of which are relevant here:

First, Section 99 applies to only oral and wire communications, which are

expressly defined. Title III, however, applies to a broader range of expressly defined

communications.

---

[5] In United States v. Marion, 535 F.2d 697 (2d Cir. 1976), the Second Circuit stated:

> Whether the proceedings be federal or state, interpretation of a state
> wiretap statute can never be controlling where it might impose
> requirements less stringent than the controlling standard of Title III. If a
> state should set forth procedures more exacting than those of the federal
> statute, however, the validity of the interceptions and the orders of
> authorization by which they were made would have to comply with that
> test as well.

Id. at 702.

Second, Title III provides that only the "principal prosecuting attorney" of the state or "the principal prosecuting attorney of any political subdivision thereof" may apply for a state order authorizing a wiretap. 18 U.S.C. § 2516(2). Section 99 in turn provides that only the attorney general, specifically designated assistant attorneys general, district attorneys or specially designated assistant district attorneys may apply for a wiretap order. G.L. c. 272, § 99F1. This requirement is designed to ensure that wiretaps are used with restraint and in accordance with uniform law enforcement policy. See Vitello, supra at 255-56.

Third, Title III and Section 99 provide that wiretap orders may be issued only in investigations of specific, designated offenses. See 18 U.S.C. § 2516(2); M.G.L. c. 272, § 99B7. In gaming investigations, Section 99 permits wiretapping only in cases involving alleged violations of G.L. c. 271, § 17, which generally proscribes keeping a place where bets are registered.

Fourth, both Title III and Section 99 require wiretap applicants to establish probable cause to believe that a designated offense has been or is being committed and that evidence of such will be found by intercepting communications over the target telephone(s). See 18 U.S.C. § 2518(1)(b); M.G.L. c. 272, § 99E2

Fifth, both Title III and Section 99 require wiretap applications to show that normal and less intrusive investigative procedures have been tried and failed or reasonably appear unlikely to succeed if tried (the "necessity" requirement). See 18 U.S.C. § 2518(3)(c) MG.L. c. 272, § 99E3. In other words, wiretap applicants must show that they are not seeking wiretaps as a preliminary investigative measure. See Vitello, supra at 259. This requirement is "constitutionally compelled because requiring the

government to persuade a court that conventional methods of investigation are not likely to succeed or are too dangerous require a showing of a form of the 'exigent circumstances' that must be made to render a search 'reasonable' in the absence of the pre-search notice that is ordinarily required by the Fourth Amendment,' but is imposed as a matter of constitutional law." United States v. Salemme, 91 F.Supp.2d 141, 365 (D. Mass. 1999), rev'd in part on other grounds, 225 F3d 78 (1st Cir. 2000).

## II. **BACKGROUND**

Below, Defendants set forth the relevant procedural history and allegations pertinent to the legal issues raised herein.

### A. Procedural History

The investigation which led to the instant indictment was initiated by the Special Service Section of the Massachusetts State Police. Troopers Nunzio Orlando and Pasquale Russolillo were the lead investigators.

On October 31, 2003, Essex Court Assistant District Attorneys John Dawley, Brian O'Keefe, and Alexander Cain ("Essex ADAs") applied for and obtained a warrant authorizing them to intercept wire communications over three cellular telephones. In support of their application, the Essex ADAs submitted an affidavit signed by Orlando. See Exh. A (affidavit); B (application). Orlando alleged that based on his "training and experience, the reliable information … received from two confidential informants, [his] own first-hand knowledge, and an analysis of billing and toll records for specific telephone numbers, … [he believed] there [was] probable cause to believe that Arthur Gianelli, Dennis Albertelli, Salvatore Ramasci, and other persons as yet unknown are part of a highly organized and sophisticated group engaged in a continuing conspiracy to

commit violations of the Massachusetts gaming statute, G.L. c. 271, § 17." Exh. A, ¶ 3.

Orlando further alleged that he had probable cause to believe that the target telephones

(two cellular telephones used by Albertelli[6] and a cellular telephone used by Ramasci)

were being used in connection with that conspiracy. Id., ¶ 4.

      As for who authorized its filing, the application stated:

> We [the Essex ADAs] are the Assistant District Attorneys
> within the meaning of General Laws Chapter 272, Section
> 99(F)(1) in that, by means of a letter dated October 29,
> 2003, the duly elected District Attorney for the Eastern
> District of the Commonwealth of Massachusetts, has
> specially designated us to make application ex parte to a
> judge of competent jurisdiction for an order and warrant to
> intercept wire communications pursuant to the provisions
> of Massachusetts General Laws, Chapter 272, Section 99.
>
>           ***
>
> As set forth previously, District Attorney Blodgett has
> specially designated these applicants to act in this
> supervisory capacity and has delegated to these applicants
> the responsibility of supervising the execution of the
> requested wiretap warrant, should it be issued.  Further, as
> set forth in the aforementioned letter, the District Attorney
> has authorized these applicants to personally make
> presentment to the Court of this application, as well as all
> extension and renewal applications, all amendment
> applications, all status reports, and all return documents
> emanating from the requested wiretap warrant, all of which
> shall have been reviewed by District Attorney Blodgett or
> his designee before being presented by these applicants.

Exh. B.  Similar language appears in each successive application, although the Essex

ADA's submitted only one letter from District Attorney Blodgett which purported to

authorize the ADAs to apply for the many wiretap warrants.  See Exh. C.  The Essex

ADAs signed the October 31, 2003 application (and each successive one) but District

Attorney Blodgett did not.

---

[6] "Albertelli" refers to Defendant Dennis Albertelli.

That same day, a Justice of the Essex Superior Court granted the application and issued a warrant authorizing the interception of calls over the Albertelli and Ramasci cellular telephones.

Relying upon communications intercepted during the execution of the first wiretap, on November 13 and 26, 2003, the Essex ADAs sought and obtained a renewal wiretap warrant for the Albertelli cellular telephones and an additional cellular telephone. Again, the Essex ADAs and Orlando alleged they had probable cause to believe that Albertelli, Ramasci, Gianelli, "and other persons whose identities are as of yet unknown" were conspiring to violate G.L. c. 271, § 17.

On December 12 and 23, 2003, the Essex ADAs sought and obtained renewal warrants, claiming probable cause to believe that Gianelli, Albertelli, and Ramasci were using three cellular telephones in furtherance of a conspiracy to violate not just G.L. c. 271, § 17, but also M.G.L. c. 266, § 2 (arson).

On December 31, 2003, the Essex ADAs filed another renewal application, alleging they had probable cause to believe that the same targets were using two cellular telephones in connection with a new offense -- and one which is not designated under the wiretap statute -- M.G.L. c. 271, § 17A (proscribing registering and placing bets over the telephone, a misdemeanor with a maximum sentence of one year).  See Exh. D.  That same day, a Justice of the Essex Superior Court issued a wiretap order, purporting to authorize the State Police to intercept wire communications concerning such a conspiracy.  See Exh. E.

On January 9, 2004, the Essex ADAs filed another renewal application, alleging they had probable cause to believe that targets Albertelli, Ramasci, Gianelli, Robert

8

Romboli, and James Viglione were conspiring to violate M.G.L. c. 271, § 17A as well as M.G.L. c. 94C, § 34 (unlawful possession of narcotics) and that evidence of such would be intercepted over five cellular telephones. That same day, the Court issued the requested warrant.

On January 24, 2004, the Essex ADAs again sought and obtained a wiretap warrant authorizing interception of calls made on six cellular telephones, for alleged conspiracies to violate M.G.L. c. 271, § 17A and M.G.L. c. 94C, § 34, by targets Albertelli, Ramasci, Gianelli, Romboli, Viglione, Scott Martinelli, and Robert Raffael.

On February 10 and 25, 2004, the Essex ADAs sought and obtained renewal warrants, again alleging probable cause to believe that Albertelli, Ramasci, and Gianelli were using certain cellular telephones in a conspiracy to violate M.G.L. c. 271, § 17A and 94C, § 34.

Between November 18, 2004 and February 28, 2005, several ADAs in Middlesex County applied for and obtained fifteen wiretap warrants seeking to intercept communications involving, among others, Defendants Puopolo and Russo. These applications and orders are discussed in more detail infra.

### B. Allegations of Probable Cause [7] in Essex County Application and Affidavit    Dated October 31, 2003

As for probable cause to believe that theEssex County targets were violating M.G.L. c. 271, § 17, Orlando alleged[8] the following:

In 1991, Gianelli was intercepted in a wiretap investigation, which "clearly proved that [he] was a bookmaker." Also in 1991, Orlando alleges, Gianelli was

---

[7] Allegations pertaining to only the first application are set forth here.

[8] Defendants in no way concede that any of Orlando's allegations are true.

"involved in an elaborate illegal video poker machine business in which he is still involved today." Exh. A, ¶ 21. In 2003, Massachusetts State Trooper Timothy Foley claims to have learned that Gianelli had "three video poker machines used explicitly for gaming purposes, situated inside Big Lou's restaurant in Revere." Id. An informant (CI-2, discussed below) told Orlando that Gianelli also had video poker machines inside the East Side Athletic Club in Malden. Orlando alleged that the video poker machines "are not used for entertainment purposes only. Rather, they are used as a source of illegal gaming." Id.

In July of 2001, Orlando and Russolillo learned from an informant (CI-1, discussed below) that Gianelli ran a "high-stakes card game once a month at the Revere Businessmen's Association (RBA) in Revere, Masschusetts. The information indicated that the card games were previously held at Gianelli's home in Lynnfield; [sic] but had grown to be quite large, which prompted Gianelli to move the card games to the private club (RBA)…." Id., ¶ 22.

As for more recent allegations, Orlando's affidavit relied heavily upon two confidential informants, CI-1 and CI-2, both of whom Orlando alleged had long-standing ties to illegal gaming and, over the course of many years, had placed bets with a number of different bookmakers in the Boston area. Id., ¶¶ 26; 37. Orlando also alleged that CI-1 "has expressed a deep fear of being identified by Gianelli or his associates" and that he has provided "information on the condition that his/her identity remain secret." Id., ¶ 34. He also alleged that CI-1 had provided reliable information in the past, had allowed police to observe him meeting with various bookmakers, and had

allowed investigators to listen to gaming-related conversations with bookmakers and/or loansharks. Id. Orlando made similar allegations as to CI-2. Id., ¶ ¶ 35-36.

CI-1 told Orlando that he had a gaming relationship with Gianelli, "who runs one of the largest gaming organizations in Massachussetts" and that Gianelli still associates with Defendant Joseph Yerardi, who at the time was serving a federal sentence for illegal gaming, loan sharking, and money laundering. Id., ¶ 27. In fact, CI-1 alleged, many of Gianelli's agents and bettors were Yerardi's former clientele. Id.

CI-1 reported that he dealt primarily with Gianelli, who he contacted via beeper, and Albertelli, who he contacted over the Albertelli target cellular telephone. Id. According to CI-1, Albertelli is "one of Gianelli's most trusted associates, who he/she believes may actually be a partner in Gianelli's organization." Id., ¶ 30. CI-1 dealt with Ramasci to settle his gaming debts, calling him on the Ramasci cellular target telephone. Id., ¶ 32. CI-1 also reported that Philip Puopolo (a defendant), Stephen Russo (also a defendant), Michael Goudie, and Ronald Heerter (all of whom Orlando and Russolillo knew to be involved in gaming) were agents of Gianelli's. Id., ¶ 27.

At some unspecified time, Gianelli personally gave CI-1 the 1-800 telephone number to an off-shore gaming office as well as his personal beeper number. CI-1 reported that "[f]rom here-on-in all of Gianelli's customers would be required to contact an off-shore gaming office to retrieve betting lines, and subsequently submit their wagers." Id., ¶ 29. C1-1 claimed to have had quite a lengthy conversation with Gianelli where Gianelli confided in him the many reasons why he decided to change from local and area bookmaking offices to an off-shore one. Specifically, CI-1 said that Gianelli told him that "using an off-shore service will eliminate any salaries he had to pay his

clerks; rental payments he was required to make to maintain a secret gaming office(s); telephone expenses; equipment costs (i.e., computers, paper, pencils, calculators etc….); and other related expenses.  Although the latter financial benefits were specifically mentioned by Gianelli, CI-1 said protecting his gaming organization from law enforcement detection was his biggest motivation for making the transition.  Gianelli clearly feels that his gaming office is now out of reach, and therefore safe from being discovered."  Id., ¶ 29.

CI-1 reported that, since Gianelli gave him the telephone number for the off-shore office, CI-1 uses it almost daily to place bets.  During one of those calls, CI-1 permitted Orlando to listen in as he retrieved the betting "lines" and made wagers.  Id., ¶ 33.

CI-1 told Orlando that the 1-800 number was used only to get lines and place bets and that "[o]ther facets of the gambling operation, such as resolving discrepancies, settling outstanding balances, discussing gaming issues and voicing complaints, are handled locally by Gianelli, Albertelli, and Ramasci."  Id., ¶ 33.  From this, Orlando concluded, "although Gianelli has moved the location of his central gaming office to a foreign soil, he must still interact and communicate with his agents and/or bettors regularly in Massachusetts to finalize their gaming activities."  To that end, CI-1 personally met with Gianelli on a number of occasions to resolve gaming-related issues and met with Ramasci to pay gaming debts and to collect winnings.  Id., ¶ 34.

CI-2 claimed he had "been involved in an illegal gaming relationship with Gianelli for an extended period of time" and that "Gianelli had advised CI-2 that the betting lines and wagering services will be handled by an off-shore bookmaking office known as `Duke Sports,' and which utilizes telephone numbered (800) 567-6993.  Since

being provided with this new telephone number, CI-2 has contacted `Duke Sports' to

retrieve betting lines and place bets on athletic contests on an almost daily basis.

According to CI-2, 'Duke Sports' role is limited to the dissemination of betting lines and

the registering of bets.  All other gambling related transactions such as payments,

collections, and the resolution of disputes are all handled by Gianelli and his entrusted

staff."  Id., ¶ 39.  "CI-2 went on to say that Gianelli has chosen to go this route because

he fears being apprehended by Massachusetts authorities.  Gianelli feels a sense of

security with the off-shore system."  Id., ¶ 38.

CI-2 dealt with Albertelli to resolve gaming conflicts, calling one of the target

telephones.  Id., ¶ 40.  He met with Ramasci to pay debts and collect winnings, after

setting up meetings over one of the target telephones.  CI-2 also reported calling Gianelli

on his home telephone regarding gaming issues.  Id.  However, "[t]he overwhelming

majority of gaming related conversations have been between CI-2 and Albertelli, and/or

CI-2 and Ramasci.  Nevertheless, Gianelli controls the operation and prefers to have

Albertelli and Ramasci handle the day to day activities, so that he (Gianelli) remains

somewhat insulated from detection."  Id.

### C. Allegations Regarding Necessity of Wiretapping in October 31, 2003 Affidavit

As set forth above (and addressed in more detail infra), Orlando was bound by

statute and constitution to show that normal and less intrusive investigative procedures

were tried and failed or that they reasonably appeared unlikely to succeed.  In that vein,

Orlando alleged as follows:

Although Orlando had gleaned a significant amount of information from CI-1 and

CI-2, he claimed that informants were of limited utility because they "are unable to

penetrate into the organization to any significant degree." Id., ¶ 69. Moreover, Orlando opined, "these informants do not possess sufficient first-hand information, through which the continued exclusive reliance on information received from them in conjunction with other normal investigative procedures is likely to result in the achievement of the goals of this investigation." Id. Also, Orlando claimed, both CI-1 and CI-2 insisted on anonymity because they feared Gianelli and his associates. Id.

As to physical surveillance (which Orlando discounted as a useful tool), Orlando's affidavit describes several instances where he or others observed or followed Gianelli. In the first instance, Orlando alleges that in July, 2001, he and Russolillo, having received information from CI-1 that Gianelli would be an "a high-stakes card game" at the RBA, observed Gianelli arrive at the RBA and saw an unidentified man greeting people at the back door and appearing to guard the entrance. Based upon these observations, Orlando opined "that the RBA was being used by Gianelli and his associates to conduct a high stakes card game." Id., ¶ 22.

On January 30, 2002, Russolillo and Orlando observed Gianelli sitting in his parked car in the parking lot of a bar. As Russolillo and Orlando approached him, Gianelli appeared nervous, then reached over to lock a briefcase sitting on the front seat. When asked why he was sitting in his parked car, Gianelli told Russolillo and Orlando that he was waiting for his friend "Phil," who the officers surmised was Phil Puopolo, allegedly known "to be affiliated in certain illegal gaming endeavors." Orlando concluded from these observations that "Gianelli was likely meeting someone to facilitate an illegal gaming transaction." Id. ¶ 23. (Orlando claims that he later learned from CI-1

that "Gianelli admitted having $8,000 inside the briefcase.  Furthermore, this money was owed to Puopolo for outstanding gambling debts."  Id., ¶ 23.)

On April 30, 2003, Foley and Orlando saw Gianelli exit Big Lou's carrying what looked like a large yellow tool box.  Orlando alleges that "Gianelli, who was dapperly dressed, went directly to his trunk and placed the container inside.  He then entered his vehicle and drove away."  Id., ¶ 21.  Foley and Orlando then followed Gianelli to the East Side Athletic Club in Malden, where Gianelli parked his car and entered the Club. Orlando opined "that Gianelli went to Big Lou's, and later to the East Side Athletic Club, to monitor the activity and/or collect proceeds related to his illegal poker machines."  Id. In April of 2003, Foley again observed Gianelli's car in the parking lot of Big Lou's. Foley followed Gianelli after he left Big Lou's but lost him in traffic.  Id., ¶ 59.

In September of 2003, CI-1 told Orlando that Gianelli was leaving the RBA to meet Albertelli.  Orlando followed Gianelli on the Massachusetts Turnpike and saw him take the exit ramp which led to Route 495; Orlando believed that he was headed towards Albertelli's home in Stow.  Orlando claims he terminated the surveillance because he "noticed Gianelli peering in rearview mirror."  Id., ¶ 48.

On October 17, 2003, a confidential informant – neither CI-1 nor CI-2 – told Orlando and Russolillo that Gianelli was at the RBA "meeting some of his agents and/or bettors."  ¶ 60.  Foley observed Gianelli's car parked in front of the RBA as well as  cars registered to Puopolo, Louis Foti, a convicted bookmaker, and Gregory Tzannos, who had been arrested for gaming violations.  Foley later followed Gianelli to his home. Id., ¶ 60.

On October 23, 2003, Foley saw Gianelli driving at a high rate of speed on Main Street in Lynnfield, headed towards North Reading. Orlando claims that Foley "was unable to safely follow Gianelli and subsequently terminated the surveillance." Id., ¶ 61.

At unspecified times, the State Police successfully held watch as CI-1 and/or CI-2 met with Gianelli, Albertelli, and/or Ramasci to pay or collect gaming money. Id., ¶ 57.

Despite the numerous successful attempts at physical surveillance, Orlando claimed that this normal investigative measure was not sufficiently fruitful because "[p]ast surveillance of Arthur Gianelli, Dennis Albertelli, and Salvatore Ramasci have shown that they employ counter-surveillance techniques in the event they are being followed. They have been observed by members of the Special Service Section making abrupt stops, acceleration to great speeds, and otherwise operating in such a manner that poses too great a risk of the surveillance being exposed." Id., ¶ 72.

Orlando and Russolillo availed themselves only of one other less invasive tool, analyzing telephone records for the target telephones. Alleging that there were between 2,000 and 3,000 calls on the telephones over a three month time span, Orlando opined that "this voluminous number of calls is indicative of an individual involved in illegal gaming." Id., ¶ 47A-C. Moreover, Orlando alleged, the analysis revealed that the target telephones were used to call several known bookmakers and agents. Id., ¶ 49-53. Nevertheless, Orlando complained that this investigation tool was insufficient because "review of telephone toll records has provided only limited identification of certain individuals placing calls to and receiving calls from the target telephones. Furthermore, …review of the toll records does not reveal the full nature or purpose of the communications." Id. ¶ 73

The manner in which the investigation was conducted, and the use of normal investigative techniques, is discussed further infra.

**III ARGUMENT**

As discussed below, the wiretap warrants failed to comply with Section 99 and Title III in five regards:

- First, the October 31, 2003[9] warrant was issued in violation of the necessity requirement;

- Second,  the wiretap applications, starting with the first, failed to demonstrate that that the applications were properly authorized either by the Essex County District Attorney or the Middlesex County District Attorney;

- Third, the first Essex County warrant[10] was issued without probable cause to believe that the targets violated the designated offense specified in the application and warrant;

- Fourth,  the December 31, 2003 warrant was issued for an offense not designated in Section 99; and

- Fifth, Section 99 does not give state courts the authority to issue a wiretap warrant for cellular telephones.

---

[9] This argument is equally applicable to each successive warrant affidavit, each of which essentially repeats the same allegations.
[10] This argument is equally applicable to many of the successive warrants.

Because the warrants failed to meet strict statutory requirements which directly and substantially implicate the plain legislative intent to limit the use of wiretapping, all evidence derived from the warrants must be suppressed.  See Giordano, 416 U.S. 505.

**D.  The First Essex County Wiretap Application Failed To Meet The Necessity Requirement.**

Orlando alleged that a wiretap was appropriate because, inter alia, it "will provide the *best available means* of identifying, apprehending and prosecuting all the members of this organization and achieving all of the goals of this investigation." Exh. A, ¶ 71 (emphasis added).  But the salient inquiry is not whether wiretapping is "the best available means" of conducting an investigation -- it goes without saying that wiretapping will almost always be the best means of obtaining evidence of an on-going conspiracy. But that is not enough to satisfy Section 99 and Title III, which permit wiretapping only in rare cases and are designed to "safeguard against the use of wiretapping as an initial step in the investigative process."  United States v. Mora, 623 F.Supp. 354, 361 (D.Mass. 1985), aff'd, 821 F. 2d 860 (1st Cir. 1987).

In enacting the necessity provision, Congress "evinced the clear intent to make doubly sure that the statutory authority be used with restraint .... These procedures were not to be routinely employed as the initial step in criminal investigation."  Giordano, 416 U.S. at 515.  Instead, investigators are "required to make a reasonable, good faith effort to run the gamut of normal investigative procedures…."  United States v. Ashley, 876 F.2d 1069, 1072 (1st Cir. 1989)(citation omitted).  Thus, a court may not authorize a wiretap if "traditional investigative techniques would suffice to expose the crime."  Commonwealth v. Fenderson, 410 Mass. 82, 83 (1991), citing United States v. Kahn, 415 U.S. 143, 153 n. 12 (1974).  To satisfy the necessity provision, "the government *must explain fully* in its

application what investigative techniques have been tried against the target of the

wiretap." United States v. Castillo-Garcia, 117 F.3d 1179, 1187 (10th Cir.), cert. den., 522

U.S. 962 (1997) (emphasis added), overruled on other grounds, United States v. Ramirez-

Encarnacion, 291 F.3d 1219 (10th Cir. 1992).

    In determining whether Orlando's affidavit meets these standards, this Court need

not credit Orlando's personal opinion that his affidavit meets the necessity requirement.

See Exh, A, ¶ 68; compare Fenderson, 410 Mass. at 86 n. 4 (declining to hold that police

expertise can be taken into account regarding sufficiency of allegations concerning

necessity and explaining that allegations pertaining to use of normal investigative

techniques "were not the type of facts which have particular significance to an expert, not

apparent from common knowledge and experience….")(citation omitted).

    And, of course, evidence obtained in violation of the necessity requirement must

be suppressed.  See Castillo-Garcia, 117 F.3d at 1185.

1. **Orlando's Description Of Investigative Goals Is Misleading.**

    According to Orlando, the investigation had lofty and far-reaching goals:

> Based on the facts and information set forth herein, and my
> training and experience, I have formed the opinion that the
> bookmaking operation/organization under investigation
> includes numerous persons other than Arthur Gianelli,
> Dennis Albertelli, and Salvatore Ramasci, who carry out a
> variety of functions for the organization.  A primary goal of
> this investigation is to penetrate the bookmaking operation
> and conspiracy described in this affidavit, and to identify,
> apprehend, and bring about the successful prosecution of
> those persons involved at all levels of this organization and
> conspiracy, including persons other than Arthur Gianelli,
> Dennis Albertelli, and Salvatore Ramasci, such as the
> `street bookies,' persons operating 'local gaming offices,'
> persons operating `area bookmaking offices,' and persons
> at higher levels of the organization.  It is also the goal of
> this investigation to identify, apprehend, and prosecute all
> of these persons and to trace the manner in which the

> proceeds of the bookmaking operation have been, and are
> being spent, stored or invested, and to seize and seek
> forfeiture of those proceeds pursuant to G.L. c. 276, § 1-7.

Exh. A, ¶ 67.  Orlando also claims that "[i]t is the goal of this investigation to infiltrate

Gianelli's organization, identify his associates, discover and exploit his association with

members of the LCN [La Cosa Nostra], and to ultimately dismantle his criminal

enterprise."  Id., ¶ 46.

There can be no doubt that these purported goals are nothing but canned

boilerplate.  In fact, Trooper Orlando echoed these same purported goals in wiretap

affidavits dated November 20, 2002 and November 2, 2005, both of which were filed in

Middlesex Superior Court.  See Exh. P (excerpt of affidavit), Para. 52 ("Based on the

facts and information set forth herein, and my training and experience, I have formed the

opinion that the bookmaking operation/organization under investigation includes

numerous persons other than [the targets] who carry out a variety of functions for the

organization.  A primary goal of this investigation is to penetrate the bookmaking

operation and conspiracy described in this affidavit, and to identify, apprehend, and bring

about the successful prosecution of those persons involved at all levels of this

organization and conspiracy, including persons other than [the targets], such as the `street

bookies,' persons operating 'local gaming offices,' persons operating `area bookmaking

offices,' and persons at higher levels of the organization.  It is also the goal of this

investigation to identify, apprehend, and prosecute all of these persons and to trace the

manner in which the proceeds of the bookmaking operation have been, and are being

spent, stored or invested, and to seize and seek forfeiture of those proceeds pursuant to

G.L. c. 276, § 1-7."); see also Exh. Q, Para. 86 (same in all material respects).  Trooper

Russolillo also made the identical, verbatim claims in an affidavit in support of an

application for a wiretap warrant on January 13, 2000 in Essex Superior Court . See Exh.

O (excerpt of affidavit), Para. 78  ("A primary goal of this investigation is to penetrate

[the target's] bookmaking operation and conspiracy and to identify, apprehend, and bring

about the successful prosecution of those person involved at all levels of this organization

and conspiracy, including those persons other than just [the targets] such as `street

bookies,' the persons operating 'local gaming offices,' the persons operating 'area

bookmaking offices,' and the persons at higher levels of the organization.  It is the goal of

this investigation to trace the manner in which the proceeds of the bookmaking operation

have been, and are being spent, stored or invested, and to seize and seek forfeiture of

these proceeds pursuant to G.L. c. 276 section 1-7.")

     In this case, Orlando exaggerated the investigation's true goal for good reason:

by erecting insurmountable hurdles, he repeatedly invoked his sweeping goals for each

and every less-intrusive measure, then repeatedly rejected any and all measures short of

wiretapping.  See Exh. A ¶ 68 (alleging that use of normal investigative procedures

would not allow police to (1) identify all person who participate in the alleged

conspiracy; (2) expose the full scope of the co-conspirators' gaming activities; (3) locate,

seize, and forfeit gaming proceeds; and (4) obtain competent evidence of organization's

activities); ¶ 69 (alleging that informants would not accomplish broadly described goals);

¶ 70 (alleging that execution of search warrants and/or approaching targets would "lead

to the identification of all the participants in the various levels of the organization and

achieve the other goals of this investigation"); ¶ 71 (alleging that undercover police

officer would not be able to infiltrate conspiracy at high enough level to fulfill goals); ¶

72 (alleging that "while physical surveillance might identify some other persons with whom [the targets] associate, this information, without more, is not likely to bring about the achievement of the goals of this investigation."); ¶ 73 (alleging that telephone analysis will not "identify fully the members of this entire organization and otherwise achieve the goals of this investigation").   But this Court should not credit Orlando's misleading allegations as to the true necessity of wiretapping by the recitation of overstated goals which are utterly unattainable, even with a wiretap.

In any event, it is abundantly clear that Orlando vastly overstated and misrepresented the investigation's true goals.  Indeed, according to Orlando's affidavit, one of the goals was to successfully prosecute those in charge of street bookies, and those in charge of local and area bookmaking offices.  But flatly contradicting himself, Orlando also alleges that bettors were no longer placing bets with or getting lines from street bookies, local bookmaking offices, or area bookmaking offices -- they were placing bets with and getting lines solely from the offshore office.  See Exh. A, ¶ 29 (CI-1 said "From here-on-in, all of Gianelli's customers would be required to contact an off-shore gaming office to retrieve betting lines and subsequently submit their wagers."); ¶ 31 (alleging that Gianelli's local bookmaking office had been eliminated).

Moreover, by the time they sought the initial wiretap, police had already identified those at the highest levels of the organization, i.e., Gianelli, Ramasci, and Albertelli, and Orlando repeatedly referred to the alleged organization as being Gianelli. The professed goal of identifying and apprehending those "at higher levels of the organization" was misleading at best.  This fact is quite notable, as Title III "was drafted to enable investigators to go `up the ladder' from a specific, often minor, crime or

criminal to major offenses and offenders."  J. Carr, <u>The Law of Electronic Surveillance</u>, §
2.4 (West 2004).

     And, further contrary to what Orlando says are his investigative goals, there was
no reason to suspect that the Duke Sports operation included anyone other than the three
specified targets.  As for Orlando's claim that the Duke Sports operation was linked to La
Cosa Nostra, this "goal" had no basis in fact and its inclusion in the affidavit is nothing
but a boilerplate, oft-made accusation.  The only case-specific allegation in this regard is
a conclusory, unsubstantiated statement attributed to CI-1.  <u>See</u> Exh. A, ¶ 34 ("CI-1 has
stated to this officer and Trooper Russolillo that Gianelli has strong ties to the mafia.")
This "goal" also contradicts Orlando's claim that bookmakers were transferring their
operations off-shore "to escape the grasp of greedy organized crime figures."  <u>Id</u>., ¶ 13.
This is but a single instance where Orlando's boilerplate allegations – which run rampant
throughout the affidavit -- are simply unsupported in fact.

     **2. Necessity Cannot Be Proved By Generalized Allegations.**

     A thorough review of Orlando's affidavit shows that the gravamen of the
necessity allegations is that the State Police had no choice but to resort to wiretapping
because Orlando's past experiences taught him that, on the whole, gambling conspiracies
are tough to crack.  These types of allegations, however, do not go far in satisfying the
necessity standard.

     Generic, boilerplate allegations purporting to show necessity are found throughout
Orlando's affidavit.  They first appear on page 11, where Orlando claims that "[p]ersons
involved in gaming organizations, from so-called `street bookies' to the 'person(s) in
charge' most often conduct their activities in such a manner as to minimize the likelihood

of detection and apprehension by law enforcement officers. The techniques employed by [persons involved in gaming organizations] to avoid detection and apprehension often make it difficult, if not impossible, for law enforcement officers utilizing `normal investigative procedures' to successfully penetrate the higher levels of these conspiracies." Exh. A, ¶ 10. In the following paragraphs, Orlando does nothing more than set forth generic and standardized allegations of why, as a rule, normal measures are not productive and/or feasible in any gambling investigation. Nowhere on these pages appears even a single fact that is particular to this case. See, e.g., Exh. A., ¶ 10F ("Members of gaming organizations often utilize portable cellular telephones to conduct their illegal activities."); ¶ 10H ("When conducting activities other than by telephone, illegal gaming participants often resort to counter-surveillance techniques designed to avoid detection, and typically arrange their meetings at isolated locations."); ¶ 10I ("Cognizant of the possibility that law enforcement officials may utilize court-ordered electronic surveillance in an effort to identify and obtain evidence necessary for the prosecution of upper-level members of a gaming organization, such persons often restrict their supervisory conversations to short periods of time immediately preceding and following the `betting' hours"); See also Exh. A, ¶¶ 10B, 10C, 10D, 10K, 10N (discussed below).

Similarly generalized allegations appear toward the end of the affidavit, under the heading "SURVEILLANCE SECTION." See, e.g. Exh. A, ¶ 58 ("As I mentioned earlier in this affidavit, bookmakers generally conduct their activities in a clandestine manner in an ongoing effort to protect the inner workings of their secretive organization…. The majority of bookmakers appear to be surveillance conscious, and routinely take steps to

avoid being followed by the police….As I have pointed out in my affidavit, bookmakers *such as* Gianelli are aware that police surveillance is always a possibility….")(emphasis added).

And, not only does Orlando heavily rely upon generalities, but several of Orlando's boilerplate allegations simply have no basis in fact and are entirely irrelevant to the case at bar. For example:

- In ¶ 10B, Orlando alleges that "[t]hese telephones are often ordered, installed, and paid for under the names of either persons not directly involved in this illegal activity, or fictitious persons." Yet he alleges that each of the target telephones were in Albertelli's own name. See Exh. A, ¶¶ 5A-C.

- In ¶ 10C, Orlando alleges that "[o]ften higher-level personnel will conduct business with subordinate personnel over pay telephones." Yet there is not a single allegation in Orlando's 74 page affidavit concerning the use of pay telephones.

- In ¶ 10D, Orlando alleges that "'[b]ookmaking offices' are commonly located within geographic areas with so-called 'wide' toll-free telephone service. Thus, telephone company records for such toll-free calls provide little useful data, if any, for normal investigative purposes." Yet the target telephones were not land-lines, but cellular telephones which typically do reflect each telephone number dialed or received.

- In ¶ 10K, Orlando alleges that "[t]he use of fear of physical harm and retribution is known to be employed to collect debts, coerce the issuance of high-interest loans and to prevent the release of information of the organization's operations and activities to law enforcement officials." Yet Orlando does not allege any specific instances where the targets capitalized on the fear of physical harm and retribution, nor does he allege any specific instances where high-interest loans were made.

- In ¶ 10N, Orlando alleges that "'[b]ookmaking offices' are quite commonly located in private homes or high-security apartment complexes, the building's doormen and security guards frequently act as lookouts utilizing closed-circuit video cameras to conduct counter-surveillance." Yet Orlando alleges that there are no bookmaking offices, in private homes, high-security apartment complexes, or otherwise, because Gianelli's organization moved its bookmaking offices off-shore to Duke Sports.

- In ¶ 10O, Orlando alleges that "[m]embers of these gaming organizations also attempt to keep 'close ties' with 'public officials' and 'public service personnel' to acquire information concerning pending or anticipated actions of law enforcement officials." Yet the affidavit fails to make any case-specific allegations in this regard.

These general, non-case specific complaints do not satisfy the constitutionally imposed necessity requirement. The law is clear and unequivocal: "[c]ourts should reject the repetitious incantation of standardized assertions with their implicit invitation to use

eavesdropping indiscriminatory and without regard to the actual needs of the particular case." J. Carr, The Law of Electronic Surveillance, § 4-60 (1988). Put another way, "generalities, or statements in the conclusory language of the statute, are insufficient to support a wiretap application. The statements must be factual in nature and they must specifically relate to the individuals targeted by the wiretap." Castillo-Garcia, supra at 1188; see also United States v. Ippolito, 774 F.2d 1482, 1486 (9th Cir. 1985) ("Such a showing must allege *specific* circumstances that render normal investigative techniques particularly ineffective or the application must be denied.")(emphasis added). But here, particularized allegations are scant. See infra.

In a case with similarly general recitations of necessity, the Western District of Kentucky ordered suppression in United States v. Rice, Doc. No. 3:04 CR-83-R (W.D. Ky Oct. 13, 2005) (Slip op.)[11]; aff'd, 478 F.3d 704 (6th Cir. 2007). In Rice, like here, police attempted very few normal investigative avenues, only utilizing toll analysis and an informant.[12] Short of specifics, the Rice affidavit – like Orlando's affidavit here -- was largely dependent upon generic allegations that could be true of any type of conspiracy. For example, the Rice affiant alleged that his confidential source was unaware of the drug organization's entire membership, the confidential source was not in a position to do a controlled buy and had only a limited ability to introduce an undercover officer, pen registers did not provide current information and did not establish the existence of a criminal conspiracy, and granting immunity to co-conspirators and/or executing search warrants would alert organization members of the investigation who

---

[11] A copy of Rice is attached hereto as Exh. N.
[12] The Rice affidavit also alleged that physical surveillance was of limited use and was dangerous. The district judge found, however, that this allegation was misleading and excised it from the affidavit. Id. at 20.

might destroy evidence or change their manner of operation.  Id. at 19-20.   With regard

to the affidavit's generic allegations, the Rice Court reasoned they were not enough

because "[e]ach explanation suffers from the same problem; it discusses typical problems

with techniques in typical drug cases, but makes no reference to any facts about [the

defendant] specifically which would make the techniques ineffective or dangerous." Id.

at 26.   So too here.

In sum, the police may not obtain a wiretap simply by characterizing an

investigation as one of a gaming organization, then recite why, generally speaking,

gaming organizations are difficult to investigate through normal, less-intrusive

techniques.

### 3.  The Particularized Allegations are Nothing But Boilerplate Copied, Word-for-Word, From Affidavits In Other Wiretap Cases.

It is abundantly clear that, to pass statutory and constitutional muster, a wiretap

affidavit must explain why, in *the particular case at hand*, normal investigative

techniques would not suffice.  "The reason for requiring specificity is to prevent the

government from making general allegations about classes of cases and thereby

sidestepping the requirement that there be necessity in the particular investigation in

which a wiretap is sought. Such a showing must allege specific circumstances that render

normal investigative techniques particularly ineffective or the application must be

denied." Ippolito, 774 F.2d at, 1486 see also Rice, supra at 20 (for a judge to make a

meaningful review of the necessity requirement, "the judge must have more information

than mere generalities; otherwise, his or her review is no more than a rubber stamp.")

Despite the law's clear mandate, Orlando's affidavit contains few particularized

explanations of why normal investigative tools would not suffice.  And, as for those few,

as demonstrated on the chart below, they are mirror or near-mirror images of the

allegations contained in affidavits filed by Orlando and Russolillo in other wiretap cases:

| Type of allegation | This Case (Exh. A) | Orlando's 2002 Affidavit (Exh. P) | Orlando's 2005 Affidavit (Exh. Q) |
|---|---|---|---|
| Generalized failings | "In my opinion, normal investigative procedures have been tried and have failed to gather sufficient evidences to (1) identify fully, apprehend and successfully prosecute [the targets and their co-conspirators]; (2) expose the full scope of the gaming activities of the persons involved in this organization, including [the targets]; (3) locate, seize and successfully forfeit the proceeds of the gaming activities; and (4) obtain competent evidence of the criminal activities of this organization. A continued exclusive reliance of normal investigative procedures is unlikely to result in the collection of sufficient evidence to identify fully all of the **[sic]** those persons who participate in the various levels of this conspiracy, and to achieve the other goals of this investigation detailed above." Para. 68. | In my opinion, normal investigative procedures have been tried and have failed to gather sufficient evidences to (1) identify fully, apprehend and successfully prosecute [the targets and their co-conspirators]; (2) expose the full scope of the gaming activities and extortionate acts of the persons involved in this organization; (3) locate, seize and successfully forfeit the proceeds of the gaming activities; and (4) obtain competent evidence of the criminal activities of this organization. A continued exclusive reliance of normal investigative procedures is unlikely to result in the collection of sufficient evidence to identify fully all of the **[sic]** those persons who participate in the various levels of this conspiracy, and to achieve the other goals of this investigation detailed above." Para. 53. | "In our opinion, normal investigative procedures is not an adequate means of gathering sufficient evidences to (1) identify fully, apprehend and successfully prosecute [the targets and their co-conspirators]; (2) expose the full scope of the gaming activities of the persons involved in this organization, including [the targets]; (3) locate, seize and successfully forfeit the proceeds of the gaming activities; and (4) obtain competent evidence of the criminal activities of this organization. A continued exclusive reliance of normal investigative procedures is unlikely to result in the collection of sufficient evidence to identify fully all of the **[sic]** those persons who participate in the various levels of this conspiracy, and to achieve the other goals of this investigation detailed above." Para. 87. |
| | ***Note that the same typo appears in all three of Orlando's affidavits** | ***Note that the same typo appears in all three of Orlando's affidavits** | ***Note that the same typo appears in all three of Orlando's affidavits** |

| First hand information | "As of this date, I know of no person willing to assist law enforcement in this investigation who has sufficient first-hand information to bring about the achievement of the goals of this investigation based exclusively on normal investigative procedures." Para. 68. | "As of this date, I know of no person willing to assist law enforcement in this investigation who has sufficient first-hand information to bring about the achievement of the goals of this investigation based exclusively on normal investigative procedures." Para. 53. | "To date, I know of no person willing to assist law enforcement in this investigation who has sufficient first-hand information to bring about the achievement of the goals of this investigation based exclusively on normal investigative procedures." Para. 87. |
|---|---|---|---|
| Informants | "Although I continue to receive information from both of the informants discussed earlier in this affidavit, these informants are unable to penetrate into the organization to any significant degree. Also, it is my opinion that these informants do not possess sufficient first-hand information, and are unable to acquire sufficient first-hand information, through which the continued exclusive reliance on information received from them in conjunction with other normal investigative procedures is likely to result in the achievement of the goals of this investigation. Neither informant is familiar with the entire conspiracy. Moreover, these informants have provided cooperation and assistance on condition that their identities remain confidential and that they will not be compelled to testify against [the targets]. These informants have also stated that they will not | "Although I continue to receive information from both of the informants discussed earlier in this affidavit, these informants are unable to penetrate into the organization to any significant degree. Also, it is my opinion that these informants do not possess sufficient first-hand information, and are unable to acquire sufficient first-hand information, through which the continued exclusive reliance on information received from them in conjunction with other normal investigative procedures is likely to result in the achievement of the goals of this investigation. Neither informant is familiar with the entire conspiracy. Moreover, these informants have provided cooperation and assistance on condition that their identities remain confidential and that they will not be compelled to testify against [the targets]. These informants have also stated that they will not wear any kind of electronic wire or bugging device on their person, due to their fear of being discovered by the targets of this investigation (which includes higher-ranking members of this | "Although we continue to receive information from both of the informants discussed earlier in this affidavit, these informants are unable to penetrate into the organization to any significant degree. Also, it is our opinion that these informants do not possess sufficient first-hand information, and are unable to acquire sufficient first-hand information, through which the continued exclusive reliance on information received from them in conjunction with other normal investigative procedures is likely to result in the achievement of the goals of this investigation. None of the informants are familiar With the entire conspiracy. Moreover, these informants have provided cooperation and assistance on condition that their identities remain confidential and that they will not be compelled to testify against [the targets] and their associates. These also stated that they will not wear any ki wire or bugging device on their person, of being discovered by the targets of this (which includes higher-ranking membe organized criminal enterprise). Any attempt to have the informants further penetrate this organization as agents of the police might place them at substantial risk of their roles as informants being discovered and, |

wear any kind of electronic wire or bugging device on their person, due to their fear of being discovered by the targets of this investigation (which includes higher-ranking members of this organized criminal enterprise). Any attempt by these confidential informants to further penetrate this ongoing criminal conspiracy as agents of the police would place them at substantial risk of being discovered and, in turn, of being harmed. Both confidential informants have told me of their fear of [the targets] and their higher-ranking associates." Para. 69.

"None of the informants currently assisting law enforcement authorities is willing to attempt to introduce and undercover officer into the organization. As explained previously, the informants listed herein are very fearful of [the targets] and their associates. Based on my knowledge of this particular organization, as well as what I have learned from the confidential informants, without such an introduction an undercover police officer would not be able to infiltrate the conspiracy at high enough levels to gather sufficient evidence

organized criminal enterprise). Any attempt by these confidential informants to further penetrate this ongoing criminal conspiracy as agents of the police would place them at substantial risk of being discovered and, in turn, of being harmed. Both confidential informants have told me of their fear of [the targets] and their higher-ranking associates, and have described specific acts of violence committed by these individuals, including severe beatings and stabbings." Para. 54.

"None of the informants currently assisting law enforcement authorities is willing to attempt to introduce and undercover officer into the organization. As explained previously, the informants listed herein are very fearful of [the targets] and their associates. Based on my knowledge of this particular organization, as well as what I have learned from the confidential informants, without such an introduction an undercover police officer would not be able to infiltrate the conspiracy at high enough levels to gather sufficient evidence to achieve the goals of this investigation. At best, an undercover officer attempting to infiltrate the organization without an introduction would be able to do littler more than place bets. For similar reasons, I believe that conducting trash analysis would at most reveal the existence of evidence of illegal

in turn, being harmed. All of the informants have told us of their fear of [one of the targets] and his higher-ranking associates." Para. 88.

"None of the informants currently assisting law enforcement authorities is willing to attempt to introduce and undercover officer into the organization. As explained previously, the informants listed herein are very fearful of [the targets] and their associates. Based on our knowledge of this particular organization, as well as what we have learned from the confidential informants, without such an introduction an undercover police officer would not be able to infiltrate the conspiracy at high enough levels to gather sufficient evidence to achieve the goals of this investigation. At best, an undercover officer attempting to infiltrate the organization without an introduction would be able to do littler more than place bets. For similar reasons, I believe that conducting trash analysis would at most reveal the existence of evidence of illegal gaming and would not fully identify the scope of this conspiracy or its higher-ranking members." Para. 90.

|  |  |  |  |
|---|---|---|---|
|  | to achieve the goals of this investigation.  At best, an undercover officer attempting to infiltrate the organization without an introduction would be able to do littler more than place bets.  For similar reasons, I believe that conducting trash analysis would at most reveal the existence of evidence of illegal gaming and would not fully identify the scope of this conspiracy or its higher-ranking members." Para. 71. | gaming and would not fully identify the scope of this conspiracy or its higher-ranking members."  Para. 56. |  |
| **Search warrants** | "It is also my opinion that executing a search warrant at the homes [of the targets] or other locations discussed herein (assuming probable cause existed to search the residence) would fail to result in the collection of sufficient evidence to identify fully all persons involved in this conspiracy, and to bring about the achievement of the other goals of this investigation.  Although it is possible that some records might be found, and some persons arrested, it is unlikely that the seizure of such records and the arrests of such persons, without more, would lead to the identification of all the participants in the various levels of the organization and achieve the other goals of this investigation.  Furthermore, I know from | "It is also my opinion that executing a search warrant at the homes [of the targets] or other locations discussed herein (assuming probable cause existed to search the residence) would fail to result in the collection of sufficient evidence to identify fully all persons involved in this conspiracy, and to bring about the achievement of the other goals of this investigation.  Although it is possible that some records might be found, and some persons arrested, it is unlikely that the seizure of such records and the arrests of such persons, without more, would lead to the identification of all the participants in the various levels of the organization and achieve the other goals of this investigation.   Furthermore, I know from my training and experience that once [the targets] learned of the execution of the search warrants, it is likely that records and other evidence | "It is also our opinion that executing a search warrant at the homes [of the targets] or other locations discussed herein (assuming probable cause existed to search the residence) would fail to result in the collection of sufficient evidence to identify fully all persons involved in this conspiracy, and to bring about the achievement of the other goals of this investigation.  Although it is possible that some records might be found, and some persons arrested, it is unlikely that the seizure of such records and the arrests of such persons, without more, would lead to the identification of all the participants in the various levels of the organization and achieve the other goals of this investigation.  Furthermore, we know from our training and experience that once [the targets] learned of the execution of the search warrants, it is likely that records and other evidence would be destroyed, their operations moved, and the organization's activities made more secretive and, as a result, we would not be successful in identifying |

| | | |
|---|---|---|
| | my training and experience that once [the targets] learned of the execution of the search warrants, it is likely that records and other records relating to this criminal conspiracy would be destroyed, their operations moved, and the organization's activities made more secretive and, as a result, we would not be successful in identifying fully all persons involved in this conspiracy and achieving the goals of this investigation." Para. 70 | relating to this criminal conspiracy would be destroyed, their operations moved, and the organization's activities made more secretive and, as a result, we would not be successful in identifying fully all persons involved in this conspiracy and achieving the goals of this investigation." Para. 55 | fully all persons involved in this conspiracy and achieving the goals of this investigation." Para. 89. |
| **Grand jury** | "It is also my opinion that confronting [the targets], whether through a grand jury proceeding or less formally, in an attempt to persuade them to cooperate would be futile for two main reasons. First, at this time, confronting [the targets] with any gaming evidence possessed by law enforcement, or the evidence we can acquire through normal investigative techniques, would not provide sufficient incentive for them to cooperate with this investigation and thereby risk the substantial likelihood of retribution. Second, my personal knowledge of this organization (including information learned from confidential informants) lead to me to believe that the loyalty of the organization's members | "It is also my opinion that confronting [the targets], whether through a grand jury proceeding or less formally, in an attempt to persuade them to cooperate would be futile for two main reasons. First, at this time, confronting [the targets] with any gaming evidence possessed by law enforcement, or the evidence we can acquire through normal investigative techniques, would not provide sufficient incentive for them to cooperate with this investigation and thereby risk the substantial likelihood of retribution. Second, my personal knowledge of this organization (including information learned from confidential informants) lead to me to believe that the loyalty of the organization's members and its close-knit nature would preclude a member from cooperating with law enforcement. Furthermore, such action would jeopardize the objectives of this investigation | ""It is also my opinion that confronting [the targets], whether through a grand jury proceeding or less formally, in an attempt to persuade them to cooperate would be futile for two main reasons. First, at this time, confronting [the targets] with any gaming evidence possessed by law enforcement, or the evidence we can acquire through normal investigative techniques, would not provide sufficient incentive for them to cooperate with this investigation and thereby risk the substantial likelihood of retribution. Second, my personal knowledge of this organization (including information learned from confidential informants) lead to me to believe that the loyalty of the organization's members and its close-knit nature would preclude a member from cooperating with law enforcement. Furthermore, such action would jeopardize the objectives of this investigation because, if any of these persons refused to cooperate, they would likely alert the other members of this organization to the existence |

| | | |
|---|---|---|
| | and its close-knit nature would preclude a member from cooperating with law enforcement. Furthermore, such action would jeopardize the objectives of this investigation because, if any of these persons refused to cooperate, they would likely alert the other members of this organization to the existence of this investigation. As such, efforts to identify fully all the members of the conspiracy would jeopardize the achievement of the goals of this investigation." Para. 70. | because, if any of these persons refused to cooperate, they would likely alert the other members of this organization to the existence of this investigation. As such, efforts to identify fully all the members of the conspiracy would jeopardize the achievement of the goals of this investigation." Para. 55 | of this investigation. As such, efforts to identify fully all the members of the conspiracy would jeopardize the achievement of the goals of this investigation." Para. 89. |
| **Telephone records** | "It is my opinion that continued exclusive reliance of normal investigative procedures such as telephone toll analysis and public record analysis will likewise fail to result in the collection of sufficient evidence to identify fully the members of this entire organization and otherwise achieve the goals of this investigation. It is important to note that telephone toll information will never be current, since I cannot obtain these records on a prompt, regular basis. As described above (Toll Analysis Section), my review of telephone toll records has provided only limited identification of certain individuals placing calls to and receiving calls from | "It is my opinion that continued exclusive reliance of normal investigative procedures such as telephone toll analysis and public record analysis will likewise fail to result in the collection of sufficient evidence to identify fully the members of this entire organization and otherwise achieve the goals of this investigation. It is important to note that telephone toll information I receive from T-Mobile and Nextel will never be current, since I cannot obtain these records on a prompt, regular basis. As described above (Para. 45), my review of telephone toll records has provided only limited identification of certain individuals placing calls to and receiving calls from the target telephones. Furthermore, while I have noted the timing of the calls above, review of the toll records | "It is also our opinion that continued exclusive reliance on normal investigative procedures such as telephone toll analysis and public record analysis will like-wise fail to result in the collection of sufficient evidence to identify and dismantle this entire organization. It is important to note that telephone Toll information we receive from telephone companies will never be current since we cannot obtain these records on a prompt, regular basis. As described above (Toll Analysis Section), as of the date of this affidavit, we have yet to receive subscriber information for many of the telephone numbers appearing on the tolls for [the target]. This subscriber information could Assist us with identifying some of the agents with whom [the target] may be in business. Also, in many instances, the subscriber information we have received is subscribed to in fictitious names or in the names of |

| | | |
|---|---|---|
| | the target telephones. Furthermore, while I have noted the timing of the calls above, review of the toll records does not reveal the full nature or purpose of the communications." Para. 74. | does not reveal the full nature or purpose of the communications." Para. 58. | people we have reason to believe are not the true users of the particular telephone. Furthermore, while we have noted the timing of the calls above, as well as the volume of telephone activity, a review of the toll records does not reveal the full nature or purpose of the communications." Para. 92. |
| **Physical Surveillance** | "Although physical surveillance of [the targets] and their associates have been conducted in the past, I believe that conducting extensive additional surveillance at this time would be detrimental to this investigation.  Past surveillance of [the targets] have shown that they employ counter-surveillance techniques in the event they are being followed.  They have been observed by members of the Special Services Section, making abrupt stops, accelerating to great speeds, and otherwise operating in such a manner that poses too great a risk of the surveillance being exposed.  This, in turn, would jeopardize the investigation.  Also, while physical surveillance might identify some other persons with whom [the targets] associate, this information, without more, is not likely to bring about the achievement of the goals of this investigation.  Because of the practical limitations of, and risks associate with, conducting prolonged | "Although physical surveillance of [the targets] and their associates have been conducted in the past, I believe that conducting extensive additional surveillance at this time would be detrimental to this investigation.  Past surveillance of [the targets] have shown that they employ counter-surveillance techniques in the event they are being followed.  They have been observed by members of the Special Services Section, making abrupt stops, accelerating to great speeds, and otherwise operating in such a manner that poses too great a risk of the surveillance being exposed.  This, in turn, would jeopardize the investigation.  Also, while physical surveillance might identify some other persons with whom [the targets] associate, this information, without more, is not likely to bring about the achievement of the goals of this investigation. Because of the practical limitations of, and risks associate with, conducting prolonged surveillance of large-scale bookmakers, I have not attempted prolonged surveillance is my investigation of [the targets].  Members of the Special Services Section and I believe, | |

| | | |
|---|---|---|
| | surveillance of large-scale bookmakers, I have not attempted prolonged surveillance is my investigation of [the targets]. Members of the Special Services Section and I believe, based on upon our collective experience and in particular our experience conducting organized crime investigations, that if surveillance were conducted on any sort of prolonged or regular basis, the risk that the police would be detected is too great. If [the targets] and their associates detected the police, they likely would drastically alter their methods of operation and the progress made in this investigation would be jeopardized. In particular, [the targets] and their associates might change their telephone numbers, disassociate themselves from confidential informants, change locations for meetings, further insulate and hide their activities and/or move to different residences." Para. 72. | based on upon our collective experience and in particular our experience with the 2001 Wiretap Investigation which involved many of the same suspects, that if surveillance were conducted on any sort of prolonged or regular basis, the risk that the police would be detected is too great. If [the targets] and their associates detected the police, they likely would drastically alter their methods of operation and the progress made in this investigation would be jeopardized. In particular, [the targets] and their associates might change their telephone numbers, disassociate themselves from confidential informants, change locations for meetings, further insulate and hide their activities and/or move to different residences." Para.57. | |
| **Summary** | "In summary, since the normal investigative techniques employed in the past and in the course of this investigation have failed to produce sufficient evidence to identify fully all the members of this organization and achieve | "In summary, since the normal investigative techniques employed in the past and in the course of this investigation have failed to produce sufficient evidence to identify fully all the members of this organization and achieve the goals of this investigation, there is a | "In summary, since normal investigative techniques would not, in our opinion, produce sufficient evidence to identify fully all the members of this organization and achieve the goals of this investigation, there is a reasonable likelihood that the continued use of normal investigative procedures |

| | | |
|---|---|---|
| the goals of this investigation, there is a reasonable likelihood that the continued exclusive use of normal investigative procedures would similarly fail to produce sufficient evidence. Give the limitations of the informants involved in this investigation, the inability to utilize effectively search warrants and grand jury investigations, the observed and understood risks of prolonged physical surveillance and trash analysis, and the insufficiency of relying upon toll record and public record analysis, as described above, I believe that court-authorized electronic surveillance will provide the best available means of identifying, apprehending and prosecuting all the members of this organization and achieving all of the goals of this investigation." Para. 74. | reasonable likelihood that the continued exclusive use of normal investigative procedures would similarly fail to produce sufficient evidence. Given the limitations of the informants involved in this investigation, the inability to utilize effectively search warrants and grand jury investigations, the observed and understood risks of prolonged physical surveillance and trash analysis, and the insufficiency of relying upon toll record and public record analysis, as described above, I believe that court-authorized electronic surveillance will provide the best available means of identifying, apprehending and prosecuting all the members of this organization and achieving all of the goals of this investigation." Para. 59. | would similarly fail to produce sufficient evidence. Given the limitations of the informants involved in this investigation, the inability to utilize effectively search warrants and grand jury investigations, the observed and understood risks of prolonged physical surveillance and trash analysis, the fear that [the target] appears to instill in people, and the insufficiency of relying upon toll record and public record analysis, as described above, we believe that court-authorized electronic surveillance will provide the only available means of identifying, apprehending and prosecuting all the members of this organization and achieving all of the goals of this investigation." Para. 93. |

Russolillo made virtually identical allegations in another affidavit, dated January 13, 2000. See Exh. O.

Even a cursory comparison of these affidavits shows that Orlando did nothing more than "cut and paste" the few particularized necessity allegations from at least one previous case and continued to use the same allegations in at least one subsequent case. This Court should not reward such blatantly improper and misleading tactics.

4.         **Normal Investigative Techniques Were Yielding Results And Therefore, Wiretapping Was Premature.**

Prior to applying for the wiretap, the State Police attempted to use only three normal investigative methods:  physical surveillance (some instances dating back several years before the wiretap), informants, and toll analysis.  Even though the investigation was still in its infancy, each yielded some results and looked promising for developing more.  Nevertheless, Orlando sought to circumvent the normal route an investigation takes and chose instead to run to the courthouse steps for a wiretap.  An examination of his affidavit shows that the investigation conducted prior to seeking a wiretap did not justify that extraordinary step.

As for his particularized explanation concerning the usefulness of physical surveillance, Orlando complained that "conducting extensive additional surveillance would be detrimental of this investigation" because the targets "have been observed by members of the Special Services Section making abrupt stops, accelerating to great speeds, and otherwise operation in such a manner that poses too great a risk of the surveillance being exposed."  Exh. A, ¶ 72.  Yet Orlando recounts only two specific instances of "counter-surveillance," neither of which supports Orlando's fact-bereft and conclusory allegation.  In one instance, Gianelli, who was entering on a highway on-ramp, "peered" in his review mirror, a perfectly normal—and safe—thing to do.  Id., ¶ 58.  In the other instance, Gianelli drove at a fast rate of speed on a road near his home.  Id., ¶ 61.  These instances, neither one of which involved targets Albertelli or Ramasci, hardly substantiate Orlando's broad claim.

Moreover, the alleged failings of physical surveillance are belied by other allegations in the record.  Indeed, the affidavit plainly reveals that surveillance of the

targets had been successful. See id., ¶¶ 21, 22, 23, 57, 58, 59, 60. Likewise, Orlando's professed fear that the targets would change their operations if made aware of police surveillance is entirely undercut by the allegations in ¶ 23, where Orlando says that while conducting surveillance of Gianelli, he and Russolillo boldly approached and questioned Gianelli. Evidently, they had no qualms about letting Gianelli know they were at least watching him, if not investigating him. Permitting Orlando to simply fabricate necessity, particularly where specific examples are surely lacking, clearly runs contrary to both Title III and Section 99.

As for informants, Orlando misleadingly chose to greatly downplay their usefulness. CI-1 and CI-2 had significant dealings with Gianelli, Albertelli, and Ramasci and that this normal investigative technique bore significant results: According to CI-1, Gianelli personally gave him telephone numbers to call when placing bets and confided in him in great detail about the reasons why he set up the offshore gaming office. Exh. A, ¶ 28- 29. Gianelli even gave CI-1 his own personal beeper number. Id., ¶ 31. CI-1 also had direct dealings and met with Gianelli on gaming related issues on several occasions. Id., ¶ 28; 30; 43. Further, CI-1 was close enough to allegedly know that Gianelli lent money to "bookmakers, agents, and others, at usurious rates." Id., ¶ 34. CI-2 also had substantial information about the targets. According to CI-2, Gianelli personally told him that "his betting lines and wagering services will be handed by an off-shore bookmaking office known as `Duke Sports'[.]" Id., ¶ 39. CI-2 knew and called Gianelli's home telephone number and met with him to discuss gaming-related matters. Id., ¶ 39. Also, CI-1, CI-2 had regular contact with Albertelli and Ramasci about gaming-related matters. Id. Surely the continued use of CI-1 and CI-2 would have led

to securing and executing search warrants at least at the homes of Gianelli, Ramasci, and Albertelli, each of whom Orlando claims to be at the higher levels of the alleged gaming conspiracy.

Telephone analysis also produced relevant information. Orlando and Russolillo were able to determine that there were high volumes of calls on the target telephones and that the targets made a large number of calls to known agents and bookmakers.

In short, Orlando's affidavit shows that, while the State Police attempted only three normal investigative means, those means were fruitful. That normal investigative techniques did so is undoubtedly relevant to this Court's necessity inquiry. As the Ninth Circuit explained:

> Although the government need not pursue every alternative means of investigation, *neither should it be able to ignore avenues of investigation that appear both fruitful and cost-effective. It is not unreasonable to expect the government to utilize those methods that appear to be potentially productive.* We would flout the statutory intent that wiretaps be used only if necessary, were we to sanction a wiretap simply because the government pursued some "normal" investigative strategies that were unproductive, when more fruitful investigative methods were available. In effect, the government would be able to secure a wiretap in every case, even where a normal strategy would be likely to achieve the same result without resort to the serious intrusion that a wiretap necessarily entails.

Ippolito, supra at 1486 (emphasis added).

Simply stated, for the foregoing reasons, the prosecution cannot show that "it has encountered difficulties in penetrating a criminal enterprise or in gathering evidence – to the point where (given the statutory preference for less intrusive techniques) wiretapping becomes reasonable." United States v. Abou-Saada, 785 F.2d 1, 11 (1st Cir.), cert. denied, 477 U.S. 908 (1986). If this Court permits the warrant to stand in this

investigation, there would be nothing to stop the police from obtaining a wiretap in every investigation where police allege that a target is engaged in a gaming conspiracy.

### 5. The Police Failed To Use Several Available Normal Investigative Techniques.

Based solely on Orlando's own allegations, this Court can clearly see that, beyond those described in the affidavit, there were several additional normal investigative techniques available which police skipped over in their rush to engage in one of the most intrusive investigative measures available.

First, it is plainly obvious that the State Police could have obtained more information from CI-1 and CI-2, and that they could have done so with relative ease. According to Orlando's affidavit, both informants were in prime position to obtain additional information about Gianelli, Ramasci, Albertelli, and other alleged co-conspirators, without exposing them to discovery or harm, as both had deep-rooted and wide-ranging contacts in the gaming world and were deeply enmeshed with many agents, bookmakers, and the like:

- CI-1 had been "involved in illegal sports betting for more than ten years;" Exh. A, ¶ 25

- CI-1 has "regularly placed illegal gaming wagers on profession and college sporting events with many different bookmakers in the greater Boston area, including Essex county;" Id.;

- CI-1 had in the past "provided [Orlando] and Trooper Russolillo with detailed information about different gaming organizations" for two years; Id., ¶ 26;

- CI-1 knew of Gianelli's alleged association with Joseph Yerardi, a defendant in this case; Id.;

- CI-1 knew that Puopolo, Russo, Goudie, Heeter and "many others" were agents in the Gianelli organization; Id., ¶ 27;

- CI-1 was in regular contact with both Ramasci and Albertelli about gaming-related matters (but not to register bets); Id., ¶¶ 32; 33; 34;

- CI-1 knew other bookmakers who had borrowed money from Gianelli; Id., ¶ 34;

- CI-2 "has provided [Orlando] with detailed information about different gaming organization in Middlesex, Suffolk, and Essex counties;" Id., ¶ 35;

- CI-2 had information about other gaming operations, such as how they operated, their telephone numbers, and the locations at which gaming-related activities were conducted, leading to several arrests and convictions as well as a wiretap; Id., ¶ 36;

- CI-2 "admitted that he/she has been involved in illegal sports betting for more than fourteen years" and "has regularly placed illegal gaming wagers on professional and college sporting events with many different bookmakers in the greater Boston area, including Essex County" and "continues to place bets with different bookmakers;" Id., ¶ 37;

- CI-2 was involved with Gianelli "for an extended period of time;" Id., ¶ 39; and

- Police had successfully prosecuted and obtained search warrants in several other gaming cases based on the information garnered by CI-1 and CI-2.  Id., ¶ 36.

Second, Orlando and Russolillo failed to avail themselves of a very basic and ubiquitous investigative method: controlled calls.  The failure to do so is particularly troubling in this case, since both CI-1 and CI-2 reported talking to each of the targets about gaming-related matters on each of the target telephones.  Yet Orlando and Russolillo made no attempt to conduct controlled calls over those target telephones which would have allowed them to hear, first-hand, the targets discuss gaming-related matters.

Third, not only could Orlando have obtained additional information from CI-1 and CI-2, but he also could have tried to cultivate new informants.  But he does not even allege that he tried.  <u>See</u>, <u>Rice</u>, <u>supra</u> at 20; 25 (finding affidavit did not meet necessity requirement where, <u>inter alia</u>, affiant did not allege that government took any steps to develop additional source with knowledge of target.)  This failure is particularly egregious here, where Orlando elicited information about Gianelli and his alleged co-conspirators from at least one additional informant.  <u>See</u> Exh. A, ¶ 60 (alleging that unnamed informant told Orlando and Russollillo that "Gianelli was at the Revere Businessmen's Association (RBA) meeting some of his agents and/or bettors.")

Fourth, Orlando alleged that telephone analysis showed that the targets had frequent telephone contact with known bookmakers and agents.  Yet the State Police failed to obtain telephone records for those known bookmakers and agents.  In fact, the State Police failed to investigate them in any manner whatsoever.

Fifth, the State Police could have also conducted an investigation into the targets' finances; this tool certainly would have gone a long way in achieving one of the stated goals of the investigation – allegedly to identify and forfeit the proceeds of the alleged conspiracy.  If officers truly "ran the gamut" of normal investigative techniques prior to resorting to a wiretap, the failure to do so here simply does not make sense.  <u>See</u> <u>e.g.</u>, <u>United States v. Vasquez</u>, 605 F.2d 1269 (2d Cir.), <u>cert</u>. <u>denied</u>, 444 U.S. 981(1979); <u>Mora</u>, 623 F.Supp. at 356-57.

Without a doubt, the State Police skipped right over the logical next steps in their investigation so they could conduct their investigation in the quickest and easiest way.

B.  **THE ESSEX COUNTY APPLICATIONS AND ORDERS WERE NOT PROPERLY AUTHORIZED.**

    1.  **The October 29, 2003 Designation Letter and All Subsequent Applications Facially Fail to Demonstrate Personal Review By the District Attorney, As Required By Title III.**

        a.  **Relevant Law**

Under Title III, only the "principal prosecuting attorney" of the state – generally the attorney general – or "the principal prosecuting attorney of any political subdivision thereof," if the state wiretap statute authorizes him to make applications, may *apply* for a state order authorizing the interception of wire communications. 18 U.S.C. §2516(2). See Giordano, 416 U.S. at 522 n.11.  The Massachusetts wiretap statute, however, specifically authorizes District Attorneys to delegate application to specially designated Assistant District Attorneys.  G.L. c.272, §99.  The First Circuit addressed the conflict between the two statutes in United States v. Smith, 726 F.2d 852, 856 (1st Cir. 1984)(*en banc)*, wherein the defendants argued that the Massachusetts wiretap statute did not comport with the requirements of the Federal wiretap statute because it allowed District Attorneys to delegate application to specially designated Assistant District Attorneys (while 18 U.S.C. §2516(2) authorizes only District Attorneys to apply for a state wiretap order).  The First Circuit affirmed the legality of the Massachusetts statutory scheme, but only because the Supreme Judicial Court had fortified and supplemented the statute by judicial interpretation in Vitello, 367 Mass. 224.  See Smith, 726 F.2d at 857 (noting that state statute has "been fortified by the carapace of deliberate judicial interpretation and

supplementary requirements imposed by the Massachusetts Supreme Judicial Court in []
<u>Vitello</u>").

In <u>Vitello</u>, to ensure that the Massachusetts statute complied with Title III and the
purposes underlying its narrow limitation of authority to apply for wiretap orders to
specified officials responsive to the political process, <u>see</u> <u>Giordano</u>, 416 U.S. at 520, the
SJC engrafted a number of requirements on the state statute, all of which must be
complied with for a state application and wiretap order to comport with Federal law.  <u>See</u>
<u>Smith</u>, 726 F.2d at 859 ("As we have indicated, we are of the view that §99 F(1), as
glossed by <u>Vitello</u>, is entirely consistent with the intent of Congress.").  In particular, the
SJC interpreted the special designation provision "to mean that an assistant district
attorney may not apply at will for wiretap orders but must bring the matter for
examination before his senior officer, the district attorney." <u>Vitello</u>, 367 Mass. at 256; <u>see</u>
<u>Giordano</u>, 416 U.S. at 515 ("investigative personnel may not themselves ask a judge for
authority to wiretap"). The District Attorney must "determine whether a particular
proposed use of electronic surveillance would be consistent with the over-all policy in
respect to monitoring followed in his jurisdiction." <u>Vitello</u>, 367 Mass. at 256. To this end,
the District Attorney "*must review and authorize each such application in writing.*"
<u>Vitello</u>, 367 Mass. at 256 (emphasis added). This determination requires "not a cursory
but a full examination by the district attorney of the application." <u>Id</u>. at 256 n.16
(emphasis added). <u>See</u> <u>also</u> <u>id</u>. at 232 (District Attorney should "give full and fair review
of the grounds asserted for seeking a wiretap warrant"). The preferred practice, the SJC
said, would be for the District Attorney to cosign the application. <u>Id</u>. at 232. The special

designation of an ADA "must be on a case by case basis with written authorization." Id.

at 257 n.17; see Smith, 726 F.2d at 857 (summarizing Vitello requirements).

Echoing the discussion in Giordano regarding the reasons why "[t]he mature

judgment of a particular, responsible Department of Justice official is interposed as a

critical precondition to any judicial order," Giordano, 416 U.S. at 515-516, the Supreme

Judicial Court explained the purposes underlying the strict limitation of the officials who

may lawfully apply for wiretap authorization:

> [T]he statutory authority to apply for wiretap orders should "be used with restraint
> and only where the circumstances warrant the surreptitious interception of wire
> and oral communications." . . . In order to ensure that restraint, the authority to
> seek wiretap orders should be restricted to those State authorities who, on
> reasoned judgment, may determine whether as matter of uniform law enforcement
> policy within their jurisdiction the initiation of wiretap procedures are proper and
> required. The determination at this level is more than a matter of necessity in the
> search for evidence, it is a matter of policy . . . , a policy to be established and
> uniformly enforced on a jurisdictionally wide level, in this Commonwealth on a
> county-wide basis.
>
> Thus, in narrowly circumscribing those State enforcement authorities who may
> apply for wiretap orders, Congress sought to ensure uniform and consistent
> standards for wiretap orders. We take note of the fact that, in contrast to the
> procedure for search warrants in general, investigative personnel may not
> themselves apply to a judge for authority to wiretap or eavesdrop. As stated in the
> Senate report on §2516(2): "The intent of the proposed provision is to provide for
> the centralization of policy relating to statewide law enforcement in the area of
> the use of electronic surveillance in the chief prosecuting officer of the State."
> S.Rep.[No. 1097, 90th Cong., 2d Sess. 98, reprinted in 1968 U.S.C.C.A.N] 2187.

Vitello, 367 Mass. at 255-56, quoting Giordano, 416 U.S. at 515; see Smith, 726 F.2d at

856 ("the objectives of federal legislation controlling electronic surveillance are to

protect privacy, to establish uniform standards not only on a federal level but in a state or

county governing the authorization of interceptions, and to ensure adherence to these

standards through centralizing responsibility in top level state and county prosecutors

who can be held accountable for departures for preestablished policy"); United States v.

<u>Citro</u>, 938 F.2d 1431, 1436 (1st Cir.1991) (discussing purposes of Title III limitations on

officials who may authorize applications for federal wiretap warrants).

> **b.  The Essex County Applications are Insufficient on Their**
> **Face to Demonstrate Compliance with the Requirements of**
> **Title III and §99(F)(1), as Guided by *Vitello*.**

In <u>Smith</u>, the First Circuit clearly mandated that, given the Supreme Judicial

Court's ruling in <u>Vitello</u>, a Massachusetts wiretap application is not properly authorized

unless the district attorney *himself or herself* first carefully reviews the application,

before he or she authorizes its submission to the court.  See <u>Smith</u>, 726 F.2d at 858

("[t]his determination requires 'not a cursory but full examination by the district attorney

of the application'"), <u>quoting</u> <u>Vitello</u>, 367 Mass. at 256, n.16.  Because of the crucial

importance of centralized policy-making regarding resort to electronic surveillance, this

duty is non-delegable. See <u>Smith</u>, 726 F.2d at 858 (congressional objectives of policy

uniformity and political accountability would be satisfied by "[t]he detailed review *by a*

*district attorney* of every application for a proposed use of electronic surveillance . . . .")

(emphasis added).

None of the relevant Essex County documents—Mr. Blodgett's October 29, 2003

Designation Letter, Mr. Blodgett's October 29, 2003 letter to the presiding judge

explaining his designation, and all of the applications—are sufficient on their face to

demonstrate compliance with these requirements.  First, neither the October 29, 2003

Essex County Designation Letter nor Mr. Blodgett's October 29, 2003 letter to the

Honorable Richard Welch affirm that Mr. Blodgett personally reviewed the original

application, dated October 30, 2003, much less the renewal and amendment applications

that followed thereafter.  <u>See</u> Exh. C.  Instead, in these designation letters, Mr. Blodgett

merely asserts that the attached application and renewals "shall be reviewed by me *or my designee* before being presented to you."  See id. (emphasis added).[13]  Thus, even if the general practice purportedly set forth in the designation letters was followed, that practice, according to the very terms of the letters, could be satisfied by review of the applications by someone other than the District Attorney. This, *Vitello* does not permit.

Second, none of the Essex County applications—not even the original October 30, 2003 application—affirm that they had been personally reviewed by the District Attorney.  Instead, they simply recite boilerplate language that the District Attorney has authorized these applicants to personally make presentment to the court of this application, as well as all extension and renewal applications, all amendment applications, all status reports, and all return documents emanating from the requested wiretap, "all of which shall have been reviewed by District Attorney Blodgett *or his designee* before being presented by these applicants."  See, e.g., Exh. B (Application dated October 31, 2003, at ¶12) (emphasis added); Exh. H6 (Renewal Application dated January 26, 2004, at ¶22).  As such, rather than affirmatively providing that the applications were personally reviewed by the District Attorney, the applications contemplate their review by someone *other than* the District Attorney.[14]

---

[13] In this regard, the language of Mr. Blodgett's designation letters differ from Ms. Coakley's, wherein she asserted that she personally reviewed the attached application. See November 18, 2004 letter from Ms. Coakley to the Honorable Regina Quinlan (noting that Ms. Coakley specially designated the ADA's to make application for an interception warrant, "which I have personally reviewed and authorized").

[14] Once again, in this regard, the procedure implemented by Essex County differed from Middlesex County.  In the original Middlesex County applications (as contrasted with "renewals," the applicants affirm that the application has been reviewed by the District Attorney.

Finally, it is certainly worth noting that the applicants also ignored <u>Vitello's</u> recommendation that the District Attorney cosign the application. <u>See</u> <u>Smith</u>, 726 F.2d at 859 (noting that *had the recommended practice been followed,* there would be no questioning the sufficiency of the District Attorney's authorization) (emphasis added); <u>Commonwealth v. Bickford</u>, 393 Mass. 1006 (1984) (noting that because the recommended practice had been followed, there was no questioning the sufficiency of the District Attorney's authorization). In <u>Smith</u>, in remanding to the district court for a "detailed factual inquiry" regarding the sufficiency of the authorization, the *en banc* Court emphasized that such a remand was necessary because of the District Attorney's failure to follow <u>Vitello's</u> cosigning recommendation, admonishing that it "hope[d] that in the future this will not be necessary." <u>Smith</u>, 726 F.2d 860. <u>Smith</u> was decided twenty (20) years before the initial wiretap applications in this case, yet its unequivocal message went unheeded by the prosecutors in this case. Thus, the applications failed to provide any confirmation that the District Attorney had actually authorized their submission, as required by <u>Vitello</u>.[15]

For all of the foregoing reasons, the Essex County application of October 30, 2003 and the renewal and/or amendment applications filed thereafter were facially insufficient to support the issuance of the corresponding wiretap orders. These facial insufficiencies make it impossible to conclude from the face of the applications that

---

[15] <u>United States v. Fudge</u>, 325 F.3d 910 (7th Cir. 2003), underscores the importance of strict compliance with the authorization directives of Title III. In <u>Fudge</u>, the application stated only that the application had been authorized by a "duly designated" DOJ official, without naming the individual as required by §2518(1)(a), but the application was accompanied by letters of designation and authorization signed by officials who could permissibly authorize wiretap applications. Even so, the Court noted that "[t]he government's piecemeal approach resulted in an application which tested the boundaries of complying with statutory provisions." <u>Id</u>. at 917.

district attorney had conducted a careful, pre-submission, *personal* review of the

applications, as required by Smith.

> ### c. The Facial Insufficiency of the Applications Requires Suppression of All Evidence Derived Directly or Indirectly from the Electronic Surveillance.

In Giordano, the Court held that "Congress intended to require suppression where

there is failure to satisfy any of those statutory requirements that directly and

substantially implement the congressional intention to limit the use of intercept

procedures to those situations calling for the employment of this extraordinary device."

Giordano, 416 U.S. at 527.  The authorization requirement, the Court continued, played

such a central role in the Title III scheme:

> We have already determined that Congress intended not only to limit
> resort to wiretapping to certain crimes and situations where probable cause
> is present but also to condition the use of intercept procedures upon the
> judgment of a senior official in the Department of Justice that the situation
> is one warranting their use. It is reasonable to believe that such a
> precondition would inevitably foreclose resort to wiretapping in various
> situations where investigative personnel would otherwise seek intercept
> authority from the court and the court would very likely authorize its use.
> *We are confident that the provision for pre-application approval was
> intended to play a central role in the statutory scheme and that
> suppression must follow when it has been shown that this statutory
> requirement has been ignored.*

Giordano, 416 U.S. at 527-28 (emphasis added); see United States v. Chavez, 416 U.S.

562, 571 (1974) ("failure to secure approval of one of these specified individuals prior to

making application for judicial authority to wiretap renders the court authority invalid

and the interception of communications pursuant to that authority 'unlawful' within the

meaning of . . . § 2518(10)(a)(i)").  In cases of facial insufficiency of the application,

suppression is warranted "when the facially insufficient information is likely to affect the

judge's determination that a wiretap is or is not warranted."  Staffeldt, 451 F.3d at 584.

Here, under <u>Giordano</u>, <u>Smith,</u> and <u>Vitello</u>, the facial insufficiency of the applications relates to information critical to the judge's determination whether a warrant authorizing electronic surveillance should be issued—*i.e.*, whether the applications were properly authorized. Absent facial proof within the designation letter and applications that the district attorney properly authorized the applications, no warrants authorizing electronic surveillance may validly issue. Suppression of all evidence directly or indirectly related to these applications and orders is, therefore, required.[16]

### d.  At minimum, an evidentiary hearing must be convened.

The Essex County designation letter and applications are clearly insufficient on their face to demonstrate compliance with the requirements of <u>Smith</u>. However, even assuming *arguendo* that the applications were not insufficient on their face, suppression is nonetheless required unless the District Attorney actually authorized the applications through the personal review process mandated by <u>Smith</u>. At a minimum, the Court should, as required in <u>Smith</u>, hold an evidentiary hearing at which the government bears the burden of proving that the applications were properly authorized. <u>Smith</u>, 726 F.2d at 860 ("We emphasize here what should be obvious, that the failure of the Massachusetts District Attorney to follow the cosigning recommendation of the Supreme Judicial Court in <u>Vitello</u> has necessitated a detailed factual inquiry by the district court. We hope that in the future this will not be necessary.") If the government cannot do so, suppression of all evidence directly or indirectly related to these applications and orders is mandated.

---

[16] Suppression here would extend to the communications intercepted pursuant to the October 30, 2003 order and all subsequent orders, not only because of their facial insufficiency, but also because the successive orders were issued based upon applications and renewal applications and affidavits which relied heavily on the intercepted conversations which preceded them. <u>See</u> <u>Giordano</u>, 416 U.S. at 531-532.

**2.  A Single Designation Letter Cannot Authorize Subsequent Renewal Applications.**

As noted, the only designation letter submitted by Mr. Blodgett was the October 29, 2003 Designation Letter, wherein he specially designated the Essex ADAs to intercept wire communications of three persons (Dennis Albertelli, Salvatore Ramasci and Arthur Gianelli, "and their associates") occurring over three telephone numbers: 2154, 8575, and 8262.  After the October 30, 2003 application, the Essex ADAs submitted nine other applications, none of which were accompanied by a written designation letter.

While the Defendants acknowledge the Supreme Judicial Court has held that under state law no *written* authorization is required for renewal applications, see Commonwealth v. D'Amour, 428 Mass. 725, 735 (1999) (concluding that neither Vitello nor §99 requires written authorization for renewals), they respectfully submit that written designation letters for renewal applications should be required if the Massachusetts statute is to comport with Federal law.  In D'Amour, the SJC did not conduct a detailed analysis of the defendant's argument that renewal applications required written authorization by the District Attorney.  While the court noted that §99(J)(1), the provision governing renewal applications, does not require written authorization for renewals, D'Amour, 428 Mass. at 735 n.13, neither does §99(F)(1), the provision governing initial applications; the requirement of written authorization for *each* application was added by Vitello.  The SJC's truncated assessment appears to rest on an assumption that a renewal is not an "application."  Such an assumption does not, however, survive a reading of §99(J). Subsection (J)(1) provides, in pertinent part:

Any time prior to the expiration of a warrant or a renewal thereof, the applicant may apply to the issuing judge for a renewal thereof with respect to the same person, place, premises, or telephone or telegraph line. *An application* for renewal must incorporate the warrant sought to be renewed together with the application therefore and any accompanying papers upon which it was issued. *The application* for renewal must set forth present grounds for extension in conformity with paragraph F, and the judge may interrogate under oath and in such event a transcript must be provided and attached to the renewal *application* . . . . (emphasis added).

Section 99(J)(2) further provides that the judge may issue an order "upon such application," and that "the application" must be retained by the issuing judge.

Under Title III, extensions of the initial order may be granted, "but only on *application* for an extension made in accordance with subsection (1) of this section . . . ." §2518(5)(emphasis added). See Giordano, 416 U.S. at 515 (wiretap orders expire within a specified period of time unless expressly extended by a judge based on further application by enforcement officials); see also In re Grand Jury Proceedings, 988 F.2d 211, 214 (1st Cir.1992) (authorization memos submitted for all extension applications); United States v. Van Meter, 278 F.3d 1156 (10th Cir. 2002) (authorization memo for extension application submitted). Thus, under Title III, there must be an application made to obtain an extension, and it is clear beyond cavil that under Title III, every application, initial or extension, must be properly authorized by a statutorily designated official.

Under Vitello, an application by an ADA is not properly authorized unless he or she first receives written authorization from the District Attorney. Thus, if Smith requires state authorities to comply with the supplementary requirements imposed by Vitello to satisfy Title III, there must be written authorization of each renewal application by the district attorney to satisfy the standards of Title III. State wiretap requirements

may not be less exacting than those required under Title III.  See Smith, 726 F.2d at 856

(noting that "so long as federal standards are not jeopardized or eroded, state regulation is

not proscribed but rather is specifically contemplated by Title III); United States v.

Marion, 535 F.2d 697, 702 (2d Cir.1976) ("[W]hether the proceedings be federal or state,

interpretation of a state wiretap statute can never be controlling where it might impose

requirements less stringent than the controlling standard of Title III").  Certainly, the

congressional objectives relating to policy centralization and political accountability are

also implicated by issues regarding how long electric surveillance, with its concomitant

severe invasions of personal privacy, should be continued. This, too, is not a decision

which Congress intended to vest solely in the hands of the line prosecutors supervising

the investigation.

> **3.  Even If Written Authorization Is Not Required For Renewals, A Single Designation Letter Cannot Authorize Subsequent Amendment Applications Seeking Permission To Intercept Telephones And Individuals Not Listed In An Original Designation Letter.**

Even if written designation letters are not required for renewal applications, they

certainly must be required for applications seeking authorization to intercept

communications occurring over telephone numbers not identified in an original

designation letter, and/or communications of individuals not identified in an original

designation letter.  In this case, eight (8) of the Essex County applications submitted after

October 30, 2003, sought permission to intercept communications occurring over

telephone numbers not listed in the October 29, 2003 Designation Letter:

| No. | Application Date | Telephone Numbers Not In October 29, 2003 Designation Letter |
|---|---|---|
| 1 | November 13, 2003 | (781) 640-3325 |
| 2 | November 26, 2003 | 3325 |
| 3 | December 23, 2003 | 3325<br>(617) 839-9475 |
| 4 | December 31, 2003 | (617) 893-8559<br>(617) 758-4162 |
| 5 | January 9, 2004 | 3325, 4162, 8559, 9475<br>(781) 938-1529 |
| 6 | January 26, 2004 | 3325, 4162, 8559, 9475<br>(781) 307-2166<br>(617) 407-8932 |
| 7 | February 10, 2004 | 3325, 4162, 8932 |
| 8 | February 25, 2004 | 3325, 4162, 8932 |

See Exh. H1-H8.

Additionally, in two of the applications submitted after October 30, 2003, the Essex ADAs sought permission to intercept communications of individuals not specifically identified in the October 29, 2003 Designation Letter. In the renewal application dated December 23, 2003, the ADAs requested permission to intercept the wire communications of Robert Romboli, in addition to Dennis Albertelli, Salvatore Ramasci, and Arthur Gianelli. See Renewal Application, December 23, 2003, attached hereto as Exhibit H3 at ¶12. In the renewal application dated January 26, 2004, the ADA's requested permission to intercept the wire communications of Robert Romboli, James Viglione, David DeAngleis, Scott Martinelli, Robert Raffael, and Paula Penney, in addition to the three defendants identified in the October 29, 2003 Designation Letter. See Renewal Application dated January 26, 2004, attached hereto as Exhibit H6 at ¶22.

In both instances, the court ordered the interception of communications of the additional individuals, notwithstanding the fact that the October 29, 2003 designation letter did not authorize interception of communications of these particular individuals.

One all-purpose letter issued by the District Attorney at the outset of the electronic surveillance process cannot supply the requisite authorization for future applications that seek authority to intercept communications over telephone numbers not listed within an original designation letter, or seeking to intercept individuals not identified in the original designation letter. In Commonwealth v. Westerman, 414 Mass. 688 (1993), the defendant claimed that amending a wiretap order to permit wiretapping of new individuals for different crimes amounted to a new warrant to pursue a new investigation, thus requiring satisfaction of the provisions of §99F. After noting that the Massachusetts statute is silent with regard to amending or modifying a wiretap warrant, the court noted that the statute does provide for renewing wiretap warrants under §99J, which provides that the renewal application must fully satisfy the same requirements that applications for warrants must satisfy under §99F. Westerman, 414 Mass. at 696, citing United States v. DeJesus, 752 F.2d 640, 643 (1st Cir.1985) (in declining to reach government argument that it is never necessary to amend a wiretap warrant to authorize the interception of conversations of new individuals, the court noted that the question of when (if ever) and how (if at all) an authorized wiretap should be amended to add the names of new interceptees was one of first impression in Massachusetts, and, "[a]bsent a pronouncement from the state court, [the court would] not infer a requirement of district attorney authorization from this otherwise silent statute"). The court held, therefore, "that a modification of or an amendment to a valid wiretap order that is still in effect is

valid under §99 if the request fully satisfies the provisions of §99 F."  Westerman, 414

Mass. at 696.

      Of course, §99F requires that an ADA must be "specially designated by the

district attorney" to submit the application.  In Vitello, in examining §99F's "special

designation" requirement in conjunction with its effort to outline guidelines for future

wiretap cases, the court specifically noted that, to satisfy §99F, the "[a]uthority to apply

for each wiretap warrant must be specifically granted *in writing* by the Attorney General

or the district attorney as the case may be."  Vitello, 367 Mass. at 231-32 (emphasis

added).  If an amendment of a warrant must fully comply with §99F, then Vitello, and

therefore federal law, requires that the authority for such amendments be specifically

granted in writing by the District Attorney.  See Smith, 726 F.2d at 859 ("As we have

indicated, we are of the view that §99 F(1), as glossed by Vitello, is entirely consistent

with the intent of Congress.").  Thus, if an amendment is sought for a wiretap order such

that officers can intercept new individuals or new telephone numbers, there must be a

written designation letter authorizing the assistant district attorney to intercept telephone

conversations occurring over the new numbers, or to intercept communications of

individuals not identified in a prior designation letter.[17]

      Requiring written authorization to expand interceptions to new telephones or

individuals is symmetrical with the policies underlying Title III.  Certainly, whether

electronic surveillance should be expanded to include other persons and other telephones

implicates the congressional concerns regarding centralized policy and political

---

[17] The Essex County procedure should be contrasted with that utilized by Middlesex
County.  Unlike Essex County, Ms. Coakley authored a new designation letter each time
the ADA's sought authority to intercept communications over a new telephone number,
or authority to intercept communications of new individuals.

accountability just as much as the filing of the first application does, and it should be

subject to the same strict authorization requirements. See Chavez, 416 U.S. at 565-66,

569-70 (upholding suppression of evidence derived from second tap where, although

Attorney General had authorized the initial application to tap one coconspirator's

telephone, he had not authorized subsequent application to tap telephone of another

coconspirator).

As such, in this case, the failure of the Essex County District Attorney to issue

written authorization for the ADAs to amend the wiretap orders in this fashion renders

those applications and wiretap orders unlawful. As such, any and all evidence directly or

indirectly derived from those applications and orders must be suppressed.

### 4.  Application Five, Dated December 23, 2003, Relies Upon An Apparently Non-existent Designation Letter.

Application Five, dated December 23, 2003, cites as its authority a designation

letter dated December 28, 2003.  See Application, dated December 23, 2003, attached

hereto as Exhibit H3.  Not only does the application pre-date its supposed authority, but

the defendants have not been provided with any designation letter dated December 28,

2003 (or at least not have located same amongst the thousands of documents provided to

the defendants in discovery).  The court issued an order pursuant to this application,

authorizing the interception of communications.  The failure to properly identify the

designation authority for this particular application mandates suppression of all evidence

directly or indirectly derived from said application and Order.  See United States v.

Staffeldt, 451 F.3d 578, 579 (9th Cir. 2006).[5]

---

[5]  In Staffeldt, the application recited that a duly designated Justice Department official
had authorized the application and referred the court to a memorandum of authorization

**5. The ADA's unilaterally expanded the Court Orders to authorize law enforcement officials to improperly intercept and monitor *all* communications over targeted phones, even if the identified individuals were not a party to the communication.**

While generally the authority to intercept under Title III is not limited to "those conversations *between* a party named in the order and others," United States v. Kahn, 415 U.S. 143, 157, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974) (emphasis in original), particular language contained within the orders issued in this case limited the interception of telephone calls to those individuals specifically listed within the orders.  See United States v. Edwards, 303 F.3d 606, 621 (5th Cir.2002), cert. denied, 123 S.Ct. 1272 (2003) (where order authorized only conversations of a named interceptee "with a named or known conspirator," interception of communications between one such individual and another, whose involvement in the crime was not known at the time the order was issued, was unlawful).

In their applications, the Essex ADAs sought permission to intercept the identified individuals and their associates.  See, e.g., Exh. B (October 30, 2003 Application) at ¶12. Furthermore, in the Monitoring Instruction Memoranda issued by the ADAs to the monitoring teams after securing the wiretap orders, the ADAs authorized law enforcement officials to intercept and monitor all conversations occurring over the identified telephone numbers, *even if* none of the individuals identified in the

---

attached to the application. The letter attached to the application pertained, however, to an entirely different wiretap with no relation to the defendant and his coconspirators. The Court, stressing that wiretap applications must show that a properly designated official authorized the tap and that the authorization letter submitted did not support the assertion in the application that it had been properly authorized, concluded that suppression was required based upon the facial insufficiency of the application, even though there was in fact a contemporaneous letter authorizing the initial application  and the wrong letter had been appended to the application by mistake.

corresponding Court Order were a party to the intercepted conversations.  See, e.g., Exh.

I (Monitoring Instruction Memorandum, dated October 31, 2003) at ¶4(b).

      The failure of these Monitoring Instruction Memoranda, however, is the fact that

the court Orders issued in this case limited interception to conversations of the identified

individuals "and their associates, agents and co-conspirators," not simply anyone utilizing

the identified telephone.  See, e.g., Exh. T (Order dated October 31, 2003, signed by

Judge Richard Welch) at ¶5 ("The communications to be intercepted over said telephone

shall be limited to those communications of Dennis Albertelli, Salvatore Ramasci, and

Arthur Gianelli and their associates, agents and co-conspirators…") (emphasis added).

By using the word "and" in its Order, as with "or," the Court intended to limit

interception and monitoring to those conversations that included one of the identified

individuals.  This reading of the Orders' language is evidenced by the court's admonition

in paragraph 8 of the relevant Orders that "[i]f a person other than Dennis Albertelli,

Salvatore Ramasci and Arthur Gianelli engages in a conversation related to the

designated offenses and is conclusively identified, such conversation should be reported

to me in a Status Report, and I will determine whether a sufficient showing of probable

cause has been made to amend this order to include other persons using said telephone."

Id. at p. 8.  The same language is included in all subsequent Orders, yet each Monitoring

Instruction Memorandum expands interception and monitoring to all calls occurring over

the designated numbers, even if the identified individuals are not a party to the

conversation.

      The court Orders did not authorize law enforcement officials to intercept and

monitor all calls occurring over the identified telephone numbers, yet those were the

instructions provided to law enforcement officials by the ADAs. As such, this unauthorized and unlawful expansion of the court's Orders requires suppression of all evidence directly or indirectly related to these orders, or at minimum an order suppressing all evidence directly or indirectly related to the interception of any telephone communications not involving a party named in the Order.

    C.  **THE MIDDLESEX COUNTY APPLICATIONS AND ORDERS WERE UNLAWFUL.**

        1.  **Several applications Facially Fail To Demonstrate Personal Review By The District Attorney**.

First, similar to the Essex County applications, the Middlesex County applicants ignored Vitello's recommendation that the District Attorney cosign the application. See Smith, 726 F.2d at 859; Bickford, 393 Mass. 1006 (1984). Thus, as with the Essex County applications, these applications failed to provide any confirmation that the District Attorney had actually authorized their submission, as required by Smith and Vitello.

Second, seven of the fourteen applications that followed the original November 18, 2004 application—those dated (1) December 2, 2004, (2) December 17, 2004, (3) December 30, 2004, (4) January 14, 2005, (5) January 27, 2005, (6) February 14, 2005, and (7) February 28, 2005—are so-called renewal applications, none of which are accompanied by their own designation letters. See Exh. S1-S7. Instead, they simply refer to prior designation letters. The failure of this process, however, is that the Middlesex County designation letters, like the Essex County October 29, 2003 Designation Letter, explicitly state that renewals will be reviewed by either the DA *or her designee*. See, e.g., Exh. K (Designation Letter dated December 17, 2004) ("Either my

designee or I will review such [renewal] documents before you present them."). Likewise, the renewal applications explicitly provide that "District Attorney Coakley *or her designee* has reviewed this renewal application and the documents filed herewith, and she *or her designee* will review all further extension and renewal applications, all amendment applications, all status reports, and all return documents emanating from the requested Wiretap Warrant before they are presented to the Court."  See, e.g., Exh. S2 (Renewal Application dated December 17, 2004) at ¶12, Page 16.

Thus, similar to the Essex County applications, these seven Middlesex County renewal applications facially fail to satisfy Vitello's requirement that a wiretap application be personally reviewed by the District Attorney *himself or herself*, before he or she authorizes its submission to the court.  As noted *supra*, this duty is non-delegable under Vitello. See Smith, 726 F.2d at 858.  Wherefore, for the same reasons argued with regard to the similar Essex County applications, suppression of all evidence directly or indirectly related to these applications and Orders is required.

Alternatively, as with the similar Essex County applications, even should this Court conclude that the applications were not insufficient on their face, suppression is nonetheless required unless the District Attorney actually authorized the applications through the personal review process mandated by Vitello.  As such, at minimum, the Court should, as required in Smith, hold an evidentiary hearing at which the government should bear the burden of proving that the applications were properly authorized.  If the government cannot do so, suppression of all evidence directly or indirectly derived from these applications and Orders is mandated under Giordano.

### 2.  A Single Designation Letter For Subsequent Renewals Is Unlawful.

.

For the same reasons advanced with regard to the Essex County renewal applications that were unaccompanied by written designation letters, any and all evidence derived directly or indirectly from the seven Middlesex County applications that are unaccompanied by their own designation letter must be suppressed.  See supra.  One all-purpose designation letter issued by the District Attorney at the outset of the electronic surveillance process cannot supply the requisite authorization for all future renewals of the initial interceptions.  But see Commonwealth v. D'Amour, 428 Mass. 725, 735 (1999). As argued supra, the requirement that each application must be personally approved by the district attorney mandates written authorization for renewal applications, not simply original applications or amendment applications.

### 3.  Evidence Obtained Pursuant To The Remaining Seven Middlesex County Applications, All Of Which Were Accompanied By Their Own Designation Letter, And Which Attest That The District Attorney Personally Reviewed The Applications, Should Be Suppressed To The Extent They Are Tainted By Any Applications Not Personally Reviewed And Approved By The District Attorney.

First, as noted, none of the Middlesex County applications were co-signed by the District Attorney and, at minimum, an evidentiary hearing should be convened to determine whether the District Attorney actually authorized all of the applications through the personal review process mandated by Vitello, even those that were accompanied by designation letters asserting that they were reviewed by the District Attorney.

However, to the extent the Court determines, before or after an evidentiary hearing, that the seven Middlesex County applications that followed the November 18, 2004 application which were accompanied by their own designation letters—those applications dated (1) December 17, 2004, (2) December 23, 2004, (3) December 30, 2004, (4) January 14, 2005, (5) January 27, 2005, (6) February 14, 2005, and (7) February 18, 2005[18] -- were properly authorized, given that the accompanying designation letters attest that the applications were reviewed by the District Attorney and the applications affirm they were reviewed by the District Attorney, evidence seized pursuant to these applications and orders should still be suppressed to the extent these applications relied upon information gleaned from applications that were not properly reviewed and authorized by the District Attorney.

### 4. The December 2, 2004 Monitoring Instruction Memorandum Authorized Interception Of An Unknown Telephone Number: (617) 331-1167

The Monitoring Instruction Memorandum dated December 2, 2004, authorized law enforcement officials to intercept and monitor communications occurring over telephone number (617) 331-1167. See Exh. L. This number was not the subject of the accompanying application or court Order.  Nor was this telephone number apparently the subject of any other application or Order.  The Court should issue an order requiring the government to disclose whether communications over this telephone number were intercepted and whose communications, if anyone, were intercepted pursuant to these instructions.

---

[18] See Exh. J3; J10; J4; J5; J11; J7; and J9.

**5.    The ADAs Unilaterally Expanded The Court Orders To Authorize Law Enforcement Officials To Improperly Intercept And Monitor *All* Communications Over Targeted Telephones, Even If The Identified Individuals Were Not A Party To The Communication**.

Like their Essex County counterparts, the Middlesex ADAs did not limit interceptions to the persons authorized in the various Designation Letters.  In their applications, the ADAs sought "authorization to fully intercept, monitor and record the wire communications in furtherance of the above-mentioned conspiracies and criminal activities" occurring over the various telephone numbers, whether the conversations involved the identified individuals or their associates.  See Applications and Renewal Applications dated November 18, 2004, December 2, 2004, December 17, 2004, December 23, 2004, December 29, 2004, January 14, 2005, January 27, 2005, February 14, 2005, February 18, 2005 (Exh. J1-J9) at Para. 8, 12.  In the Monitoring Instruction Memoranda issued to law enforcement officers that accompanied the Orders, the ADAs likewise did not limit interception and monitoring to calls involving the identified individuals, but instead authorized interception of all calls occurring over the identified telephone numbers.  See Exh. L (Monitoring Instruction Memoranda at Paragraph 4(b)).

The Orders issued by the court, however, like the Essex County Orders, limited interception to conversations of the identified individuals and their associates, agents and co-conspirators, not simply anyone utilizing the identified telephone.  See, e.g., Exh. M (January 14, 2005  Order) at ¶5 ("The communications to be intercepted over said telephone shall be limited to those communications of Stephen Russo, Michael DiPietro, Philip Puopolo and his associates, agents and co-conspirators…") (emphasis added).  As

noted in connection with the Essex County Court Orders, the use of the word "and" was intended to limit interception to only those communications that involved one of the identified individuals. For example, in the Court Order dated January 14, 2005, the Court admonished that "[i]f a person other than Stephen Russo, Michael DiPietro, Philip Puopolo engages in a conversation related to the designated offenses and is conclusively identified, such conversation should be reported to me in a Status Report, and I will determine whether a sufficient showing of probable cause has been made to amend this order to include other persons using said telephone."  Exh. M at ¶8.

The Court Orders did not authorize law enforcement officials to intercept and monitor all calls occurring over the identified telephone numbers, yet those were the instructions provided to law enforcement officials by the ADAs. Any and all evidence derived directly or indirectly from the Commonwealth's unilateral expansion of the court's Orders must be suppressed.

### D.  <u>THE DECEMBER 31, 2003 WARRANT IS VOID ON ITS FACE.</u>

Title III provides that a state wiretap warrant must be "in conformity with § 2518 of this chapter and with the applicable State statute" and may be issued only where the "interception may provide or has provided evidence of the commission of the offense of murder, kidnapping, gambling, robbery, bribery, extortion, or dealing in narcotic drugs, marihuana or other dangerous drugs, or other crime dangerous to life, limb, or property, and punishable by imprisonment for more than one year, designated in any applicable State statute authorizing such interception, or any conspiracy to commit any of the foregoing offenses."  18 U.S.C. § 2516(2).  Section 99, in turn, sets forth a number of offenses designated for wiretap investigations.

On December 31, 2003, the Essex ADAs applied for and obtained a renewal warrant, alleging they had probable cause to believe that targets were conspiring to use wagers in violation of M.G.L. c. 271, § 17A, which proscribes placing or registering bets over a telephone.  See Exh. D and E.  The state judge, however, did not have the authority to issue such a warrant.  To be sure, with regard to gaming investigations, Section 99 authorizes warrants only for alleged violations of M.G.L. c. 271, § 17, *not* § 17A.  See M.G.L. c. 272, § 99B7.   Moreover, contrary to Title III, a violation of §17A is not punishable by imprisonment for more than one year.  As such, the warrant plainly and facially violates both Section 99 and Title III.

A statutory violation such as this mandates only one remedy:  suppression, as "[a]n application cannot be sought, nor an order entered, authorizing interceptions to gather evidence of offenses not enumerated in § 2516."  United States v. Ward, 808 F.Supp. 803, 806 (S.D. Ga. 1992).  The Ward Court aptly explained why:

> [T]he purpose of the legislation …was effectively to prohibit…all interceptions of oral and wire communications, except those specifically provided for in the Act….Although [t]he Act is not as clear in some respects as it might be, ... it is at once apparent that it ... limits the crimes for which intercept authority may be obtained.... Compliance with § 2516 is therefore no mere technicality; Congress took deliberate steps to restrict wiretap authorizations to a specific list of offenses. Section 2516 thus plays a `central and functional' role in furthering Congress's legislative purpose to guard against unwarranted use of wiretapping or electronic surveillance, and it `directly and substantially' implements Congress's limiting intent regarding this intrusive technique."

Id., quoting Giordano, 416 U.S. at 514.  As such, Ward concluded, suppression was the appropriate remedy where a wiretap warrant purported to authorize the interception of communications related to offenses not listed in § 2516 of Title III.  Id.; see also United

States v. Millstone Enterprises, Inc., 684 F.Supp. 867, 870-71 (W.D. Pa.), rev'd on other grounds, 864 F.2d 21 (3rd Cir. 1988)(holding that state wiretap warrants unlawfully issued where issued for investigation of crimes outside scope of 18 U.S.C. § 2516(2)). Ward's reasoning and holding is equally convincing with regards to Section 99.

Because each successive warrant is the fruit of the poisonous tree – i.e., the unlawful warrant purporting to authorize the interception of calls relating to a non-designated offense – this Court must suppress all evidence obtained in subsequent wairetaps.  See Girdano, supra.

### E. THE FIRST ESSEX COUNTY WIRETAP APPLICATION FAILED TO ESTABLISH PROBABLE CAUSE TO BELIEVE THAT THE TARGETS WERE COMMITTING A DESIGNATED OFFENSE.

As set forth below, the application for the October 31, 2003 wiretap order failed to establish probable cause to believe there was a violation of the Massachusetts gaming statute at issue – M.G.L. c. 271, § 17.  As such, the order was issued in violation of Title III and Section 99.

"Unlawfully intercepted" communications include those that were intercepted in violation of the Constitution as well as those intercepted in violation of the federal wiretap statute.  Giordano, 416 U.S. at, 527.  Interceptions made without probable cause fall within the definition of "unlawfully intercepted" communications and must be suppressed.  Id. at 526.  Any evidence derived from an unlawfully intercepted communication must also be suppressed, including communications intercepted under any subsequent extension orders. 18 U.S.C. § 2515; Giordano, 416 U.S. at 533.

Section 99, like Title III, authorizes the interception of wire and electronic communications only where there is probable cause to believe that a "designated offense" has been committed.  M.G.L. c. 272, § 99E2.  "Probable cause must be fully in place

**before** the wiretap is authorized." United States v. Ricciardelli, 998 F.2d 8, 21 (1st Cir. 1993)(emphasis in original). Sufficient information must be presented to support a belief that an offense has been committed. Illinois v. Gates, 462 U.S. 213, 239 (1983). The affidavit in support of the application must set forth facts minimally adequate to support such a belief. United States v. Villarman-Oviedo, 325 F.3d 1, 9 (1st Cir. 2003). The State court judge's probable cause determination "cannot be a mere ratification of the bare conclusions of others." Gates, 462 U.S. at 239.

Among the "designated offenses" is gaming under M.G.L. c. 271, § 17 ("Section 17"); this is the *only* gaming violation for which a wiretap warrant may issue and was the only offense alleged in the application and affidavit in support of the October 31, 2003 wiretap order. See M.G.L. c. 272, § 99B7; Exh. A and B. The State court judge, therefore, was required to find probable cause to believe Section 17 was violated before issuing an order. See United States v. Santana, 342 F.3d 60, 65 (1st Cir. 2003).

To demonstrate probable cause to believe a violation of Section 17 was being committed, the affidavit had to identify **a place** in Massachusetts where bets were registered. Section 17 does not make it a crime to register bets but, rather, it prohibits the keeping of a room for such purpose, occupying a place containing registering apparatus, or being found in a place with registering apparatus. Commonwealth v. Carlson, 331 Mass. 449, 451, 120 N.E.2d 384, 385 (1954) ("What is criminal under the statute is being found in any place with apparatus or any device for registering bets"); see also Commonwealth v. Sousa, 33 Mass. App. Ct. 433, 438, 600 N.E.2d 1012, 1015 (1992)("Whereas § 17A prohibits the use of the telephone to place or accept bets, Section 17 prohibits the keeping or occupying of any place with apparatus, books, or other

devices for the 'registering' of bets, and the actual 'registering' of bets by one present in such a place.").  Specifically section 17 states:

> Whoever keeps a building or room, or any part thereof, or occupies, or is found in, any place, way, public or private, park or parkway, or any open space, public or private, or any portion thereof, with apparatus, books or any device, for registering bets, or buying or selling pools, upon the result of a trial or contest of skill, speed or endurance of man, beast, bird or machine, or upon the result of a game, competition, political nomination, appointment or election, or whoever is present in such place, way, park or parkway, or any such open space, or any portion thereof, engaged in such business or employment; or, being such keeper, occupant, person found or person present, as aforesaid, registers such bets, or buys or sells such pools, or is concerned in buying or selling the same; or, being the owner, lessee or occupant of a building or room, or part thereof, or private grounds, knowingly permits the same to be used or occupied for any such purpose, or therein keeps, exhibits, uses or employs, or knowingly permits to be therein kept, exhibited, used or employed, any device or apparatus for registering such bets, or for buying or selling such pools, or whoever becomes the custodian or depository for hire, reward, commission or compensation in any manner, of any pools, money, property or thing of value, in any manner staked or bet upon such result, shall be punished.

M.G.L. c. 271, § 17.

Here, Orlando's affidavit alleged a violation of Section 17.  Exh. A, ¶¶ 3, 46, 66.  However, it failed to set forth facts minimally adequate to support this allegation because it failed to establish "a place" in Massachusetts where bets were registered (or where apparatus was kept).  The affidavit clearly established that Gianelli no longer maintained a place for registering bets in Massachusetts -- Orlando repeatedly stated throughout his affidavit that all bets were registered off-shore, with an organization known as "Dukes Sports," **not** in Massachusetts.  See Exh. A, ¶¶ 29, 33, 34, 38, 44, 45, 54.  Indeed, Orlando stated that, "According to Gianelli, using an off-shore service will eliminate any salaries he had to pay his clerks; rental payments he was required to make to maintain a secret gaming office(s); telephone expenses; equipment costs (i.e., computers, paper,

pencils, calculators etc….); and other gaming related expenses." Exh. A, ¶ 29. That is, the utilization of a foreign-based internet gaming service eliminated all places in Massachusetts where gaming apparatus was kept and registering bets occurred. Without identifying "a place" within the territorial reach of Section 17, the affidavit failed to demonstrate probable cause to believe there was a violation of Section 17.

In addition to the lack of specific facts supporting a Section 17 violation, the information from confidential informants – upon which Orlando heavily, almost exclusively, relies -- was uncorroborated and unreliable. Informant reliability has a direct bearing on probable cause determinations. "An informant's veracity, reliability, and basis of knowledge are all highly relevant in determining the value of his report." Gates, 462 U.S. at 230 (internal quotations omitted). When determining the value of informant tips, Courts should look at the totality of the circumstances. Id.

Other than disclosing that the informants had been involved in gaming for a number of years, the affidavit failed to disclose whether the informants had a criminal record or whether they were receiving any promises, rewards or inducements. See United States v. Brown, 500 F.3d 48, 55 (1st Cir. 2007) ("factors like an informant's prior criminal record and desire to advantage himself with respect to pending criminal charges are to be considered in evaluating his reliability."). Such information would have aided the State court judge in determining reliability and should have been included in Orlando's affidavit.

In addition, the State Police did not corroborate the informants' claims. Gates, 462 U.S. at 242 ("an officer may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is

reasonably corroborated by other matters within the officer's knowledge.")(internal
quotations and citation omitted).  This failure is curious, as each informant provided the
State Police with a phone number purportedly given to them by Gianelli.  Exh. A, ¶¶ 29,
39.  Yet the State Police did not even attempt to corroborate the informants' claims that
these telephone numbers were used for gaming purposes.  Although CI-1 allowed
Orlando "to listen in as he/she contacted telephone numbered (800) 567-6993 [the off-
shore telephone number for Duke Sports]," nothing about these conversations revealed a
connection to Gianelli, Albertelli or Ramasci.  Exh. A, ¶ 33.

     The affidavit also stated that the informants called Albertelli and Ramasci on the
target phones to discuss gaming matters.  For example, CI-1 told Orlando that "he/she
routinely contacts Albertelli over cellular telephone numbers (781) 710-2154 and (978)
758-8575…" Exh. A, ¶ 30.[19]  Similarly, CI-2 told Orlando that he/she "contacts
Albertelli over cellular telephones numbered (781) 710-2154 and (978) 758-8575…to
discuss gaming related matters."  Exh. A, ¶ 40.[20]  Similar claims were made with respect
to contacting Ramasci.  See, e.g., Exh. A, ¶¶ 33, 40.  No effort, however, was made to
corroborate this information.

     Moreover, despite accessing toll information for the Albertelli and Ramasci
phones, Orlando did not confirm that the informants had actually contacted any of the
target phones.  Orlando made every effort to identify other phone numbers that were in
contact with the Albertelli and Ramasci target phones. See generally, Exh. A, ¶¶ 49 – 53
(detailing phone numbers and the number of times they were in contact with the target
phones).  Given his reported relationship with the informants, Orlando could have easily

---

[19] This claim is repeated in ¶¶ 33, 34.
[20] This claim is repeated in ¶ 40

identified the informants' phone calls could have taken a much simpler approach and listened in on the informants' calls, as he had done with the 1-800-number for "Dukes Sports." <u>See</u> Exh. A, ¶ 33.

In sum, the application failed to set forth facts sufficient to demonstrate probable cause to believe there was a violation of Section 17. As such, the order violated both Title III and Section 99. For those reasons, all communications intercepted pursuant to the October 31, 2003 wiretap order and all evidence derived therefrom – <u>i.e.,</u> all evidence derived from subsequent wiretap warrants -- must be suppressed.

### F. THE STATE COURT WAS NOT AUTHORIZED TO ISSUE AN ORDER PERMITTING THE INTERCEPTION OF COMMUNICATIONS OVER CELLULAR TELEPHONES.

Beginning with the first, each wiretap warrant purported to authorize the State Police to intercept communications occurring over cellular telephones. The Superior Court, however, lacked the authorization to permit such interceptions.

By enacting Title III of the Omnibus Crime Control and Safe Street Acts of 1968, 18 U.S.C. § 2510, <u>et</u> <u>seq.</u>, Congress forbid the interception of wire and oral communications except in enumerated circumstances. Importantly, this version of Title III did *not* authorize interceptions over cellular telephones. <u>See</u> <u>Bartnicki v. Vopper</u>, 532 U.S. 514, 524 (2001). Rather, as <u>Bartnicki</u> explained, it was not until Congress passed the Electronic Communications Privacy Act ("ECPA") of 1986 that Congress broadened Title III to include "electronic communications." "By reason of that amendment…Title III now applies to the interception of conversations over … cellular … phones." <u>Id.</u>, <u>see</u> <u>also</u> <u>United States v. Suarez</u>, 906 F.2d 977, 980 (4th Cir. 1990)(explaining that the ECPA was intended **"**to update and clarify Federal privacy protections and standards in light of dramatic changes in the new computer and telecommunications technologies" and that

initial version of Title III did not protect "communications transmitted by new

noncommon carrier communications services or new forms of telecommunications and

computer technology."); In re Application, 157 F.Supp.2d 286, 289 (S.D.N.Y.

2001)(ECPA was intended to apply "to large-scale electronic mail operations, computer-

to-computer data transmissions, cellular and cordless telephones, paging devices, and

video teleconferencing."); Peavy v. Harvey, 37 F.Supp.2d 495, 506-07 (N.D. Tex.

1999)("Title III originally covered only wire and oral communications. However, the

rapidly growing number of non-wire technologies such as e-mail, cellular phones, paging

devices, and computer-to-computer data transmissions eventually rendered the statute

hopelessly out of date'… Congress responded with the Electronic Communications

Privacy Act of 1986."). aff'd in part, vacated in part on other grounds, 221 F.3d 158 (5th

Cir. 2000);  United States v. Kim, 803 F.Supp. 352, 361 (D. Haw. 1992)("Following the

passage of the Electronic Communications Privacy Act of 1986 ("ECPA"), cellular

telephone communications have enjoyed the same privacy protections as standard

telephone communications.");  Shubert v. Metrophone, Inc., 1989 WL 79349, * 3 (E.D.

Pa. 1989) ("To take account of the technical characteristics of cellular transmissions, not

previously recognized in the statute, the legislature specifically added interception of

cellular calls to the list of prohibited acts.")

  It is the pre-1986 version of Title III – *__which did not authorize interceptions over__*

*__cellular telephones__* -- upon which Section 99 is based.   A comparison of Section 99 and

Title III reveals that Section 99 simply does not encompass cellular telephones.

  First, only Title III applies to electronic communications, which are defined as

"any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature

transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce, but does not include…any wire or oral communication….” 18 U.S.C. § 2510(12). Section 99 contains no similar language.

Second, Section 99’s definition of “wire communications,” unlike Title III, does not include cellular telephones. Rather, Section 99B defines “wire communication” as “any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception.” In contrast, since the ECPA was passed, Title III now provides that “`wire communication’ means any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception (*including the use of such connection in a switching station*) furnished or operated by any person engaged in providing or operating such facilities for the transmission of interstate or foreign communications or communications affecting interstate or foreign commerce[.]” 18 U.S.C. § 2510 (emphasis added). This distinction is critical because, unlike land lines, cellular calls are transmitted in part through “switching stations.” And, importantly, the Massachusetts House of Representatives have taken notice of the Section 99’s limitations, as evidenced by 2007 Mass. House Bill 1601 (January 10, 2007), which would, if passed, update the definition of “wire communications” and “electronic communications” to mirror that of Title III. See Exh. F (excerpt from House Bill 1601).

Not only does the plain language of Title III and Section 99 differ, but this Court cannot read Title III's application to cellular telephones into Section 99. To be sure, when Congress passed the ECPA (thereby bringing cellular communications within the protections of Title III), it included a "Special Rule." That Rule required each state to bring its own wiretap statute in compliance with the federal law by October 21, 1988.[21] See Pub.L. 99-508, §111(b),[22] see also S.Rep.No.541 at 35, *reprinted in* 1986 U.S. Code Cong. Admin. News at 3589 ("…the states must enact statutes which are at least as restrictive as the provisions of [Title III] before they can authorize their state courts to issue interception orders."); Suarez, 906 F.2d at 981. But the Massachusetts Legislature never amended its statute to conform with the federal requirement and, at the expiration of the two year grace period, federal law took the place of state wiretap law. Massachusetts state courts thus could not issue a wiretap warrant except by federal authorization; see Brown v. Waddell, 50 F.3d 285, 290 n.3 (4th Cir. 1995); which exists *only if* the state's procedural requirements for the issuance of a wiretap are met. See 18

---

[21] While Congress did not intend to preempt state regulatory authority in the wiretap arena, the ers of the federal statute did intend to establish minimum privacy standards for state statutes to follow. United States v. McNulty, 729 F.2d 1243, 1253 (9th Cir. 1984); S. Rep. No. 1097, 90th Cong. 2d Sess. (1968), *reprinted in* 1968 U.S. Code Cong. & Admin. News 2112, 2180, 2187 ("The state statute must meet the minimum standards reflected as a whole in the proposed chapter…[T]he states would be free to adopt more restrictive legislation, or no legislation at all, but not less restrictive legislation").

[22] Pub.L. 99-508, §111(b) states that "[a]ny interception pursuant to section 2516(2) of title 18 of the United States code which would be valid and lawful without regard to the amendments made by this title shall be valid and lawful notwithstanding such amendments if such interception occurs during the period beginning on the date such amendments take effect and ending on the earlier of –(1) the day before the date of the taking effect of State law conforming the applicable state statute with chapter 119 of title 18, United States Code, [18 U.S.C. § 2510 *et seq.*] so as amended; or (2) the date of two years after the date of the enactment of [the Privacy Act]."

U.S.C. § 2516(2). The legislative history of the provision confirms this reading of the statute. See S.Rep.No. 1097, *reprinted in* 1986 U.S. Code Cong. & Admin. News 2187. ("No applications may be authorized unless a specific statute permits it.")

In sum, because Massachusetts does not have a statute or other procedural rule which permits the interception of cellular communications, the requirements of 18 U.S.C. § 2516(2) were not met and the warrants at issue are invalid. Accordingly, any evidence derived therefrom must be suppressed.

### III.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants Arthur Gianelli, Maryann Gianelli, Frank Iacoboni, Philip Puopolo, Dennis Albertelli, Randy Albertelli, Gisele Albertelli, Salvatore Ramasci, and Joseph Yerardi respectfully request the fruits of each wiretap warrant executed during the investigation of this case.

Respectfully submitted,
Defendant, Arthur Gianelli,
By his attorney,

/s/ Patricia A. DeJuneas
Patricia A. DeJuneas, Esquire BBO: 652997
Richard M. Egbert, Esquire BBO: 151800
Law Offices of Richard M. Egbert, PC
99 Summer Street, Suite 1800
Boston, Massachusetts 02110
(617) 737-8222

Respectfully submitted,

Defendant, Philip Puopolo,

By his attorney,

/s/ Robert M. Goldstein

Robert M. Goldstein, Esquire

20 Park Plaza, Suite 903

Boston, MA 02116

(617) 742-9015

Respectfully submitted,

Defendant, Frank Iacaboni,

By his attorney,

/s/ Matthew D. Thompson____

Matthew D. Thompson, Esquire

Butters, Brazilian & Small, LLP

One Exeter Plaza

699 Boylston Street

Boston, MA 02116

(617) 367-2600

Respectfully submitted,

Defendant, Mary Ann Gianelli

By her attorney,

/s/ E. Peter Parker_____

E. Peter Parker, Esquire

Law Offices of E. Peter Parker

151 Merrimac Street

Boston, MA 02114

(617) 742-9099

Respectfully submitted,

Defendant, Gisele Albertini,

By her attorney,


/s/ Page Kelley_____

Page Kelley, Esquire

Federal Defenders

408 Atlantic Avenue

Boston, MA 02210

(617) 223-8061


Respectfully submitted,
Defendant, Rafia Feghi,

By her attorney,


/s/ Walter B. Prince
Walter B. Prince, Esquire
Prince, Lobel, Glovsky & Tye LLP
100 Cambridge Street
Suite 2200
Boston, MA 02114
617-456-8000



Respectfully submitted,
Defendant, Randy Albertelli,

By his attorneys,


/s/ Raymond A. O'Hara____
Raymond A. O'Hara, esquire
1 Exchange Place
Worcester, MA 01608
(508) 831-7551

Respectfully submitted,
Defendant, Joseph Yerardi,
By his attorney


/s/ Deborah DelVecchio

Debra DelVecchio, Esquire

DelVecchio & Hoeseman

15 Front Street

Salem, MA 01970

(978) 740-5999



Respectfully submitted,

Defendant, Dennis Albertelli,

By his attorney


/s/ Charles W. Rankin

Charles W. Rankin, Esquire
Rankin & Sultan
151 Merrimac Street, 2nd Floor
Boston, MA 02114
(617) 720-0011

Respectfully submitted,
Defendant, Salvatore Ramasci,

By his attorney,


/s/ Joseph J. Balliro, Jr.

Joseph J. Balliro, Jr., Esquire
Balliro & Mondano
99 Summer Street, Suite 1800
Boston, MA 02110
(617) 737-8442


Dated:  March 20, 2008


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this  day of    , 2008.


/s/ Patricia A. DeJuneas
Patricia A. DeJuneas, Esquire