UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Crim. No. 05-10003-NMG |
| v. | ) | |
| | ) | |
| ARTHUR GIANELLI, | ) | |
| JOSEPH YERARDI, JR., | ) | |
| DENNIS ALBERTELLI A/K/A "FISH," | ) | |
| PHILIP PUOPOLO, | ) | |
| SALVATORE RAMASCI A/K/A "LEFTY," | ) | |
| FRANK IACABONI, | ) | |
| RANDY ALBERTELLI, | ) | |
| STEPHEN RUSSO A/K/A "MOON," | ) | |
| MICHAEL PINIALIS A/K/A "MAX," | ) | |
| ENEYDA GONZALEZ RODRIGUEZ, | ) | |
| MARY ANN GIANELLI, | ) | |
| GISELE ALBERTELLI, and | ) | |
| RAFIA FEGHI A/K/A RAFIA YERARDI, | ) | |
| | ) | |
| Defendants. | ) | |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION
TO MOTION TO SUPPRESS FRUITS OF WIRETAP WARRANTS**

Defendants Arthur Gianelli, Joseph Yerardi, Jr., Dennis Albertelli a/k/a "Fish," Philip Puopolo, Salvatore Ramasci a/k/a "Lefty," Frank Iacaboni, Randy Albertelli, Mary Ann Gianelli, Gisele Albertelli, and Rafia Feghi a/k/a Rafia Yerardi have moved to suppress the fruits of wiretap warrants.[1] Their motion is without merit and should be denied.

---

[1] Defendant Stephen Russo a/k/a "Moon," has appeared with counsel on this indictment but is not listed as joining in the motion. Defendants Michael Pinialis a/k/a "Max," and Eneyda Gonzalez Rodriguez have not been arrested on this indictment and are not parties to the motion.

## Table of Contents

1.  Relevant Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   a.  Which Law Applies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   b.  Certain Types of Errors Do Not Warrant Suppression . . . . . . . . . . . . . . . . . 5

   c.  Standard of Review of a Wiretap Order.. . . . . . . . . . . . . . . . . . . . . . . . . . . 7

2.  The Wiretap Affidavits Complied With the "Necessity" Requirement. . . . . . . . . . . . . . . 9

3.  The Wiretap Applications Were Properly Authorized.. . . . . . . . . . . . . . . . . . . . . . . . . 26

   a.  The Designation Letters.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

   b.  The So-Called December 28, 2003 Designation Letter. . . . . . . . . . . . . . . . . . 37

   c.  The Monitoring Instructions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

4.  The December 31, 2003 Essex County Warrant Is Valid. . . . . . . . . . . . . . . . . . . . . . 40

5.  The October 31, 2003 Essex County Wiretap Affidavit Established Probable Cause.. . . 45

   a.  M.G.L. c.272, Section 17 Was Violated Within Massachusetts. . . . . . . . . . . . . 45

   b.  Reliability and Corroboration of the Confidential Informants.. . . . . . . . . . . . . 51

6.  The Wiretapping of 617-331-1167 Was Duly Authorized. . . . . . . . . . . . . . . . . . . . . . 58

7.  The Massachusetts Statute Authorizes Wiretapping of Cellular Telephones. . . . . . . . . . 59

1.  Relevant Law

a.  Which Law Applies

Federal law controls the admissibility of the fruits of state electronic surveillance in federal courts. *United States v. Sutherland*, 929 F.2d 765, 769 (1st Cir. 1991). When Congress enacted Title III, it intended to occupy the field of wiretapping. *United States v. Smith*, 726 F.2d 852, 860 (1st Cir. 1984). Although states may impose additional requirements for obtaining and executing *state* surveillance warrants, *United States v. Mora*, 821 F.2d 860, 863 n. 3 (1st Cir. 1987), failure to meet such higher state standards does *not* preclude the admissibility of the seized conversations in a *federal* prosecution. *Sutherland*, 929 F.2d at 769, 771. This is true because the admissibility of evidence in a federal prosecution is determined by *federal* law, *id.*, even if the communications were gathered by state law enforcement personnel under a state court order. *Mora*, 821 F.2d at 863.

In *United States v. Charles*, 213 F.3d 10 (1st Cir. 2000), the defendants sought suppression in federal court of a state wiretap *that had already been suppressed in Massachusetts state court*. The First Circuit rejected the defendants' argument that the district court was required to suppress the evidence because the state court had done so in the prior state proceeding:

> According to appellants, [18 U.S.C.] § 2516(2) requires federal courts to defer to state law in circumstances where, as here, the federal prosecution attempts to make use of wiretap evidence obtained through use of a state court warrant. If state law applies, appellants reason, the district court was required to suppress the evidence arising out of the 21 Field Street wiretap because the state court had done so in the prior state proceeding. Appellants misconstrue the statute.

> The district court correctly ruled that *federal law governs* the admissibility of evidence in federal prosecutions. As a result, evidence obtained in violation of neither the Constitution nor federal law is admissible in federal court proceedings *without regard to state law*. This is true even when the evidence is obtained pursuant to a

state search warrant or in the course of a state investigation. Considering a question closely related to the one we face today, the Supreme Court has squarely affirmed this principle:

> In determining whether there has been an unreasonable search and seizure by state officers, a *federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out. The test is one of federal law*, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed.

*Elkins v. United States*, 364 U.S. 206, 223-24 (1960) [emphasis added].

\* \* \*

[W]e find additional support for our conclusion in *United States v. Sutherland*, 929 F.2d 765 (1st Cir. 1991), a decision that does not directly address the reach of § 2516(2).

In *Sutherland*, state law enforcement personnel utilized an informant to procure incriminating tape recordings without a warrant. Under Massachusetts law, warrantless interception of oral and wire communications is prohibited absent consent of all the parties, except in two circumstances which did not apply to the case. The Commonwealth conceded that the tape recordings had been obtained in violation of state law and consequently that testimony derived therefrom could not be used as substantive evidence in a Massachusetts prosecution. The Commonwealth, however, moved in limine for a determination that it would be allowed to use the tapes as impeachment evidence. The question was presented to the Supreme Judicial Court, which held that the recorded conversations were not admissible for any purpose. As a result of this ruling, the Commonwealth dismissed the case.

A federal indictment followed. Prior to trial, the defendants moved to suppress on the ground that the tape recordings were obtained by state law enforcement personnel *in violation of the Massachusetts wiretap law*. The district court denied the motion and this Court affirmed, stating "we hold that *in federal criminal prosecutions, the*

*admissibility of wiretap evidence is a question of federal law.*"
Today, we reaffirm the holding of *Sutherland* and apply it with equal
force to this case.

In so doing, we once again leave open the possibility that in an
extreme case of flagrant abuse of the law by state officials, where
federal officials seek to capitalize on that abuse, this court might
choose to exercise its supervisory powers by excluding ill-gotten
evidence.  ...

Finally, in rejecting appellants' § 2516(2) argument, we recognize
that several courts have concluded that § 2516(2) may require the
application of state law where the state wiretap statute contains
standards that are more protective of privacy than the corresponding
provisions of the Federal Wiretap Statute.

\* \* \*

This rule of law, however, is not applicable to this case. As the
district court stated, "because the state court's suppression order in
this case was not based upon the application of more stringent
standards governing authorization procedures for wiretap orders
under Massachusetts law, this line of cases is inapposite to
defendants' claim, which hinges on the appropriate remedy for
violation of a minimization order."

213 F.3d at 18-20 (emphasis added; citations and internal marks omitted).

### b.  Certain Types of Errors Do Not Warrant Suppression

The Supreme Court has repeatedly held that "suppression is *not* mandated for every violation

of the statutory requirements of Title III...."  *United States v. Chavez*, 416 U.S. 562, 575 (1974).  To

the contrary, suppression is required *only* for a "failure to satisfy any of those statutory requirements

that *directly and substantially* implement the congressional intention to limit the use of intercept

procedures to those situations clearly calling for the employment of this extraordinary investigative

device."  *Id.*, quoting *United States v. Giordano*, 416 U.S. 505, 527 (1974) (emphasis added).

Thus, when a duly authorized government official had *actually* approved a wiretap application, the misidentification of the approving official in the wiretap application did *not* warrant suppression, since the identification requirement of 18 U.S.C. §§ 2518(1)(a) and 2518(4)(d) does not play a "substantive role" in the regulatory system established by Title III, and therefore the misidentification in the application did *not* rise to the level of making the wiretap unlawful within the meaning of 18 U.S.C. § 2518(10)(a)(i).  *Chavez*, 416 U.S. at 577-80.  Similarly, in *United States v. Donovan*, 429 U.S. 413 (1977), the Supreme Court held that suppression was *not warranted* for violation of the identification requirement of 18 U.S.C. § 2518(1)(b)(iv) and the notice requirement of 18 U.S.C. § 2518(8)(d).

In *Commonwealth v. Vitello*, 367 Mass. 224, 327 N.E.2d 819 (1975), the Massachusetts Supreme Judicial Court ("SJC") adopted the federal standard about when to suppress evidence obtained through the use of an allegedly deficient wiretap warrant:

> [S]uppression is required, not in all instances, but where there has been a failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device. [*United States v. Giordano*, 416 U.S. 505,] 527 [(1974)].  In resolving this issue, the court's inquiry should be directed toward determining, among other things, whether the particular procedure involved is a central or functional safeguard to prevent abuses in electronic surveillance as opposed to a procedural or reporting mechanism (*United States v. Chavez*, 416 U.S. 562, 578 (1974)); whether the purpose that the particular procedure was designed to effect has been accomplished in spite of the error (*id*. at 575); and, whether the statutory requirement was deliberately ignored, and if so, whether this was done to gain an unfair tactical advantage. *Id* at 572-573.

*Vitello*, 367 Mass. at 269-70, 327 N.E.2d at 845 (internal marks omitted).

In *Vitello,* the SJC found that suppression was too extreme a remedy where the return on the wiretap warrant was two days late:  "[W]arrant return procedures are ministerial, and failure to comply therewith is not ground for voiding an otherwise valid search."  *Id.*, 367 Mass. at 275, 327 N.E.2d at 848 (citation and internal marks omitted); *see also Commonwealth v. Assad*, 393 Mass. 418, 420; 471 N.E.2d 1290, 1293 (1984) (denying motion to suppress and finding that an "application is defective for failing to disclose information about a prior application *only* if the persons involved in or authorizing the application process knew or on reasonable inquiry would have learned of the prior application") (emphasis added).

### c.  Standard of Review of a Wiretap Order

Because there has already been a judicial finding -- by the issuing court -- of the adequacy of the affidavits supporting the warrants for electronic surveillance, a presumption of validity attaches to them.  *See Franks v. Delaware*, 438 U.S. 154, 171 (1978). The Supreme Court has repeatedly stated that after-the-fact scrutiny by courts regarding sufficiency of the affidavit should *not* take the form of a *de novo* review.  *See Illinois v. Gates*, 462 U.S. 213, 236 (1983). A prior judicial determination of probable cause should be paid great deference by the reviewing court.  *Id.*; *Spinelli v. United States*, 393 U.S. 410, 419 (1969); *United States v. Woodbury*, 511 F.3d 93, 98 (1st Cir. 2008).  Further, an issuing judge's finding of probable cause is itself a substantial factor tending to uphold the validity of warrants.  *United States v. Spinosa*, 982 F.2d 620, 626 (1st Cir. 1992).

The task of the district court judge in reviewing another judge's prior determination concerning probable cause and the unavailability of alternative investigative techniques is *not* to make a *de novo* determination of sufficiency, but to decide whether "the facts set forth in the application were *minimally adequate* to support the determination that was made."  *United States*

*v. Ashley*, 876 F.2d 1069, 1074 (1st Cir. 1989) (citations omitted; emphasis added); *United States v. Nelson-Rodriguez*, 319 F.3d 12, 32 (1st Cir. 2003); *United States v. Smith*, 726 F.2d 852, 863-864 (1st Cir. 1984); *United States v. Scibelli*, 549 F.2d 222, 226 (1st Cir. 1977).

The sufficiency of the application is to be tested in a practical, common sense fashion. *United States v. Smith*, 726 F.2d at 864; *United States v. Ashley*, 876 F.2d at 1075; *United States v. Abou-Saada*, 785 F.2d 1, 11 (1st Cir. 1986).

As the Supreme Court stated in *Brinegar v United States*, 338 U.S. 160, 175 (1949):

> In dealing with probable cause, however, as the very name implies, we deal with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act ...

and again in *Illinois v. Gates*, 462 U.S. 213, 245 n.13 (1983):

> [P]robable cause requires only a probability or *substantial chance* of criminal activity, *not an actual showing of such activity*. By hypothesis, therefore, innocent behavior will frequently provide the basis for a showing of probable cause; to require otherwise would be to *sub silentio* impose a drastically more rigorous definition of probable cause than the security of our citizens demands ... In making a determination of probable cause the relevant inquiry is *not whether particular conduct is "innocent" or "guilty", but the degree of suspicion that attaches to particular types of non-criminal acts.*

(emphasis added).

The sufficiency of the affidavit with reference to the necessity requirement is upheld if the reviewing court determines that the issuing court "could have reasonably concluded that normal investigatory procedures reasonably appear to be unlikely to succeed." *United States v. Ashley*, 876 F.2d at 1074.

2.  <u>The Wiretap Affidavits Complied With the "Necessity" Requirement</u>

The federal wiretap statute, 18 U.S.C. § 2518(1)(c), requires that the application contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Section 2518(3)(c), in turn, provides that before a judge may approve a wiretap order, he must determine on the basis of the facts submitted by the applicant that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." This is commonly known as the "necessity" requirement. *See*, *e.g.*, *United States v. Santana*, 342 F.3d 60, 65 (1st Cir. 2003).

As the First Circuit has explained in *Santana*, 342 F.3d at 65, the "necessity" requirement of 18 U.S.C. § 2518(1)(c) is satisfied if the application demonstrates that the government made "a *reasonable, good faith effort* to run the gamut of normal investigative procedures" before resorting to electronic interception. *Id*. (emphasis added; citation and internal marks omitted). The government is *not* required to demonstrate that it exhausted all investigative procedures, *id*., or that other methods have been entirely unsuccessful. *United States v. Villarman-Oviedo*, 325 F.3d 1, 9 (1st Cir. 2003).

Moreover, when a trial judge reviews a wiretap order that was issued by a different judge, it is *not* appropriate for the trial judge to make a *de novo* determination of sufficiency as if he were the judge who issued the wiretap order. *Santana*, 342 F.3d at 65; *see Villarman-Oviedo*, 325 F.3d at 9. Rather, the proper role of the trial judge is limited to "examin[ing] the face of the affidavit and decid[ing] whether the facts set forth in the application were *minimally adequate* to support the determination that was made." *Villarman-Oviedo*, 325 F.3d at 9 (emphasis added; citation and

internal marks omitted); *see also Santana*, 342 F.3d at 65.  The wiretap affidavit's showing of "necessity" must be found adequate "if it satisfies the burden that it indicate[d] a *reasonable likelihood* that alternative techniques would fail to expose the crime."  *Santana*, 342 F.3d at 65 (emphasis added; citations and internal marks omitted).  And, the trial court must uphold the sufficiency of the affidavit if the trial court "determines that the issuing court *could have reasonably concluded* that normal investigatory procedures reasonably appeared to be unlikely to succeed." *United States v. Lopez*, 300 F.3d 46, 53 (1st Cir. 2002) (citations and internal marks omitted).

The defendants in the present case argue that the statements of "necessity" in Trooper Nunzio Orlando's affidavits were largely "boilerplate" which were "unsupported in fact" and did not relate specifically to this investigation.  (Br. 23).[2]  They also claim that the State Police "exaggerated the investigation's true goal" in order to erect "insurmountable hurdles" to normal investigative techniques, thereby artificially manufacturing the "necessity" for wiretaps.  (Br. 21).

The First Circuit rejected similar arguments in a recent drug case, *United States v. Martinez*, 452 F.3d 1, 4 (1st Cir. 2006), and they should be rejected in the present case for the same reasons.

First, there is no requirement that the government "reinvent the wheel" by drafting entirely new language for every wiretap affidavit, and there is no rule that wiretaps may not be used in "ordinary" investigations:

> Martinez is misguided in his insistence that the government can meet the Title III necessity requirement only by showing that the particular investigation at issue is "different from the ordinary drug investigation".  *There is no requirement that the government establish such a difference*.  Necessity is a function of the specifics of the case, not its uniqueness. If a seemingly "ordinary" drug investigation requires a Title III wiretap, and the government establishes that

---

[2]        "Br." refers to the defendants' brief.

> necessity with the particulars of a given investigation, no more is needed. *The ordinariness of the investigation does not preclude a finding of necessity for the use of wiretaps to further the investigation*. In this instance, we are satisfied that the affidavits provided sufficient detail to meet the "necessity" requirement of Title III.

*Id*., 452 F.3d at 5-6 (emphasis added).

Second, the government may "legitimately cast a wide net" in its investigative goals, *Martinez*, 452 F.3d at 6. Thus, the First Circuit has upheld wiretaps where the goals of the investigation were to "uncover[ ] the *full scope* of the potential crimes under investigation, as well as the identities of those responsible" and to obtain "evidence of the *totality of offenses* in which the targets of the investigation were involved" and "the *complete range of operations* of the target conspiracy." *Villarman-Oviedo*, 325 F.3d at 10 (emphasis added); or to "uncover the *full scope* of the conspiracy, including *conclusive proof* of identity and information as to how the drug sales were made." *United States v. Santana*, 342 F.3d 60, 66 (1st Cir. 2003) (emphasis added).

Similarly, in *Martinez*, the First Circuit upheld the wiretap where the investigation objectives were "(1) identifying *all* of the individuals who were supplying Martinez with cocaine; (2) identifying the manner in which the organization transported cocaine; (3) identifying the manner in which payment was made to the sources of supply for the cocaine that was distributed by Martinez; (4) identifying *all* of the locations where cocaine was stored by the organization; and (5) identifying the manner in which Martinez and his associates laundered and invested their drug proceeds." 452 F.3d at 6 (emphasis added).

Thus, the defendants' attacks on the "necessity" component of Trooper Orlando's October 31, 2003 affidavit (Br. 18-43) must be rejected.

Trooper Orlando's October 31, 2003 affidavit provided evidence that, as of that date, "Arthur Gianelli, Dennis Albertelli, Salvatore Ramasci, and other persons as yet unknown are part of a highly organized and sophisticated group engaged in a continuing conspiracy to commit violations of the Massachusetts gaming statute, G.L. c. 271, § 17" (Def. Exh. at 4);[3] that "Gianelli's gaming syndicate is one of the largest illegal bookmaking organizations currently operating in the Commonwealth of Massachusetts" (Def. Exh. at 29); and that "traditional organized crime families (such as the La Cosa Nostra ('Mafia' or 'LCN') or organized crime groups ... have been heavily involved in illegal gaming/bookmaking and have maintained a significant degree of control and supervision over organized bookmaking operations ... [such as by] extort[ing] weekly or monthly 'rent' payments from bookmakers in return for [the bookmakers] being allowed to operate without interference [from organized crime]." (Def. Exh. A at 10-11).

The affidavit explained that "For many years the State Police have attempted to disrupt, destroy, and prosecute these illegal bookmaking groups that are often closely affiliated with the New England LCN. Many in the law enforcement community consider illegal bookmaking the lifeblood of the LCN. The proceeds derived from bookmaking are often used by members of the LCN to supplement or support other criminal ventures." (Def. Exh. A. at 42).

Thus, Trooper Orlando stated that "It is the goal of this investigation to infiltrate Gianelli's organization, identify his associates, discover and exploit his association with members of the LCN, and to ultimately dismantle his criminal enterprise. It is also the goal of [the State Police] to utilize

---

[3]        Rather than duplicate exhibits that have already been submitted to the Court on this motion, "Def. Exh. A" refers to Exhibit A to the defendants' wiretap suppression motion, namely, Trooper Orlando's October 31, 2003 affidavit. The page numbers for Def. Exh. A used within this brief are the original page numbers on the bottom of each page, not the Bates numbers that were added. We will use similar designations for other defense exhibits to which we refer in this brief.

Gianelli's reliance on Albertelli and Ramasci ... as a means of exposing his direct involvement in the operation.  If the [wiretap] orders are granted [for the Albertelli and Ramasci cell phones], ... it is anticipated that the information gathered will lead us to Gianelli, and therefore a step closer to our goal of dismantling his criminal enterprise." (Def. Exh. A at 43-44).  "Gianelli's 'behind the scenes' involvement makes it more difficult for him to be detected by law enforcement, and its attempts at getting to the hierarchy of the organization.  ...  [I]t is the collective hope of the [State Police] that this investigation will serve to dismantle Gianelli's organization, expose his agents, associates, and organized crime ties." (Def. Exh. A at 54).  "A primary goal of this investigation is to penetrate the bookmaking operation and conspiracy described in this affidavit, and to identify, apprehend, and bring about the successful prosecution of those persons involved at all levels of this organization and conspiracy, including persons other than Arthur Gianelli, Dennis Albertelli, and Salvatore Ramasci, such as the 'street bookies,' persons operating 'local gaming offices,' persona operating 'area bookmaking offices,' and persons at higher levels of the organization.  It is also the goal of this investigation to identify, apprehend, and prosecute all of these persons and to trace the manner in which the proceeds of the bookmaking operation have been, and are being spent, stored or invested, and to seize and seek forfeiture of these proceeds...." (Def. Exh. A at 63).

Under the case law set forth above, those goals were entirely appropriate.  And, contrary to the defendant's contentions, these goals were not "exaggerat[ions]" and "insurmountable hurdles" (Br. 21) that "vastly overstated and misrepresented the investigation's true goals." (Br. 22).  To the contrary, these goals were realistic and attainable -- as is readily apparent by looking at what the pending indictment in this case demonstrates that the investigation has already achieved as a direct result of these wiretaps:

♦    The government developed sufficient evidence to indict twenty-one (21) defendants as a direct result of this investigation and these wiretaps.[4]

♦    The roster of defendants, as set forth in Paragraph 3 of the Indictment, includes the heads of this bookmaking operation (Arthur Gianelli and Joseph Yerardi, Jr.), bookmaking "agents" (Dennis Albertelli, Randy Albertelli), the principal of another but related bookmaking office (Puopolo), the operator of a local bookmaking office (Russo), the people who ran the offshore bookmaking website and toll-free number (Pinialis, Westerman, Gonzalez Rodriguez), the intermediary between the local and offshore bookmaking components (Daniels), a money collector and distributor (Ramasci), and people involved in laundering proceeds from the illegal gambling business (Mary Ann Gianelli, Gisele Albertelli, Rafia Feghi).

In addition, Trooper Pasquale Russolillo testified at the January 11, 2005 detention hearing of Arthur Gianelli in this case that a search warrant (that resulted from the wiretaps in this investigation) led to the discovery of a document indicating that Gianelli was making $2,000 monthly payments to two particular members of the New England La Cosa Nostra (1/11/05 Transcript at 27-28, 68). A copy of that transcript is submitted herewith as Exhibit 1.

Moreover, Trooper Orlando's October 31, 2003 affidavit described in detail the investigative procedures that had been tried in this investigation and why they had failed to achieve the

---

[4]    Of the 17 defendants indicted under Indictment 05-cr-10003-NMG, three (Deeb Homsi, Todd Westerman, and Tony Daniels) have already pleaded guilty to multiple felony charges. Two other defendants (Michael McCormack and Sean Slater) were charged in Indictment 04-10127-NG as a direct result of this investigation, and both have pled guilty. Two more defendants (Joseph Mercurio and Dennis Jenks) have been convicted after trial of separate indictments (06-cr-10272-DPW and 06-Cr-40027-FDS) that resulted from this investigation.

investigation's goals, and also described why other investigative procedures reasonably appeared to be unlikely to succeed if tried or to be too dangerous:

♦     Troopers Orlando and Russolillo attempted to interview Gianelli on January 30, 2002 but when they asked him what was inside an attaché case that he had just locked, he said it was none of their business, and when they asked him whether the "Phil" that he was waiting for was Phil Puopolo, Gianelli would not reply.  (Def. Exh. A at 25).

♦     There was no reason to believe that confronting Gianelli, Dennis Albertelli, Ramasci or others or subpoenaing them to a grand jury would persuade them to cooperate and provide pertinent truthful information, and probably would backfire by having them alert other members of the organization.  (Def. Exh. A at 65-66).

♦     CI-1[5] was not familiar with the entire conspiracy, was unable to penetrate the organization to any significant degree, would not wear an electronic or wire bugging device, would not testify publicly, and was willing to provide information only on condition that CI-1's identity not be disclosed because CI-1 believed that his safety would be jeopardized if it became known that CI-1 was cooperating with the police on this investigation (Def. Exh. A. at 28, 36, 55, 64-65).

♦     CI-2 also was not familiar with the entire conspiracy, was unable to penetrate the organization to any significant degree, would not wear an electronic or wire bugging device, would not testify publicly, and was willing to provide information only on

---

[5]     CI-1 and CI-2 were confidential informants.  They are referred to herein as males, without regard to their actual gender.

condition that CI-2's identity not be disclosed because CI-2 was afraid of retaliation (Def. Exh. A. at 37, 55, 64-65).

♦ None of the informants assisting law enforcement authorities was willing to introduce an undercover officer into the organization, due to the informants' fear of reprisal.  Without such an introduction, an undercover police officer would not be able to infiltrate the conspiracy at a high enough level to be useful.  (Def. Exh. A at 66).

♦ The phone companies were very slow in providing subscriber information in the Gianelli investigation, so that Trooper Orlando still had more than 1,500 telephone numbers that had come up in the toll records but for which the telephone companies had not yet provided subscriber information.   Moreover, toll and subscriber information do not reveal the nature and purpose of the communications.  (Def. Exh. A at 31, 47, 54-55, 68).

♦ Search warrants would be of only limited value, because Gianelli was using an offshore betting service.  (Def. Exh. A. at 32, 54-55, 65).

♦ The State Police could not infiltrate Gianelli's bookmaking operation because Gianelli was using the offshore bookmaking office (Def. Exh. A. at 17, 19, 32, 36, 39, 42, 43) and because Gianelli had insulated himself from the day-to-day operation of his bookmaking business and was more involved "behind the scenes."  (Def. Exh. A. at 33, 54).

♦ Physical surveillance had been performed but was of very limited value because the meetings of Gianelli and his associates were short in duration.  (Def. Exh. A. at 56).

♦  In addition, Gianelli, Albertelli, and Ramasci were surveillance conscious -- making abrupt stops, accelerating to high speeds, etc. -- and therefore were difficult to follow for an extended period without the Troopers risking discovery and thereby jeopardizing the entire investigation.  At best, physical surveillance would only identify some people with whom Gianelli, Albertelli, and Ramasci were meeting -- which would not achieve the goals of the investigation.  (Def. Exh. A. at 57-60, 67).

♦  Trash analysis would have little value because it would not be likely to identify the scope or membership of the conspiracy.  (Def. Exh. A at 66-67).

This detailed, case-specific description fully satisfied the "necessity" requirement, and easily was as comprehensive as the "necessity" showings that have repeatedly been approved by the First Circuit.  *See United States v. Cao*, 471 F.3d 1, 3 (1st Cir. 2006) ("the *partial* success of the investigation did not mean that there was nothing more to be done"); *United States v. Martinez*, 452 F.3d at 4-7; *United States v. Nelson-Rodriguez*, 319 F.3d 12, 33 (1st Cir. 2003) ("Title III requires that the affidavit show why wiretapping is necessary in place of less intrusive investigative techniques ... [b]ut it does not impose an exhaustion requirement[; a]ccordingly, the government is not required to show that other methods have been wholly unsuccessful") (citations and internal marks omitted); *United States v. Rivera-Rosario*, 300 F.3d 1, 19 (1st Cir. 2002) (although the government knew the identity of some members of the conspiracy, "it was sensible for the district court to allow the government to employ electronic surveillance in order to uncover the complete range of operations of the target organization"); *United States v. David*, 940 F.2d 722, 729 (1st Cir. 1991) ("An application for electronic surveillance need not be based on proof positive that, without electronic assistance, a promising investigation is up a blind alley. It is enough that reasonable efforts

to succeed without such assistance have been tried and failed, and that electronic surveillance seems a suitable next step in a plausible progression."); *United States v. Lopez*, 300 F.3d at 53; *United States v. Santana*, 342 F.3d at 65-66; *United States v. Villarman-Oviedo*, 325 F.3d at 9-10.

Indeed, it is clear from the entire affidavit that although the State Police had developed probable cause sufficient for a wiretap order, the State Police had not amassed proof beyond a reasonable doubt even for the named subjects, and did not have a reasonable prospect of doing so by further use of traditional investigative techniques. Moreover, there was no reasonable prospect that traditional investigative methods would expose the full scope and membership of the conspiracy -- and it is readily apparent just by looking at the pending indictment that it could not have been arrived at through reasonable use of traditional investigative means.

The defendants' remaining arguments on this point are equally unavailing. The defendants assert that "there was no reason to suspect that the Duke Sports operation included anyone other than the three specified targets" (Br. at 23), but that is wrong. Gianelli had told CI-1 that Duke Sports was an *offshore* betting service that Gianelli had decided to use in order to eliminate the possibility of his gaming office being infiltrated by the police and to protect his gaming organization from law enforcement detection. (Def. Exh. A. at 32). Similarly, Gianelli told CI-2 that Duke Sports was an *offshore* bookmaking office that Gianelli had decided to use (Def. Exh. A. at 39). Further, Trooper Orlando stated that the State Police knew from other investigations that sophisticated bookmakers had been utilizing bookmaking offices in offshore locations including Antigua and Jamaica (West Indies) to try to thwart State Police investigations in Massachusetts. (Def. Exh. A. at 17-19). Therefore, Trooper Orlando was entirely correct in believing that the Duke Sports operation involved

people other than Gianelli, Albertelli, and Ramasci -- as has been borne out by the indictment that has resulted.

The defendants argue that Trooper Orlando contradicted himself by (a) saying that a goal of the wiretap was to identify local members of Gianelli's bookmaking operation, but also (b) alleging that Gianelli was using an offshore bookmaking office.  (Br. at 22).  There is no contradiction, since Trooper Orlando's affidavit clearly and correctly stated that --

- ◆ "[A]lthough Gianelli has moved the location of his central gaming office to a foreign soil, he must still interact and communicate with his agents and/or bettors regularly in Massachusetts to finalize their gaming activities."  (Def. Exh. A at 35-36).

- ◆ Although CI-1 uses Gianelli's offshore office to retrieve betting lines and place bets, CI-1 "continues to contact [Dennis] Albertelli on the 'Albertelli Cellular Telephones' to discuss gaming-related issues [and] continues to contact Salvatore Ramasci on the 'Ramasci Cellular Telephone' to arrange meetings for the purpose of settling outstanding gambling debts."  (Def. Exh. A at 36).

- ◆ "According to CI-2, 'Duke Sports' role is limited to the dissemination of betting lines, and the registering of bets.  All other gambling related transactions such as payments, collections, and the resolution of disputes are handled locally by Gianelli and his entrusted staff."  (Def. Exh. A at 39).

- ◆ "Gianelli, in addition to his illegal bookmaking operation, also controls a significant portion of the illegal football card operation in Essex County and beyond.  ... According to CI-2, Albertelli handles most of the football card activity.  ... [F]ootball cards are commonly used for illegal gaming purposes."  (Def. Exh. A at 40-41).

- ♦ "It is believed that Gianelli ... receives his customers' balances from 'Duke Sports.' ... [B]oth informants have found that Albertelli and Ramasci have an activity report available to them that lists each customers' wagers for the previous week. ... [T]he fact that Albertelli and Ramasci have this information available to them indicates that Gianelli's illegal bookmaking organization is controlled locally. The exchange of money between Gianelli and his agents and/or customers occurs in Massachusetts." (Def. Exh. A at 43).

- ♦ Between June 1, 2003 and September 18, 2003, approximately 174 calls occurred between Albertelli Telephone A and telephone numbers at the Stoneham, Massachusetts home of Ronald Heerter, who was convicted of illegal gaming offenses in 1988 and again in 1993 and who, according to CI-1, was still one of the agents in Gianelli's illegal bookmaking business. (Def. Exh. A at 47-48). There were also 29 calls between the Ramasci Cellular Telephone and the Heerter phones. (Def. Exh. A at 51).

- ♦ Telephone records also revealed a dozen calls between Albertelli Telephone A and the Revere, Massachusetts home of Stephen Russo who, according to CI-1, was still an agent in Gianelli's bookmaking operation. Moreover, on October 8, 2003, when Russo was arrested at his home on an outstanding default warrant, Russo was found conducting an illegal gaming operation at his kitchen table, surrounded by "numerous pieces of gaming evidence in plain view" -- which the State Police seized. (Def. Exh. A at 49).

♦    Telephone records revealed 94 telephone calls between Albertelli Telephone A and the Chelsea, Massachusetts home of John Doramajian, Jr., whom CI-2 identified as an agent for Gianelli's bookmaking business.  (Def. Exh. A at 49-50).  There were also 68 calls between the Ramasci Cellular Telephone and Doramajian's phones. (Def. Exh. A at 51).

♦    There were 45 calls between the Ramasci Cellular Phone and the phone at Central Park Lanes, which was operated by long-time bookmaker Charles Vozzella.  (Def. Exh. A at 51-52).

♦    During the three month period for which the State Police received toll records, there were more than eight thousand (8,000) calls on the Albertelli and Ramasci cell phones, which was "indicative of a busy gaming operation."  (Def. Exh. A at 52).  As Trooper Orlando explained, "The introduction of this far-away gaming operative known as Duke Sports, makes it necessary that Gianelli and his cohorts communicate with his agents and/or bettors on a regular basis.  It is logical that the level of communication, which is generally an intricate part of illegal bookmaking to begin with, will vastly increase with the emergence of an off-shore participant."  (Def. Exh. A at 53).

The defendants also argued that Trooper Orlando "misleadingly chose to greatly downplay" the "usefulness" of CI-1 and CI-2, the two informants.  (Br. at 39; *see also* Br. at 41-42).  To the contrary, Trooper Orlando was forthcoming not only about the information that they provided, but also about the limitations of their usefulness.  For example:

♦   CI-1 and CI-2 refused to testify publicly because of fear that their safety would be jeopardized.  (Def. Exh. A at 28-29, 36-37, 64).

♦   The informants refused to wear any kind of electronic wire or bugging device due to fear of being discovered and harmed. (Def. Exh. A at 64-65).

♦   The informants refused to attempt to introduce an undercover officer into the Gianelli organization, due to fear of reprisal.  (Def. Exh. A at 66).

♦   Neither informant was familiar with the entire conspiracy.  (Def. Exh. A at 64).

♦   The informants did not have sufficient first-hand information to enable the achievement of the goals of the investigation.  (Def. Exh. A at 64).

♦   The informants lacked the capability to penetrate the Gianelli organization to any significant degree.  (Def. Exh. A at 64).

The defendants contend that "the alleged failings of physical surveillance" are overblown (Br. at 38-39), but once again they are incorrect.  Trooper Orlando stated that "Past surveillance of Arthur Gianelli, Dennis Albertelli, and Salvatore Ramasci, have shown that they employ counter-surveillance techniques" including "making abrupt stops, accelerating to great speeds, and otherwise operating in such a manner that poses too great a risk of the surveillance being exposed" which "would jeopardize the investigation."  (Def. Exh. A at 67).

Moreover, Trooper Orlando correctly explained that although physical surveillance might help law enforcement identify some members of a conspiracy, it could not achieve all the goals of the investigation.  *Id.*  For example, physical surveillance of the Revere Businessmen's Association might identify people entering and leaving the place, but the State Police had no way of proving what went on inside since it was a private club whose entrance was guarded.  (Def. Exh. A at 24).  And,

because Gianelli, Albertelli, and Ramasci were demonstrably surveillance conscious, the physical surveillances that had been performed found that their meetings with CI-1 and CI-2 were all short in duration and apparently limited to exchanging money. (Def. Exh. A at 56).

Thus, as Trooper Orlando accurately stated, physical surveillance can "at times assist in developing intelligence" but at best has limited utility and is not worth performing so extensively as to risk jeopardizing the entire investigation.[6] (Def. Exh. A at 60).

The defendants argue that "Telephone [toll record] analysis also produced relevant information. Orlando and Russolillo were able to determine that there were high volumes of calls on the target telephones and that the targets made a large number of calls to known agents and bookmakers." (Br. at 40). That is true, but does not advance the defendants' point. The toll records contributed to the showing of probable cause, but could not accomplish what wiretaps would do in achieving the goals of the investigation because, as Trooper Orlando explained, "review of the toll records does not reveal the full nature or purpose of the communications." (Def. Exh. A at 68).

Finally, the defendants argue that wiretaps were not necessary in this investigation because the State Police could have obtained more information from CI-1 and CI-2; made controlled calls; tried to cultivate new informants; obtained telephone toll records for co-conspirators; and obtained

---

[6]    The defendants claim that "the alleged failings of physical surveillance are belied" by an incident in which, "*while conducting surveillance of Gianelli*, [Troopers Orlando] and Russolillo boldly approached and questioned Gianelli," suggesting that the State Police "had no qualms about letting Gianelli know they were at least watching him, if not investigating him." (Br. at 39) (emphasis added). But, that is not what happened. Trooper Orlando clearly stated that he and Trooper Russolillo had "arrived at the Vision Nightclub in Saugus, Massachusetts, *to speak to Frank Amato regarding an unrelated gaming investigation*." (Def. Exh. A at 25) (emphasis added). While waiting there, the Troopers saw Gianelli pull into the parking lot, park his car, and remain inside his car. Thus, the State Police were *not* surveilling Gianelli and had arrived at the location *before* he did, for a completely unrelated purpose. Moreover, there was nothing unusual about them approaching him when he parked his car in the parking lot but did not get out of his car.

financial records.  (Br. at 41-43).  The reality, of course, is that those techniques would not have resulted in the indictment that is currently facing the defendants.  Indeed, although the State Police investigation as of October 31, 2003 had succeeded in developing probable cause sufficient to obtain a wiretap, the evidence was not sufficient to convict anybody of anything, and the additional investigation suggested by the defendants would not have developed sufficient evidence to convict anybody of anything, particularly because Gianelli was using the offshore bookmaking office for the express purpose of frustrating investigation and prosecution.  As Trooper Orlando's affidavit amply demonstrated, the one and only way to prove the case was through wiretaps.

For all of the foregoing reasons, Trooper Orlando's October 31, 2003 wiretap affidavit satisfied the requirement of 18 U.S.C. § 2518(1)(c) by demonstrating that other investigative procedures had been tried and failed to achieve the reasonable and appropriate goals of the investigation, and that additional investigative procedures reasonably appeared to be unlikely to succeed if tried or to be too dangerous.  In short, Trooper Orlando's affidavit demonstrated the requisite "necessity" for a wiretap order.  *See*, *e.g.*, *United States v. Southard*, 700 F.2d 1 (1st Cir. 1983); *United States v. Scibelli*, 549 F.2d 222 (1st Cir. 1977); *United States v. DiMuro*, 540 F.2d 503 (1st Cir. 1976); *United States v. Gerardi*, 586 F.2d 896 (1st Cir. 1978).

Although the "necessity" requirement must be satisfied as to each successive application, the First Circuit has specifically observed that simple incorporation of the *original* affidavit in support of succeeding affidavits "went a long way towards meeting the [Section 2518(1)(c)] requirement." *United States v. Scibelli*, 549 F.2d at 228.  There the court held that an affidavit in support of extension of the order was adequate where it incorporated the previous affidavits and stated that the affiant was aware of the results to date and concluded that the electronic surveillance continued to

be necessary. And, in *United States v. Yeje-Cabrera*, 430 F.3d 1 (1st Cir. 2005), the First Circuit upheld the sufficiency of a series of wiretap orders against charges that the statements of "necessity" were insufficient "boilerplate" -- even when one affidavit contained no independent statement of "necessity" and simply incorporated a prior one by reference:

> The last affidavit ... incorporates by reference the statement of necessity set out in a prior (attached) affidavit, instead of setting out a fresh one. Despite [the defendant's] characterization of the affidavits as consisting largely of "boilerplate," all the affidavits did contain much that was concrete and pertained to this specific investigation. *See López*, 300 F.3d at 53-54 (rejecting defendant's argument that application was "mere boilerplate" where affidavit contained specific details about the investigation and about attempts to use less invasive surveillance techniques). We have reviewed these affidavits and find no flaws in the issuing court's determination that they were sufficient.

Id., 430 F.3d at 9.

In the Gianelli investigation, the renewal applications as well as the initial application clearly satisfied the "necessity" requirement. *See, e.g.*, Def. Exh. D at 4 ("necessity" statements in December 31, 2003 Essex County renewal application); Def. Exh. J8 at 10-13 ("necessity" statements in February 14, 2005 Middlesex County renewal application); Exhibit 9 (filed under seal herewith, and previously produced to the defendants Bates numbered 0765-0888) at 24-28 (January 9, 2004 Essex County renewal affidavit).

### 3. The Wiretap Applications Were Properly Authorized

The defendants assert that the wiretap applications and orders were not properly authorized. (Br. 44-65). Their contentions are without merit and should be rejected without an evidentiary hearing.

#### a. The Designation Letters

The defendants contend that the designation letters, in which District Attorney Jonathan W. Blodgett of Essex County and then-District Attorney Martha Coakley of Middlesex County respectively authorized certain designated assistant district attorneys ("ADAs") to seek wiretap warrants, were insufficient. (Br. at 47-50, 61-63). They are wrong.

Under 18 U.S.C. § 2516(2), the principal prosecuting attorney of any political subdivision of a state may apply to a state court judge of competent jurisdiction for a wiretap order to seek evidence of a gambling crime punishable by imprisonment for more than one year, if the attorney is authorized by a statute of that state to do so. The Massachusetts wiretap statute, M.G.L. c. 272, § 99(F)(1), authorizes any district attorney, or any assistant district attorney specially designated by the district attorney, to make such an application.

In *Commonwealth v. Vitello*, 367 Mass. 224, 327 N.E.2d 819 (1975), the Massachusetts Supreme Judicial Court held that M.G.L. c.272, § 99(F)(1) complies with 18 U.S.C. § 2516(2). The SJC noted that the Senate Report on Title III explained that the federal statute, 18 U.S.C. § 2516(2), provides that a district attorney "may authorize an application to a State judge" for a wiretap order, and that "The issue of delegation by that officer would be a question of State law." 367 Mass. at 254-55, 327 N.E.2d at 838, citing Sen.Rep. 1097, 90th Cong. 2nd Sess, reprinted at U.S.C.C.A.N. 2112, 2187.

With regard to the state law requirement of M.G.L. c.272, § 99(F)(1) that the ADA who applies for a state wiretap order must be specially designated by the district attorney, the SJC "interpret[ed] that to mean that *an assistant district attorney may not apply at will* for wiretap orders but *must bring the matter for examination before his senior officer, the district attorney*. ... We construe the provision for special designation to mean that the ... district attorney is to determine whether a particular proposed use of electronic surveillance would be consistent with the over-all policy in respect to monitoring followed in his jurisdiction, and to this end the [district] attorney must review and authorize each such application in writing. *Through this process the necessary centralization is provided for as is the concomitant protection that the individual with final authority to regulate electronic surveillance be subject to public accountability*." 367 Mass. at 256, 327 N.E.2d at 838-39 (footnote omitted; emphasis added).

In passing, the SJC commented:

> Indeed, *it can be said* that the better procedure is that the [state] Attorney General or district attorney should cosign the application for the warrant with the designated assistant....

367 Mass. at 232, 327 N.E.2d at 825-26 (emphasis added).

But, in reviewing the facts of the case before it, the SJC in *Vitello* upheld the wiretaps without mandating that the district attorney personally cosign wiretap applications. To the contrary, the SJC went out of its way to emphasize that it was not concerned about mere form, but rather with the *substance* that the district attorney was taking personal responsibility for each wiretap affidavit that he was authorizing his ADAs to file:

> There is *nothing in this record* to indicate that the district attorney *did not* so review these applications. Further, *the signed letters of special designation* limited to these specific wiretaps in our view *sufficiently*

> establish the lines of responsibility to the district attorney as a central
> authority figure accountable to the courts and the public.

367 Mass. at 256, 327 N.E.2d at 838 n.16 (emphasis added).  In other words, the personal signature

of the district attorney on the special designation letters in itself carried the presumption that the

district attorney was signing the letter in good faith, having reviewed the application and being

willing to personally and publicly identify himself as having authorized the wiretap application.

Underlining its point that what matters is that the district attorney "subject [himself] to public

accountability" for each wiretap, the SJC elaborated:

> To read [18 U.S.C.] § 2516(2) as limiting ... the district attorney, by
> requiring that he *personally apply or affirmatively demonstrate total
> familiarity with all aspects of a case* would in our opinion, *serve no
> purpose* not accomplished by authorization of an application by a
> district attorney followed by special designation to an assistant district
> attorney to apply therefor.  *Moreover, the practice of authorizing an
> assistant district attorney to apply is beneficial in that such assistant
> district attorney, through his closer association with investigation of
> the case, may more completely and adequately respond to the judge's
> inquiry* with respect to the requirements of the State and Federal
> statutes requiring proof that probable cause exists.

367 Mass. at 257, 327 N.E.2d at 839 (emphasis added).

A quarter century after the *Vitello* decision, the SJC adhered to its view that the purpose of

M.G.L. c.272 § 99(F)(1) is to ensure that the district attorney takes personal responsibility for each

wiretap that his office obtains, and that once a district attorney has put himself on the line by signing

a designation letter, it carries a presumption of validity and is not a proper subject for an evidentiary

hearing.

In *Commonwealth v. D'Amour*, 428 Mass. 725, 704 N.E.2d 1166 (1999), the SJC upheld the

sufficiency of the district attorney's authorization to apply for a wiretap order.  After observing that

"[t]he ability to perform electronic surveillance in Massachusetts is governed in detail by G.L. c. 272,

§ 99, and our decision in *Commonwealth v. Vitello*," the SJC pointedly noted that "as the language

of *Vitello* clearly indicates, *there is no requirement that the district attorney cosign*" the warrant

application.[7]  428 Mass. at 733, 735, 704 N.E. 2d at 1174-75 (emphasis added).  Further, the SJC

held that "neither the wiretap statute nor *Vitello* requires written authorization for renewals."  428

Mass. at 735, 704 N.E.2d at 1175 (footnote omitted).

     The designation letter in *D'Amour* said:

> I, Elizabeth A. Scheibel, District Attorney for the Northwestern
> District, specially designate Assistant District Attorney David S. Ross
> and First Assistant District Attorney David A. Angier ... to apply ex
> parte to a judge of competent jurisdiction for a warrant to intercept
> wire and oral communications pursuant to Section 99 of Chapter 272
> of the General Laws in connection with the investigation of the
> murder of Robert P. D'Amour and related matters including the
> fraudulent receipt and larceny of life insurance proceeds, and each to
> perform all acts in connection with said application and warrant
> *including the filing of amended or renewal applications* to the same
> extent as the District Attorney is empowered to do so.

428 Mass. at 734 n.10, 704 N.E.2d at 1174 n.10 (emphasis added).

     The SJC in *D'Amour* emphatically rejected the defendant's attacks on the sufficiency of the

designation letter:

> The defendant ... argues that the authorization did not indicate that the
> district attorney fully examined or considered the application.  We
> disagree.  *The district attorney, subject to public accountability,*
> *accepted responsibility for the application through the authorization*
> *letter*.  Once it is established that the district attorney authorized the
> application (after reviewing the application as required by *Vitello*),
> *her authorization is not subject to further judicial review*.  Here, there
> is ample evidence that the district attorney properly reviewed the

---

[7]    Therefore, the defendants' complaint that District Attorneys Blodgett and Coakley did not cosign the wiretap applications (Br. at 49, 61) is irrelevant.

> application and the defendant offers no evidence to the contrary. The
> district attorney's familiarity with the case was indicated by the
> description of life insurance fraud and larceny in the authorization
> letter. Indeed, the authorization and the application were bound
> together and shared the same date, suggesting that the district attorney
> was familiar with the content of the application when she signed the
> authorization.

428 Mass. at 734-35, 704 N.E.2d at 1174-75 (footnote and citations omitted) (emphasis added).

The SJC in *D'Amour* cited *United States v. O'Malley*, 764 F.2d 38, 41 (1st Cir. 1985), which indeed is instructive on this point. In *O'Malley*, which involved a federal wiretap, the First Circuit rejected the defendant's assertion that an evidentiary hearing was necessary to determine whether the Assistant Attorney General who had authorized the wiretap application had actually reviewed the wiretap affidavit in depth:

> Appellant ... argue[s] that the Assistant Attorney General is under an
> enforceable duty to review personally and in depth any application
> and its supporting materials, since only by so doing can he be said to
> exercise his "mature judgment." But we do not think the district
> court erred in refusing to second-guess the adequacy of the Assistant
> Attorney General's examination procedure and thought processes.
> In insisting that only certain senior officials could authorize a wiretap,
> Congress did not go on to prescribe the methods they should use to
> satisfy themselves that a wiretap was in order. *Nowhere did Congress
> forbid them the assistance of subordinates in reviewing the
> application. Other courts have uniformly held that once the proper
> official is found to have authorized a wiretap application, his
> authorization is not subject to further judicial review.* As the Ninth
> Circuit said,
>
> > Once a proper authorizing officer is properly
> > identified, ... thereby fixing on him the responsibility
> > for a particular authorization, *the basis on which, or
> > the method by which, he gave the authorization is not,
> > in our judgment, subject to review* for compliance
> > with § 2516(1). Rather it is to be presumed that the
> > officer has properly exercised the judgment called for

> by the statute when he affixes his signature to an order authorizing the application.
>
> *United States v. Turner*, 528 F.2d [143] at 151 [(9th Cir. 1975) (emphasis added)].
>
> This court has said that an authorization bearing the signature of one of the statutorily designated officials is "entitled to the greatest deference." *United States v. Smith*, 726 F.2d 852, 859 (1st Cir. 1984). *Cf. United States v. Acon*, 403 F.Supp. 1189, 1195 (W.D.Pa.1975) (denying motion for discovery and oral testimony against Attorney General and former Assistant Attorney General). We accordingly sustain the district court's refusal to hold an evidentiary inquiry into the sufficiency of the Assistant Attorney General's review of the application.

*O'Malley*, 764 F.2d at 41 (citations omitted) (emphasis added).

For the same reasons, the defendants' attacks on the designation letters of District Attorneys Blodgett and Coakley are without merit and should be denied without a hearing.

Essex County District Attorney Blodgett's October 29, 2003 special designation letter to ADAs John T. Dawley, Brian T. O'Keefe, and Alexander R. Cain said, in pertinent part:

> I hereby specifically designate you to make application pursuant to Massachusetts General Laws, Chapter 272, Section 99, for an interception warrant, and to make applications for any amendments, renewals and extensions thereof, to intercept certain wire communications of Dennis Albertelli, Salvatore Ramasci and Arthur Gianelli and their associates occurring over telephones numbered (781) 710-2154, (978) 758-8575 and (617) 571-8262.
>
> I further authorize and designate you to personally make presentment to a justice of competent jurisdiction of the application for the interception warrant, as well as all extension and renewal applications, I further authorize and designate you to personally make presentment to a justice of competent jurisdiction of the application for the interception warrant, as well as all extension and renewal applications, amendment applications, status reports, and return documents emanating from the above-mentioned interception

> warrant. I or my designee will personally review all of the
> above-mentioned documents before you present them.

(Def. Exh. C at 2).

District Attorney Blodgett's October 30, 2003 letter to the issuing court said, in pertinent

part:

> I have specially designated First Assistant District Attorney John T.
> Dawley and Assistant District Attorneys Brian T. O'Keefe and
> Alexander R. Cain, pursuant to Massachusetts General Laws, Chapter
> 272, Section 99, to make application for an interception warrant, and
> any amendments, renewals and extensions thereof, to intercept certain
> wire communications of Dennis Albertelli, Salvatore Ramasci and
> Arthur Gianelli and their associates occurring over telephone numbers
> (781) 710-2154, (978) 758-8575 and (617) 571-8262.
>
> I have authorized and designated First Assistant District Attorney
> John T. Dawley and Assistant District Attorneys Brian T. O'Keefe
> and Alexander R. Cain to personally make presentment to the Court
> of the attached application, as well as all extension and renewal
> applications, all amendment applications, all status reports, and all
> return documents emanating from the interception warrant, all of
> which shall be reviewed by me or my designee before being presented
> to you.

(Def. Exh. C at 1).

These letters clearly are legally sufficient. District Attorney Blodgett's letters were explicitly

mentioned in all of the wiretap applications (*e.g.*, Def. Exh. B at 1, 6-7; Def. Exh. D at 1, 6-7) and

unequivocally put the elected District Attorney on record as taking personal and political

responsibility and public accountability for those applications.

The defendants rely upon *United States v. Smith*, 726 F.2d 852, 860 (1st Cir. 1984) (*en banc*)

for the proposition that there must be an evidentiary hearing to determine whether District Attorney

Blodgett "actually authorized the application through the personal review process mandated by *Smith*." (Br. at 51).

But, *Smith* did *not* mandate an evidentiary hearing about the district attorney's authorization whenever a defendant moves to suppress a state wiretap in a federal criminal proceeding. In *Smith*, the First Circuit (en banc) *had* to remand for an evidentiary hearing because "the record was not entirely clear as to whether or not a signed letter of designation accompanied the *initial* [wiretap] application." 726 F.2d at 860 n.1 (emphasis added). Indeed, before the First Circuit heard the *Smith* case *en banc*, a panel of the First Circuit had been "under the impression that *no* letter of designation accompanied the first application," 726 F.2d at 856 n.1 (emphasis added), and the panel had reversed convictions that had been based on the wiretaps. When the government petitioned for rehearing *en banc*, it supplemented the record with a designation letter that the government contended had accompanied the first wiretap application. It was with that background that the First Circuit *en banc* withdrew the panel's opinion and remanded to the district court. 726 F.2d at 855, 860.

Just a year after deciding *Smith*, the First Circuit stressed that the purpose of the wiretap authorization process in § 2516(1) -- the federal counterpart to § 2516(2) -- is simply to insure that wiretap applications are authorized by officials who are at a high enough level to be "responsive to the political process" and who can be expected to exercise "mature judgment" in deciding whether to authorize applications for wiretaps. *United States v. O'Malley*, 764 F.2d 38, 41 (1st Cir. 1985).

The First Circuit in *O'Malley* proceeded to *reject* the defendant's argument that the district court was required to hold "an evidentiary hearing on the question whether Assistant Attorney General Jensen had adequately reviewed the wiretapping applications before authorizing them or

whether, in effect, he delegated this non-delegable obligation to others." 764 F.2d at 40 (internal

marks omitted).

The defendant in *O'Malley* had argued that Assistant Attorney General Jensen "was obliged

under ... § 2516(1) to review personally and adequately any wiretap application before authorizing

it," 764 F.2d at 40 (footnote omitted), and that the district court needed to hold an evidentiary

hearing because the government had submitted an affidavit indicating that Assistant Attorney

General Jensen had merely relied upon "a recommendation contained in a short memorandum" that

staff had prepared. *Id*. n.3.

But, the First Circuit in *O'Malley* emphatically *rejected* the argument that an evidentiary

hearing was required, as discussed above. Accordingly, the First Circuit in *O'Malley* affirmed the

district court's refusal to hold an evidentiary inquiry into the sufficiency of the Assistant Attorney

General's review of the application. *Id*., 764 F.2d at 41.

Moreover, as the First Circuit has recently reminded, "Evidentiary hearings on motions are

the exception, not the rule." *United States v. Vilches-Navarrete*, -- F.3d --, 2008 WL 1009432 at 9;

2008 U.S. App. LEXIS 7660 at *34 (1st Cir. Apr. 10, 2008) (citations and internal marks omitted).

"The test for granting an evidentiary hearing in a criminal case is substantive: did the defendant

make a sufficient threshold showing that material facts were in doubt or dispute? Vilches made no

such showing. A hearing was not necessary to address the suppression issues because in support of

his motion, ... Vilches did not dispute the Government's version of events and instead relied upon

the[m]. This makes an evidentiary hearing unnecessary since there were no material facts that were

in dispute." *Vilches-Navarrete*, -- F.3d at --; 2008 WL 1009432 at 9; 2008 U.S. App. LEXIS 7660

at *33-*34 (citations and internal marks omitted).

The defendants concede that the November 18, 2004 special designation letter by then-Middlesex County District Attorney Martha Coakley -- in which she stated that she had personally reviewed the initial wiretap application -- was legally sufficient.  (Br. at 48 n.13; *see* Def. Exh. J1, last page).  The defendants also acknowledge that then-District Attorney Coakley sent *new*, legally sufficient designation letters with each later application in which new telephone lines were to be intercepted.  (Br. at 48, n. 14; *see* the last page of Def. Exh. J3,  J4, J5, J6, J7, J9, and J10).

The defendants complain that then-District Attorney Coakley did not send new letters for the renewal applications but instead authorized them in advance with letters that said that "Either my designee or I will review such documents before they present them."  But, there was no requirement for *any* authorization letter for a renewal.  *See D'Amour*, 428 Mass. at 735, 704 N.E.2d at 1175 ("neither the wiretap statute nor *Vitello* requires written authorization for renewals").

 The October 29, 2003 and October 30, 2003 authorization/designation letters from Essex County District Attorney Blodgett (Def. Exh. C) authorized the specified ADAs to seek not only the initial wiretap order and renewals, but also amendments of those wiretaps, which also was entirely permissible.  *See United States v. DeJesus*, 752 F.2d 640, 643 (1st Cir. 1985) (authorization by the district attorney is *not* required for Massachusetts state wiretap amendment applications, even if they add new interceptees).[8]

It is worth noting that before the *DeJesus* case reached the First Circuit, the district court found that "amendments to certain of the wiretaps challenged here were presented to the court

---

[8]     It should go without saying that state law enforcement officers are entitled to rely reasonably, in good-faith, on settled law.  *See*, *e.g.*, *United States v. Miller*, 116 F.3d 641, 661 (2d Cir. 1997); *United States v. Spadaccino*, 800 F.2d 292, 297 (2d Cir. 1986); *United States v. Butz*, 982 F.2d 1378, 1382-83 (9th Cir. 1993).

*without the District Attorney's prior knowledge*." *United States v. Smith*, 587 F.Supp. 653, 656

(D.Mass. 1984) (emphasis added). But, the district court held that neither federal nor state law

requires a district attorney to authorize applications for a wiretap amendment, even if it adds new

interceptees, 587 F.Supp at 657, and the First Circuit affirmed. *DeJesus*, 752 F.2d at 643.[9]

It was not necessary for District Attorney Blodgett to send a new designation/authorization

letter when his specially designated ADAs submitted a renewal, extension, or amendment application

that added new telephone lines to be intercepted, given District Attorney Blodgett's personal, signed

representation to the issuing judge, in the October 29, 2003 and October 30, 2003 letters, that District

Attorney Blodgett or his designee would review such applications in advance, before they were

presented to the court. *See, e.g., Vitello*, 367 Mass. at 256-57, 327 N.E.2d at 839; *D'Amour*, 428

Mass. at 734-35 & n.10, 704 N.E.2d 1174-75 & n.10; *O'Malley*, 764 F.2d at 41.

However, to eliminate any possible doubt, District Attorney Blodgett has submitted an

affidavit to this Court, which is submitted herewith as Exhibit 2, in which District Attorney Blodgett

---

[9]      The defendants cite *In re Grand Jury Proceedings*, 988 F.2d 211, 214 (1st Cir. 1992) and *United States v. Van Meter*, 278 F.3d 1156 (10th Cir. 2002), apparently for the proposition that separate authorization memos *must* be submitted for all extension applications. (Br. at 53). But, there is no such holding in either case. Both cases recite that separate authorization memos *were* submitted for the extension applications, but neither case says that such separate memos were *required*. It makes practical sense for the Department of Justice to use separate letters for *federal* wiretap extensions, because the only officials authorized to sign such letters are based in Washington, D.C., not in regular, personal contact with Assistant U.S. Attorneys around the country who handle wiretap investigations. In addition, more than half a dozen officials in the Justice Department are empowered to sign authorization letters, so the official who approved one application will not necessarily be the official who reviews the extension request. By contrast, the elected district attorney for a county may serve for many years and is the only person authorized in that county to approve wiretap applications. The district attorney works for the same office, in the same county, as the prosecutors who will actually submit the applications. Therefore, during the tenure of a district attorney, it is entirely appropriate for the district attorney to submit one letter, in advance, taking public accountability for the initial wiretap application and all future renewal, extension, and amendment applications.

has confirmed that he *personally* reviewed every single application in this case -- namely, the initial

October 31, 2003 application and the renewal and/or amendment applications of November 13,

2003, November 26, 2003, December 12, 2003, December 23, 2003, December 31, 2003, January

9, 2004, January 26, 2004, January 30, 2004, February 10, 2004,and February 25, 2004, and that he

*personally* approved the addition of new designated interceptees and telephone lines.

b. The So-Called December 28, 2003 Designation Letter

The defendants argue that the December 23, 2003 wiretap order and its fruits must be

suppressed because the application referred to a December 28 [*sic*], 2003 authorization letter that

has not been provided.  (Br. at 58).

All of the earlier Essex County wiretap applications -- namely, the original October 31, 2003

application (Def. Exh. B), the November 13, 2003 renewal application (Def. Exh. H1), the

November 26, 2003 renewal (Def. Exh. H2), and the December 12, 2003 renewal application[10] -- had

referred to the October 29, 2003 authorization letter from District Attorney Blodgett.

And, all of the later Essex County wiretap applications -- dated December 31, 2003 (Def.

Exh. D), January 9, 2004 (Def. Exh. H5), January 26, 2004 (Def. Exh. G; also Def. Exh. H6),

February 10, 2004 (Def. Exh. H7), and February 25, 2004 (Def. Exh. H8) -- also referred to the

October 29, 2003 authorization letter.

Obviously, when the December 23, 2003 application said that the ADAs were authorized to

make the application by virtue of a December 28, 2003 letter from District Attorney Blodgett (Def.

Exh. H3 ¶ 1), the reference to December 28, 2003 was a typographical error.

---

[10]    This December 12, 2003 renewal application does not seem to have been included
in the defendants' exhibits, but was produced to the defendants on May 17, 2005 during discovery
(Bates numbered 491-498) and is available to the Court upon request.

The reference, of course, should have been to the October 29, 2003 letter, which was the basis for all of the prior *and later* applications.  For the reasons set forth above, no new authorization letter was even needed for the December 23, 2003 application, since District Attorney Blodgett in the October 29, 2003 letter had already authorized the specially designated ADAs to apply for renewal orders.  Moreover, *in fact*, District Attorney Blodgett personally reviewed and authorized the December 23, 2003 application, as he has confirmed in his affidavit (Exhibit 2).

The existence of such an obvious typographical error is not a basis for suppressing the fruits of the December 23, 2003 wiretap order.  *See*, *e.g.*, *Chavez*, *Donovan*, *supra*.

### c.  The Monitoring Instructions

The defendants argue that the monitoring instructions in both the Essex County wiretaps and the Middlesex County wiretaps improperly went beyond the wiretap orders by authorizing the State Police to intercept conversations that did not include any of the named interceptees in the wiretap orders.  (Br. at 59-61, 65-66).  However, the defendants rely upon a crabbed reading of the wiretap orders, and they ignore the fact that the issuing judges approved the way the monitoring was conducted.

In *United States v. Kahn*, 415 U.S. 143 (1974), the Supreme Court considered a wiretap order that authorized the government to "intercept wire communications *of* Irving Kahn *and* others as yet unknown."  *Id*. at 156 (emphasis added).  This is, of course, similar to the language in the January 14, 2005 Middlesex County wiretap order (Def. Exh. M at 7) cited by the defendants (Br. at 65):

> "The communications to be intercepted ... shall be limited to those communications *of* Joseph Russo, Stephen Russo, Philip Puopolo *and* his associates, agents and co-conspirators, some of whom have yet to be identified...."

(Emphasis added).

The Supreme Court, in *Kahn*, rejected the defendants' contention that the wording of the order prohibited interceptions unless Irving Kahn was participating in the conversation:

> The order does not refer to conversations *between* Irving Kahn and others; rather, it describes "communications *of* Irving Kahn and others as yet unknown" to and from the target telephones. To read this language as requiring that Irving Kahn be a party to every intercepted conversation would not only involve a substantial feat of verbal gymnastics, but would also render the phrase "and others as yet unknown" quite redundant, since Kahn perforce could not communicate except with others.
>
> Moreover, the interpretation of the wiretap authorization [requiring Irving Kahn to be a party] is at odds with one of the stated purposes of [the wiretap] order. The [issuing] Judge specifically found that the wiretap was needed to "reveal the identities of [Irving Kahn's] confederates, their places of operation, and the nature of the conspiracy involved." It is evident that such information might be revealed in conversations to which Irving Kahn was not a party. For example, a confederate might call in Kahn's absence, and leave ... an incriminating message.

415 U.S. at 156.

Finally, the monitoring instructions were not kept secret from the judges who issued the wiretap orders in Essex County and Middlesex County in this case. To the contrary, the monitoring instructions were submitted to those judges *in advance*, as part of the applications for the wiretap warrants. *See*, *e.g.*, Def. Exh. A at 69, 80. Moreover, the judges approved of the way the monitoring was being conducted, because they issued renewal orders, thereby granting implicit approval to the prior interceptions. *See*, *e.g.*, *United States v. London*, 66 F.3d 1227, 1235 (1st Cir. 1995) ("It is settled that disclosure authorization [under 18 U.S.C. § 2517(5), for an intercepted conversation concerning a crime that was *not* a target offense listed in the wiretap order] can be *implicitly*

*obtained* when a judge grants a renewal of a wiretap after being advised of the essential facts of the unspecified violation") (citation and internal marks omitted; emphasis added); *United States v. McKinnon*, 721 F.2d 19, 23-24 (1st Cir. 1983) (same).

### 4.   The December 31, 2003 Essex County Warrant Is Valid

The defendants argue that the December 31, 2003 Essex County wiretap and all subsequent Essex County wiretaps should be suppressed because the December 31, 2003 application and order referred to Section 17A of M.G.L. c. 271 instead of Section 17.  (Br. at 66-68).

But, it is obvious that the substitution of "17A" for "17" was merely a typographical error:

♦   Before submitting the December 31, 2003 application, the Essex County District Attorney had received the initial wiretap order on October 31, 2003 and renewal orders on November 13, 2003, November 26, 2003, December 12, 2003, and December 23, 2003; and after the December 31, 2003 order, the Essex County District Attorney obtained further renewal orders on January 9, 2004, January 26, 2004, February 10, 2004, and February 25, 2004.  Every single one of those eight (8) prior and subsequent orders referred, correctly, to Section 17.[11]

♦   As in the prior applications, the December 31, 2003 renewal application said: "[T]here is probable cause to believe that one or more organized and continuing conspiracies ... exist in ... Essex County ... to supply illegal services relating to the *registering of bets* by the commission of violations of Massachusetts General Laws,

---

[11]       The defendants have copies of all of those other applications and orders, so there should be no dispute about this fact, but upon request, the government will provide the Court with the orders that the defendants did not include within their exhibits on the motion.

Chapter 271" -- but then substituted "Section 17A" for "Section 17."   (Def. Exh. D

at ¶ 2) (emphasis added).

♦ It is obvious that "17A" was a typographical error, because Section 17 covers the

*registering of bets* and Section 17A does not:

§ 17. Place *for registering bets* or dealing in pools; owner or occupant; custodian or depository

Whoever keeps a building or room, or any part thereof, or occupies, or is found in, any place, way, public or private, park or parkway, or any open space, public or private, or any portion thereof, with apparatus, books or any device, *for registering bets*, or buying or selling pools, upon the result of a trial or contest of skill, speed or endurance of man, beast, bird or machine, or upon the result of a game, competition, political nomination, appointment or election, or whoever is present in such place, way, park or parkway, or any such open space, or any portion thereof, engaged in such business or employment; or, being such keeper, occupant, person found or person present, as aforesaid, *registers such bets*, or buys or sells such pools, or is concerned in buying or selling the same; or, being the owner, lessee or occupant of a building or room, or part thereof, or private grounds, knowingly permits the same to be used or occupied for any such purpose, or therein keeps, exhibits, uses or employs, or knowingly permits to be therein kept, exhibited, used or employed, any device or apparatus *for registering such bets*, or for buying or selling such pools, or whoever becomes the custodian or depository for hire, reward, commission or compensation in any manner, of any pools, money, property or thing of value, in any manner staked or bet upon such result, shall be punished by a fine of not more than three thousand dollars or by imprisonment in the state prison for not more than three years, or in jail or the house of correction for not more than two and one half years.

(Emphasis added.)

♦   By contrast, Section 17A says *nothing* about registering bets:

§ 17A. Telephones; use for gaming purposes

Whoever uses a telephone or, being the occupant in control of premises where a telephone is located or a subscriber for a telephone, knowingly permits another to use a telephone so located or for which he subscribes, as the case may be, for the purpose of accepting wagers or bets, or buying or selling of pools, or for placing all or any portion of a wager with another, upon the result of a trial or contest of skill, speed, or endurance of man, beast, bird, or machine, or upon the result of an athletic game or contest, or upon the lottery called the numbers game, or for the purpose of reporting the same to a headquarters or booking office, or who under a name other than his own or otherwise falsely or fictitiously procures telephone service for himself or another for such purposes, shall be punished by a fine of not more than two thousand dollars or by imprisonment for not more than one year; provided, however, that this section shall not apply to use of telephones or other devices or means to place wagers authorized pursuant to the provisions of section 5C of chapter 128A.

♦   The December 31, 2003 application was captioned as a *renewal* application, and nothing in the application said or suggested that the nature of the offense under investigation had changed from the prior applications, which all were investigating violations of Section 17.

♦   The December 31, 2003 application explicitly incorporated by reference the attached affidavit of Trooper Nunzio Orlando (*see* Def. Exh. D ¶ 3), a copy of which is being filed herewith, under seal, as Exhibit 7.  (It was previously produced to the defendants, Bates numbered 0627-0654).  That affidavit clearly stated, in Paragraphs 1, 9, 10, 13, and 16 that the crime under investigation was violation of Section 17. Nowhere in the affidavit was Section 17A ever mentioned.

♦ The December 31, 2003 wiretap order explicitly stated that the issuing judge had reviewed the *affidavit* as well as the application and had found probable cause for the wiretap renewal order. (Def. Exh. E)

♦ The December 31, 2003 wiretap order specifically authorized the interception of "[c]ommunications concerning the receipt and *registration of wagers or bets* upon the results of events or contests, and the requesting, receiving and furnishing of the lines or odds of pending events or contests" (Def. Exh. E at ¶ 5(b)) (emphasis added) -- which are violations of Section 17.

♦ A review of the December 31, 2003 wiretap affidavit clearly demonstrates that it did establish probable cause regarding violations of Section 17.

♦ The December 31, 2003 monitoring instructions -- which were explicitly incorporated by reference into Trooper Orlando's affidavit (¶ 16) -- specifically state (at ¶ 3) that "The Order and Warrant authorizes you to monitor only those conversations pertaining to illegal gaming in violation of G.L. c. 271, s. 17." (For ease of access, the December 31, 2003 Monitoring Instructions -- which were Exhibit 7 to Trooper Orlando's December 31, 2003 affidavit -- are submitted herewith, under seal, as a separate exhibit, Exhibit 8, and were previously produced to the defendants Bates numbered 0655-0663.)

It is, therefore, obvious that the reference in the December 31, 2003 application and order to Section 17A instead of Section 17 was merely a typographical error, and probable cause was established for the December 31, 2003 wiretap order to be issued based on violation of Section 17.

This type of typographic error in the December 31, 2003 renewal order and application is *not* a basis for suppression.  The December 31, 2003 order was the *fifth renewal* of the original order,[12] and the December 31, 2003 affidavit and monitoring instructions made clear that it was just like the others in authorizing wiretapping for violations of Section 17.  The defendants have long since received the logs and the recordings of all the interceptions conducted pursuant to the December 31, 2003 order, as well as the January 9, 2004 affidavit that supported the next renewal, and it is clear that the December 31, 2003 wiretap order was in fact used to gather evidence of violations of Section 17.[13]  *See*, *e.g.*, Exhibit 9 at 12-15.

In *United States v. Chavez*, 416 U.S. 562 (1974), the Supreme Court held even though the identification of the official who has authorized a wiretap is specifically required by 18 U.S.C. §§ 2518(1)(a) and 2518(4)(d), the mere misidentification of that official is *not* a sufficient reason to suppress wiretap evidence when a duly authorized official has, in fact, approved the wiretap -- so the Supreme Court *reversed* the suppression of the wiretap evidence in that case.  There is no more reason to suppress the wiretap evidence in the present case, where there was merely a typographical error in the identification of the statute's number.

---

[12]     It may also be regarded as an amendment to the existing December 23, 2003 renewal order, since it covered new cell phones that had been obtained by Albertelli and Ramasci -- both of whom had been designated interception targets since the original October 31, 2003 wiretap order.

[13]     A copy of the January 9, 2004 affidavit is submitted herewith, under seal, as Exhibit 9 and was previously produced to the defendants Bates numbered 0765-0888.

5. The October 31, 2003 Essex County Wiretap Affidavit Established Probable Cause

a. M.G.L. c.272, Section 17 Was Violated Within Massachusetts

The defendants argue that the first Essex County wiretap warrant, and each of the later ones, was issued without probable cause to believe that the targets violated the designated offense M.G.L. c.271, § 17 specified in the application and warrant. (Br. at 68-73). In particular, they contend that Trooper Orlando's October 31, 2003 affidavit "failed to set forth facts minimally adequate to ... establish [that there was] 'a place' *in Massachusetts* where bets were registered (or where apparatus was kept)." (Br. at 70) (emphasis added). They add that Trooper Orlando's affidavit "clearly established that Gianelli no longer maintained a place for registering bets in Massachusetts -- Orlando repeatedly stated throughout his affidavit that all bets were registered off-shore, with an organization known as 'Dukes Sports,' **not** in Massachusetts." *Id*.

In fact, however, Trooper Orlando's affidavit clearly established probable cause to believe that Gianelli was violating Section 17 *within Massachusetts*, by setting forth the following facts, among others:

♦ The off-shore gaming service "do[es] *not* protect the bookmakers and/or agents that must *meet* their customers to settle their outstanding gambling debts." (Def. Exh. A at 19) (emphasis added).

♦ The "arrangement between bookmakers and off-shore offices does *not* eliminate the exchange of monies that must occur to complete a gaming transaction. (Def. Exh. A at 19) (emphasis added).

♦ "Although Gianelli's bookmaking office is logistically out of reach, all other facets of his illegal bookmaking business must be handled locally." (Def. Exh. A at 42).

♦      Two confidential informants, referred to as CI-1 and CI-2, have *face to face meetings* with Gianelli, Albertelli, and Ramasci within Essex County.  (Def. Exh. A at 6).

♦      For several months during 2003, CI-1 retrieved betting lines and placed bets on a daily basis with a man called "Tony," who was a clerk for the Gianelli organization, operating a gaming office.  CI-1 met *in person* with "Tony" to settle gambling debts. (Def. Exh. A at 31).

♦      Recently, Gianelli told CI-1 that Gianelli was no longer employing "Tony" and that the gaming office telephone number was being changed, with Gianelli now using an offshore service called Duke Sports, whose number is 800-567-6993.  (Def. Exh. A at 32).  Despite this restructuring, Gianelli gave CI-1 a beeper number, 800-268-3975, at which CI-1 could contact Gianelli, with Gianelli explaining that he wanted to make himself available to his customers, and Gianelli also told CI-1 to continue contacting Albertelli.  (Def. Exh. A at 34).

♦      CI-1 said that the elimination of Gianelli's local bookmaking office has forced Gianelli to become more involved with the day to day operation.  (Def. Exh. A at 34).

♦      CI-1 said that Salvatore Ramasci, also known as "Lefty," is a runner for the Gianelli bookmaking business, and that Ramasci *meets agents and bettors* to pay or collect balances for Gianelli's illegal bookmaking business.  (Def. Exh. A at 4, 35).

♦      CI-1 continues to discuss issues concerning Gianelli's illegal bookmaking business with Gianelli, Albertelli, and Ramasci.  (Def. Exh. A at 34).

♦      CI-1 continues to *meet* with Ramasci, within Essex County, to settle outstanding gambling balances.  (Def. Exh. A at 34-35).

- ♦     Although Duke Sports operates an offshore 800 (toll-free) number to provide betting lines (odds) and accept bets from Gianelli customers, CI-1 said that many other facets of Gianelli's gambling operation -- such resolving discrepancies, settling balances, discussing gaming issues, and voicing complaints -- continue to be *handled locally* by Gianelli, Albertelli, and Ramasci.  Thus, "although Gianelli has moved the location of his central gaming office to a foreign soil, he must still interact and communicate with his agents and/or bettors regularly in Massachusetts to finalize their gaming activities."  In addition to telephone conversations with Gianelli, Albertelli, and Ramasci relating to the bookmaking operation, CI-1 "continues to *meet* Ramasci in order to pay or collect any monies won or lost as a result of [CI-1's] illegal wagers."  (Def. Exh. A at 35-36).

- ♦     CI-2 also told the State Police that Gianelli recently moved his central bookmaking office offshore called Duke Sports, which utilizes 800-567-6993.  (Def. Exh. A at 39).  CI-2 said that although Duke Sports disseminates betting lines and taking bets for Gianelli, all other gambling related transactions such as payments, collections, and the resolution of disputes are *still handled locally* by Gianelli, Albertelli, and Ramasci -- and CI-2 *still meets* with Ramasci to pay or collect gambling balances. (Def. Exh. A at 39-41).

- ♦     CI-1 said that Stephen Russo is one of the agents for Gianelli's illegal bookmaking business.  (Def. Exh. A at 30).

- ♦     On October 8, 2003 -- *just 3 weeks before this October 31, 2003 wiretap affidavit was submitted* -- Troopers Orlando and Foley served an arrest warrant at Stephen

Russo's home in Revere, Massachusetts, and saw Russo sitting at his kitchen table in the midst of conducting his illegal gambling business, *surrounded by gambling paraphernalia* including betting slips, papers with gaming notations, cuff sheets, football cards, sports books, a ledger identifying the code names of numerous bettors, and other gaming related evidence. Accordingly, the Troopers arrested Russo not only on the default warrant but also for violating the state gaming laws. (Def. Exh. A at 30-31).

♦    In addition to his illegal bookmaking business, Gianelli operates an illegal video poker machine business within Massachusetts, with Gianelli illegally operating poker machines at Big Lou's restaurant in Revere, the East Side Athletic Club in Malden, and at other locations. (Def. Exh. A at 22-24, 58). An illegal video poker machine business violates Section 17 because a video poker machine used for gaming purposes is a "device for registering bets" within the meaning of Section 17. *United States v. Marder*, 48 F.3d 564, 568 (1st Cir. 1995).

♦    CI-2 said that Gianelli and Albertelli also operate an illegal football card business (which also violates Section 17) in Essex County and elsewhere, in which the football cards list the weekly college and professional football games, the favorites, and the odds. (Def. Exh. A at 40-41).

Section 17 makes it a crime to keep a room for the purpose of registering bets, *or* to occupy a place containing registering apparatus, *or* to be found in a place with registering apparatus. The defendants argue that no violations of Section 17 took place in Massachusetts because the bets were

registered offshore.  However, Massachusetts courts have never construed the registering of a bet so narrowly.

Massachusetts courts have given an expansive definition to registering a bet under Section 17.  In *Sullivan v. Vorenberg*, 241 Mass. 319, 321; 135 N.E. 165, 166 (Mass. 1922), the Supreme Judicial Court originally defined "registering of a bet" as "the receiving of a bet upon [the result of a contest of skill, speed or endurance of beast] and making a memorandum of it on the slip of paper delivered to the one making the bet."  However, in *Commonwealth v. Pasquale*, 334 Mass. 669, 671; 138 N.E.2d 204, 206 (1956), the Court expanded this definition to include an action *by a bettor* in recording the bet.  A bet is also registered if a memorandum is made out *by the bettor* and delivered to the person receiving the bet.  *Id*.

In *Commonwealth v. Cosolito*, 359 Mass. 469, 470, 269 N.E.2d 679, 681 (1971), the SJC went even further, holding that the trial judge was correct when he charged the jury that one can register a bet, within the meaning of Section 17, by committing it to memory.  The SJC also held that a racing publication is an apparatus for registering bets when a person taking bets supplies the publication for use in placing the bets.  359 Mass. at 469-70, 269 N.E.2d at 681.  In *Commonwealth v. Sousa*, 33 Mass.App.Ct. 433, 438, 600 N.E.2d 1012, 1016 (1992), the SJC reaffirmed that one may register a bet by committing it to memory, as noted by the First Circuit in *United States v. Marder*, 48 F.3d 564, 568 (1st Cir. 1995).

In *Marder*, the First Circuit stated that Section 17 "is not limited to bookmaking in the traditional sense," and that the statutory language is "broad and encompassing."  48 F.3d at 567.  In *Marder*, the Court held that video poker gaming machines were devices for registering bets within

the definition of Section 17.  *Id.* at 568.  The machines "registered" the bet by displaying the number of credits the bettor had selected.  *Id.*

Moreover, Gianelli, Albertelli, Ramasci, and their agents had their own records -- within Massachusetts -- of the bets.  They were, after all, the people in the illegal gambling business who were financially at risk on the bets and were directly collecting from, making payments to, and settling disputes with the individual betting customers in Massachusetts.

Obviously, it would be impossible for Gianelli, Albertelli, Ramasci, and agents working under them to settle up (make payments and collections) on bets within Massachusetts, and to resolve disputes, unless Gianelli and his co-conspirators knew the amounts and nature of the bets that they were settling.

As set forth in Trooper Orlando's October 31, 2003 affidavit:

> It is believed that Gianelli ... receives his customers' gambling balances from "Duke Sports."  Neither informant [CI-1 or CI-2] knows if these balances are faxed to Gianelli or if he retrieves them via computer.  Both informants do know that come Monday Albertelli and Ramasci have their figures (dollar amounts won or lost) readily available.  Also, in cases where CI-1 and CI-2's figure differs from that quoted by Albertelli and Ramasci, both informants have found that *Albertelli and Ramasci have an activity report available to them that lists each customers' wagers for the previous week*.  When discrepancies arise, Albertelli and Ramasci compare their activity report to that of the disagreeing customer.  This system of checks and balances helps to pinpoint the root of the disparity.  Nevertheless, the fact that Albertelli and Ramasci have this information available to them indicates that Gianelli's illegal bookmaking organization is controlled locally.  The exchange of money between Gianelli and his agents and/or customers occurs *in Massachusetts* and not off-shore.

(Def. Exh. A at 43) (emphasis added).

"Probable cause is a common sense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *United States v. McFarlane*, 491 F.3d 53, 57 (1st Cir. 2007) (citations and internal marks omitted). In determining the sufficiency of an affidavit, the reviewing court "consider[s] whether the totality of the circumstances stated in the affidavit demonstrates probable cause.... [The reviewing court must] examine the affidavit in a practical, common-sense fashion and accord deference to reasonable inferences the [issuing judge] may have drawn from the attested facts." *United States v. Greenburg*, 410 F.3d 63, 66-67 (1st Cir. 2005) (citation and internal marks omitted). Under the probable cause standard, the "totality of the circumstances" is considered, and "[i]n a doubtful or marginal case, the court defers to the issuing [judge's] determination of probable cause." *Id*. at 67 (citation omitted).

Trooper Orlando's October 31, 2006 affidavit clearly established probable cause to believe that MGL c.271 Section 17 was being violated within Massachusetts by Gianelli, Albertelli, and Ramasci, notwithstanding the use of an offshore service.

### b. Reliability and Corroboration of the Confidential Informants

The defendants claim that Trooper Orlando's affidavit failed to corroborate or otherwise indicate the reliability of the confidential informants, CI-1 and CI-2. (Br. at 71-72). However, Trooper Orlando was entirely forthcoming with the issuing court about CI-1 and CI-2, and provided the court with sufficient indicia of their reliability. For example, Trooper Orlando advised the court of the following facts, among others, that were true as of the date of Trooper Orlando's October 31, 2003 affidavit:

♦ Trooper Orlando had known CI-1 and CI-2 for more than 5 years. (Def. Exh. A at 28, 37).

♦ Trooper Orlando knew CI-1's and CI-2's true names and current home addresses. (Def. Exh. A at 28, 37).

♦ CI-1 did *not* know that CI-2 provided Trooper Orlando with any pertinent information concerning Gianelli, Albertelli, and Ramasci, and CI-2 did *not* know that CI-1 provided Trooper Orlando with any such information. (Def. Exh. A at 37, 41). Yet, the information separately provided by CI-1 and by CI-2 was consistent. (Def. Exh. A at 40).

♦ CI-1 admitted being involved in *illegal* sports betting for more than 10 years and was still doing so. (Def. Exh. A at 28).

♦ CI-2 admitted being involved in *illegal* sports betting for more than 14 years and was still doing so. (Def. Exh. A at 38-39).

♦ CI-1 and CI-2 each currently placed bets with more than one bookmaker in the greater Boston area. (Def. Exh. A at 28, 39).

♦ CI-1 had provided Troopers Orlando and Russolillo with "detailed information about different gaming organizations" for approximately two years. (Def. Exh. A at 28).

♦ State Police investigations that had resulted from CI-1's information had confirmed CI-1's information to be truthful and reliable. (Def. Exh. A at 28).

♦ CI-1 allowed Troopers Orlando and Russolillo to secretly observe meetings between CI-1 and various bookmakers at which outstanding gambling debts were paid or collected and gambling-related issues were discussed. (Def. Exh. A at 28).

- ♦ CI-1 permitted Troopers Orlando and Russolillo to listen to gambling-related conversations between CI-1 and various bookmakers, in which CI-1 received betting lines, compared betting lines, placed wagers, and made arrangements to borrow money to settle outstanding gambling debts.  (Def. Exh. A at 29).

- ♦ With CI-1's consent, Trooper Orlando listened in as CI-1 called Duke Sports at 800-567-6993 and thereby corroborated CI-1's statements that CI-1 used a code name when he called Duke Sports; that the individual at Duke Sports who accepted bets had a foreign accent; that the person at Duke Sports provided betting lines (odds); and that the person at Duke Sports accepted wagers.  (Def. Exh. A at 35).

- ♦ CI-2 had provided information to Trooper Orlando about gambling operations for the past two years.  (Def. Exh. A at 37).

- ♦ State Police investigations that had resulted from CI-2's information had confirmed CI-2's information to be truthful and reliable.  (Def. Exh. A at 37).

- ♦ CI-2 provided critical information that led to a 2001 Essex County wiretap investigation that resulted in search warrants, seizure of gambling evidence including approximately $400,000 in cash, and the indictment and conviction of Joseph Previte, John Paroyan, Gregory Costa, and James Panos for gambling offenses.  (Def. Exh. A at 37-38).

- ♦ CI-2 also provided Trooper Orlando with information that led to a 2002 Middlesex County wiretap investigation that resulted in the indictment of five (5) individuals and the seizure of gambling evidence as well as a large amount of illegal drugs.  (Def. Exh. A at 38).

- ♦ CI-2 provided Troopers Orlando and Russolillo with information about another large-scale bookmaking operation in Winthrop that resulted in the arrests of Scott Andy and Michael Nappi for gambling violations (for which they received continued without finding dispositions) and a search warrant that led to the seizure of gambling evidence. (Def. Exh. A at 38).

- ♦ CI-1 reasonably believed that his safety would be jeopardized if his cooperation with the State Police becomes known, because Gianelli had strong ties to the Mafia, and the State Police believed that it was imperative to omit details that might tend to reveal the identity of CI-1 because CI-1 would otherwise be exposed to retribution or physical harm. (Def. Exh. A at 28-29, 36, 41, 65-66).

- ♦ CI-2 reasonably believed that his safety would be jeopardized if his cooperation with the State Police became known, and the State Police believed that it was important to preserve CI-2's anonymity because disclosure of CI-2's identity could lead to retribution or physical harm to CI-2. (Def. Exh. A at 37, 41, 65-66).

- ♦ CI-1 stated that Gianelli was currently operating a large-scale gaming operation -- one of the largest illegal bookmaking organizations operating in the Commonwealth of Massachusetts -- and it was comprised of numerous betters, agents, and other operatives. (Def. Exh. A at 29). CI-1 said that Gianelli was still associated with Joseph Yerardi and eagerly awaited Yerardi's release from federal prison, because Gianelli believed that Yerardi's release from prison would make the gambling operation more lucrative. (Def. Exh. A at 29-30). Telephone records showed that Yerardi -- who was serving time for illegal gambling and other convictions -- had

been making calls from federal prison to Gianelli's house in Lynnfield, Massachusetts. (Def. Exh. A at 29-30).

♦    Telephone toll records provided corroboration of the scale of the Gianelli operation and the likelihood that it involved illegal bookmaking. In the 3½ month period from June 1, 2003 to September 18, 2003, Dennis Albertelli's cell phones 781-710-2154 and 978-758-8575 had a total of 5,079 telephone calls made or received; and in the 4 month period from June 1, 2003 to September 30, 2003, Ramasci's cell phone 617-571-8262 had 2,964 calls. (Def. Exh. A at 46-47, 52-53).

♦    CI-1 said that Gianelli's betting agents included Phil Puopolo, Stephen Russo, Michael Goudie, Ronald Heerter, and many others. (Def. Exh. A at 30). Telephone records showed 174 calls between Albertelli's cell phone and the phones at Ronald Heerter's house (Def. Exh. A at 47-48), and 29 calls between Ramasci's cell phone and Heerter's house. (Def. Exh. A at 51). Telephone records showed that Stephen Russo's telephone was currently being called by Albertelli and Ramasci. (Def. Exh. A at 31, 49).

♦    On October 8, 2003 -- just 3 weeks before submitting this October 31, 2003 wiretap affidavit -- Troopers Orlando and Foley served an arrest warrant at Stephen Russo's home in Revere, Massachusetts, and saw Russo sitting at his kitchen table in the midst of conducting his illegal gambling business, surrounded by gambling paraphernalia including betting slips, papers with gaming notations, cuff sheets, football cards, sports books, a ledger identifying the code names of numerous bettors, and other gaming related evidence. Accordingly, the Troopers arrested Russo not

only on the default warrant but also for violating the state gaming laws.  (Def. Exh.
A at 30-31).

♦    CI-2 stated that John Doramajian, Jr. currently worked as an agent for Gianelli.  (Def.
Exh. A at 50).  Telephone records showed 94 calls between Albertelli's cell phone
and three telephones located at Doramajian's home, and Albertelli's name and
address were part of the telephone company's billing information for those telephone
lines at Doramajian's home.  (Def. Exh. A at 49-50).  Telephone records also showed
68 calls between Ramasci's cell phone and Doramajian's home.  (Def. Exh. A at 51).

♦    CI-1 notified the State Police in advance of occasions when CI-1 would be meeting
with Gianelli, Albertelli, and/or Ramasci in or near Essex County, Massachusetts,
and State Police physical surveillance confirmed that such meetings occurred and that
they were of short duration, which was consistent with CI-1's information that the
meetings were for the limited purpose of exchanging money due or owed in the
Gianelli gambling operation.  (Def. Exh. A at 56).

♦    CI-2 notified the State Police in advance of occasions when CI-2 would be meeting
with Gianelli, Albertelli, and/or Ramasci in or near Essex County, and State Police
physical surveillance confirmed that such meetings occurred and that they were of
short duration, which was consistent with CI-2's information that the meetings were
for the limited purpose of exchanging money due or owed in the Gianelli gambling
operation.  (Def. Exh. A at 56).

These facts were clearly sufficient to demonstrate the reliability and corroboration of CI-1
and CI-2.  As the First Circuit has held, "Where ... the basis for the [issuing judge's] probable cause

finding was information provided by an unnamed informant, the affidavit must provide some information from which the magistrate can assess the informant's credibility. Many kinds of information may help establish credibility." *Greenburg*, 410 F.3d at 67 (citation omitted). For example, "face-to-face contact between the agent and the informant supports the informant's reliability." *Id*. So does the agent's knowledge of the informant's identity, because that enables the agent to "hold the informant responsible if he provided false information [which] tends to establish an incentive for the informant to tell the truth." *Id*. (citations omitted). Further, "evidence of the informant's prior credibility is relevant and in some cases may be all that is needed to establish probable cause." *Id*. (citation omitted). Moreover, "[a] specific, first-hand account of possible criminal activity is a hallmark of a credible tip," and "[w]hen a self-incriminating statement is provided by an informant whose identity is known to the authorities, the statement is more likely to be true because of the risk inherent in making such a statement." *Id*. at 67-68 (citations omitted). Finally, "corroboration of even innocent activity reported in the tip may support a finding of probable cause." *Id*. at 69 (citations and internal marks omitted).

All of these factors were present here, as set forth above, and the issuing judge was fully justified in relying on the confidential informants' information as part of his basis for finding probable cause for the October 31, 2003 wiretaps.[14]

------------------------------------------------------------

[14]     Citing *United States v. Brown*, 500 F.3d 48, 55 (1st Cir. 2007), the defendants argue that the affidavit should have disclosed whether the confidential informants had prior criminal records or whether they were receiving any promises, rewards, or inducements. (Br. at 71). But, aside from the fact that the affidavit in this case *did* disclose that both CI-1 and CI-2 had long been involved in illegal gambling activities, *Brown* holds that although "factors *like* an informant's prior criminal record and desire to advantage himself with respect to pending criminal charges are to be considered in evaluating his reliability[,] *such considerations are not dispositive*. The fact of the matter is that those who possess information about the inner workings of the drug trade are unlikely to be persons of impeccable moral integrity. While the source's general credibility must be

### 6.  The Wiretapping of 617-331-1167 Was Duly Authorized

The defendants assert that although monitoring instructions dated December 2, 2004 purported to authorize wiretapping of 617-331-1167, there was no application or court order covering that telephone line.  (Br. at 64).  That is incorrect.

Telephone line 617-331-1167 was subscribed to by Albert Sacramone, who died in 2005 and was never a defendant in this case.  None of the defendants in this case was intercepted over that line.

As part of the discovery in this case, the government provided the defendants with the December 2, 2004 state wiretap affidavit of Trooper Nunzio Orlando, which sought renewal authorization for two telephone lines (781-526-0516 and 781-244-9606) that are pertinent to this indictment.  The government also provided the December 2, 2004 application and orders issued for those lines, noting in the cover letter that it was *not* including material for phone lines that are not relevant to this indictment.  Thus, the government did not produce the *irrelevant* separate application and orders that covered the "new" telephone line 617-331-1167 for which Trooper Orlando's December 2, 2004 affidavit had also sought wiretap authorization.

---

considered, all that the law requires is that, when all the pertinent considerations are weighed, the information reasonably appears to be reliable."  500 F.3d at 55 (citation omitted; emphasis added).  Moreover, *United States v. Canfield*, 212 F.3d 713, 719 (2nd Cir. 2000) holds that law enforcement agents may properly exclude information -- including a confidential informant's criminal record that does not involve perjury or untruthfulness -- that would unduly risk revealing the confidential informant's identity and exposing him or her to harm.  And, *United States v. Young*, 877 F.2d 1099, 1103 (1st Cir. 1989) holds that "The law does not require an officer swearing out an affidavit for a warrant to include all possible impeachment material.  It need only explain that the officer has found the informant to be reasonably reliable.  *See Illinois v. Gates*, 462 U.S. 213, 230-39 (1983)."

Instead of simply asking the government whether there was a December 2, 2004 application and order covering telephone line 617-331-1167, *see* Local Rules 112.1 and 7.1(A)(2) ("No motion shall be filed unless counsel certify that they have conferred and have attempted in good faith to resolve or narrow the issue"), the defendants proceeded to file a motion that, among other things, expressed the concern that 617-331-1167 was "apparently [not] the subject of any ... application or Order."  (Br. at 64).

In fact, there were separate December 2, 2004 orders and a separate December 2, 2004 application for 617-331-1167, which -- along with the logs for that telephone line -- have now been provided to the defendants (Bates numbered 7553-7612) and are submitted herewith, under seal, as Exhibit 10.

7.  <u>The Massachusetts Statute Authorizes Wiretapping of Cellular Telephones</u>

The defendants assert that the Massachusetts wiretap statute, MGL c.272, § 99, does not cover cell phones.  (Br. 73-77).  That argument has repeatedly been rejected by Massachusetts state courts and should be rejected by this Court.

First, the defendants' discussion of "electronic communications" (Br. 73-75), is irrelevant. Conversations over cell phones are *not* "electronic communications" as defined by Title III at 18 U.S.C. § 2510(12), but instead are "wire communications," as defined by 18 U.S.C. § 2510(1). *See*, *e.g.*, *United States v. Councilman*, 418 F.3d 67, 77 (1st Cir. 2005) (en banc) (emphasis added):

> As the House report made clear, ... "As a rule, a communication is an *electronic* communication if it is *neither* carried by sound waves *nor* can fairly be characterized as one containing the human voice (carried in part by wire)." H.R.Rep. No. 99-647, at 35.

That House report on the Electronic Communications Privacy Act of 1986 ("ECPA") went on to say:

> A *wire* communication encompasses the whole of a voice telephone transmission even if part of the transmission is carried by fibre-optic cable or by radio -- *as in the case of cellular telephones* and long-distance satellite or microwave facilities.

*Id*. (emphasis added).  A copy of H.R.Rep. No. 99-647 is submitted herewith as Exhibit 3.

Similarly, the Senate report on ECPA made clear:

> [The 1986 legislation] amends the definition of the term "*wire* communication" in subsection 2510(1) of title 18 ... [to] specif[y] that the use of wire, cable, or other similar connections for the transmission of communications includes the use of such connections in a switching station ... [which] makes clear that *cellular communications* -- whether they are between two cellular telephones or between a cellular telephone and a "land line" telephone -- are included in the definition of "*wire* communications" and are covered by the statute.

* * *

> Thus, a *wire* communication encompasses the whole of a voice telephone transmission even if part of the transmission is carried by fiber optic cable or by radio -- *as in the case of cellular telephones*....

S.Rep. No. 99-541, at 11-12, *reprinted in* 1986 U.S.C.C.A.N. 3565-66 (emphasis added).

Second, the defendants are wrong when they assert that the Electronic Communications Privacy Act of 1986 required Massachusetts to amend its wiretap statute in order to be able to intercept cell phone conversations.  (Br. 76-77).  The "special rule" in the ECPA called upon states to amend their statutes with regard to *electronic* communications, *not* wire communications.  Thus, the House report on ECPA stated:  "It is possible that state laws will *not* need to be changed to accommodate revisions on interceptions of *wire* ... communications."  H. Rep. No. 99-647 at 62 (1986) (emphasis added).

There was no need for Massachusetts to amend its wiretap statute in order to cover cell phones. A cell phone conversation is a "wire communication" under federal wiretap law, which covers "any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception (including the use of such connection in a switching station)...." 18 U.S.C. § 2510(1). The Massachusetts wiretap statute, MCL c. 272, § 99(B)(1), is substantively the same, covering "any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception."

The SJC has held that "[t]he Massachusetts wiretap statute in major portion matches section for section the provisions of the Federal statute regulating interception of wire and oral communications. Because the Massachusetts Legislature adopted the language of the Federal statute regulating the interception of wire and oral communications, [Massachusetts courts] construe the Massachusetts statute in accordance with the construction given the cognate Federal statute by the Federal courts." *O'Sullivan v. NYNEX Corp.*, 426 Mass. 261, 264 n.5; 687 N.E.2d 1241, 1244 n.5 (1997) (citations and internal marks omitted).[15]

---

[15]     In addition, Massachusetts courts have previously interpreted the *state* wiretap statute to have incorporated an amendment to the *federal* wiretap statute, on the grounds that (a) the Massachusetts wiretap statute was modeled on the contemporaneous federal wiretap statute; (b) because of the correspondence of the two statutes, Massachusetts courts generally read the state statute in accordance with the construction given to the federal statute by the federal courts; and (c) in appropriate circumstances, the fact that there has been no amendment of the state statute should not bar the Massachusetts courts from reading the state statute in light of the amendment to the federal statute, in order to preserve the state wiretap statute's intrinsic intended scope rather than diminish it, maintain the state statute's viability in the broad run of cases, and avoid producing absurd or unreasonable results. *See Dillon v. MBTA*, 49 Mass.App.Ct. 309, 314-16; 729 N.E.2d 329, 332-34 (2000), discussed with approval in *Commonwealth v. Hyde*, 434 Mass. 594, 601 n.8; 750

In accordance with this principle, Massachusetts courts have repeatedly held that the Massachusetts wiretap statute, MCL c. 272, § 99, empowers state courts in Massachusetts to authorize the interception of cell phone conversations. Thus, in *Commonwealth v. Aldana*, Middlesex MICR 2002-0213-0215, at 6-7 (Mass.Super. Sept, 25, 2003), a copy of which is submitted herewith as Exhibit 4, the court held:

> The Massachusetts Wiretap Statute did not require revisions to comply with the [1986] amendments to Title III. The Massachusetts law protects the same technology defined as wire communications in Title III. ... [T]he legislative history indicates Congress intended to afford cellular telephone communication protection as wire communications, not electronic communications.
>
> Accordingly, cellular telephone communications constitute wire communications properly protected by the Massachusetts Wiretap Statute. As a result, state court judges may validly issue wiretap warrants for cellular telephone intercepts pursuant to the statute and any evidence discovered by police using information from such wiretaps need not be suppressed.

Accord, *Commonwealth v. Alleyne*, 2007 WL 4997621, at *2; 2007; 2007 Mass. Super. LEXIS 591, at *6 (Mass.Super. Nov. 1, 2007); *Commonwealth v. Simone*, MICR 2001-49-001, 002, at 3-5 (Mass.Super. June 8, 2004) (copy submitted herewith as Exhibit 5); and *Commonwealth v. Sanders*, MICR 2000-1533, 1534, 1539, at 13-17 (Mass.Super. Aug. 19, 2003) (copy submitted herewith as Exhibit 6).

The defendants argue that, "importantly, the Massachusetts House of Representatives have taken notice of the Section 99's limitations, as evidenced by 2007 Mass. House Bill 1601...." (Br. at 75). That argument was properly rejected in *Commonwealth v. Sanders*, *supra*, at 17, which (back in 2003) observed that although the Massachusetts Attorney General was supporting legislation to

---

N.E.2d 963, 968 n.8 (2001).

update Section 99, the Attorney General's office had acknowledged in testimony before the Joint

Committee that "Massachusetts' prosecutors and judges have routinely applied the [existing] law

to ... cellular telephones...."

In the unlikely event that the SJC were at some future date to overrule the settled statutory

interpretation embodied in decisions such as *Aldana*, *Alleyne*, *Simone*, and *Sanders*, suppression of

wiretaps previously obtained -- as in this case -- would not be appropriate, given the law enforcement

officers' reasonable good-faith reliance on the prior settled law.  *See, e.g.*, *United States v. Miller*,

116 F.3d 641, 661 (2d Cir. 1997) ("we have refused to apply retroactively state decisions announcing

a more restrictive interpretation of state wiretap law to evidence obtained by state officers acting in

good faith based on existing interpretations of state law if doing so were contrary to the interests of

justice"); *United States v. Spadaccino*, 800 F.2d 292, 297 (2d Cir. 1986); *United States v. Butz*, 982

F.2d 1378, 1382-83 (9th Cir. 1993).

<u>Conclusion</u>

For the foregoing reasons, the defendants' motion to suppress the wiretap evidence should

be denied.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:    */s/ Michael L. Tabak*
         MICHAEL L. TABAK
         FRED M. WYSHAK, JR.
         Assistant United States Attorneys
         U.S. Attorney's Office
         United States Courthouse
         1 Courthouse Way, Suite 9200
         Boston, MA 02210

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered parties.

/s/ Michael L. Tabak
Michael L. Tabak
Assistant United States Attorney

Date: May 1, 2008

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v

ARTHUR GIANELLI
MARYANN GIANELLI
FRANK IACOBONI
PHILIP PUOPOLO
DENNIS ALBERTELLI          Criminal No. 05-10003-NMG
RANDY ALBERTELLI
GISELE ALBERTELLI
SALVATORE RAMASCI
RAFIA FEGHI and
JOSEPH YERARDI

I, Jonathan W. Blodgett, upon my oath, state as follows:

    1.    I hold office as the District Attorney for Essex County. As the District Attorney, I am the principal prosecuting attorney for an application for an order authorizing interception of oral communications pursuant to General Laws chapter 272, section 99.

    2.    In October, 2003, I was made aware of an investigation by the Massachusetts State Police of a gaming operation in Essex County. I assigned First Assistant John T. Dawley and Assistant District Attorneys Brian O'Keefe and Alexander Cain to oversee the investigation.

    3.    In late October, the assistants requested approval to apply for an order authorizing interception of oral communications. Thereafter, prior to my approval to do so, I reviewed draft copies of an affidavit setting forth the probable cause and an

application setting forth the statutory requirements defining how the order was to be implemented. I was satisfied that as a matter of uniform law enforcement policy within this jurisdiction, the initiation of a wiretap was proper and required. I was satisfied that the application and affidavit were in compliance with section 99.

4. On October 29, 2003 I specially designated First Assistant Dawley and Assistant District Attorneys O'Keefe and Cain as my designees to oversee the investigation and delegated to them the responsibility of applying for and supervising the execution of the intercept order and all renewals, amendments, status reports and returns.

5. After the initial order of October 31, renewals and /or amendments to the initial application occurred on November 13, November 26, December 12, December 23, December 31, 2003, January 9, January 26, January 30, February 10 and February 25, 2004. In each instance, the specially designated Assistants continued to oversee the investigation and supervised the execution of the orders.

6. I personally reviewed every renewal application and supporting affidavit.

7. I met on a regular basis with the specially designated Assistant District Attorneys to keep informed of developments of the investigation, including developmentally of the expansion of the investigation so as to include target telephones and persons for criminal conduct not initially mentioned in the initial application and supporting affidavit.

8. I intended for the specially designated Assistant District Attorneys to oversee the investigation in its entirety which I anticipated would include a number of target telephones and persons for criminal conduct set forth in latter applications that were not mentioned in the initial application and affidavit.

Signed under the penalties of perjury this 28 day of April, 2008

Jonathan W. Blodgett

# COMMONWEALTH OF MASSACHUSETTS

**MIDDLESEX, SS.**

**SUPERIOR COURT
CRIMINAL ACTION
DOCKET NOS: 2002-0213
2002-0214
2002-0215
2002-0216
2002-1725**

## COMMONWEALTH

### vs.

### FABER ALDANA & OTHERS[1]

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE DERIVED FROM INTERCEPTIONS OF WIRE AND ORAL COMMUNICATIONS

The matter is before the court on defendant, Faber Aldana's (Aldana), motion to suppress evidence derived from interceptions of wire and oral communications, in which the listed defendants join. Aldana is charged with one count of trafficking over 200 grams of cocaine in violation of G.L. c. 94C, § 32E(b)(4), one count of trafficking over 28 grams of heroin in violation of G.L c. 94C, § 32E(c)(2), and two counts of conspiracy to violate the controlled substances act in violation of G.L. c. 94C, § 40.[2]

---

[1] Monica Reyes (Reyes), Mario Reyes Jr. (Reyes Jr.), William Torres (Torres), Gilberto Cruz (Cruz), James Abreus (Abreus) and Carlos Parra (Parra).

[2] Reyes was charged with one count of possession with intent to distribute heroin in violation of G.L. c. 94C, § 32(a), one count of possession with intent to distribute cocaine in violation of G.L. c. 94C, § 32A(c). Reyes, Jr. was charged with two counts of trafficking in over 200 grams of cocaine in violation of G. L. c. 94C, § 32E(b)(4), one count of trafficking in over 28 grams of heroin in violation of G.L c. 94C, § 32E(c)(2), two counts of conspiracy to violate the controlled substance act in violation of G.L 94C, § 40, one count of furnishing a false name to the police in violation of G.L. c. 268, § 34A, one count of possession of a firearm without a license in violation of G.L. c. 269, § 10(h), one count of possession of ammunition without a license G.L. c. 269, §10(h), and one count of failure to secure a firearm in violation of G.L. c. 140, § 131L(a). Torres was charged with one count of trafficking in over 200 grams of cocaine in violation of G.L. c. 94C, § 32E(b)(4), one count of furnishing a false name to the police in violation of G.L. c. 268, § 34A, and one count of conspiracy to violate the controlled substances act in violation of G.L. c. 94C, § 40. Cruz was charged with one count of trafficking in over 200 grams of cocaine in violation of G.L. c. 94C, § 32E(b)(4), one count of trafficking in over 28 grams of heroin in violation of G.L. c. 94C,

This court **DENIES** the motion for the following reasons.

## BACKGROUND

The following basic facts are not in dispute for purposes of this motion to suppress. From June to November 2001, the federal Drug Enforcement Administration and the Massachusetts state police conducted an investigation into a heroin, cocaine, and MDMA (ecstasy) distribution organization centered in eastern Massachusetts.

On September 21, 2001, Assistant Attorneys General, William Bloomer and Aloke Chakravarty, sought and were granted wiretap warrants from Superior Court Judge Christopher J. Muse for the interception of calls on two cellular telephones, (617-818-7852) and (617-818-7853), belonging to Reyes. In October 2001, the assistant attorneys general sought and were granted wiretap warrants for three additional cellular telephones, (781-397-0545), (617-216-5873), and (617-438-8217), and a renewal of the first two wiretap warrants. The warrant applications were based on 95 pages of affidavits by Trooper Cespero (Cespero) and Trooper Ridlon (Ridlon) that detailed numerous undercover drug purchases, physical surveillance, confidential informants' information, and examination of the billing records for the cellular telephones.

As a result of information gleaned from these wiretaps and the other investigative measures, police arrested the defendants on November 1-2, 2001. They seized drugs, money, a

---

§ 32E(c)(2), and two counts of conspiracy to violate the controlled substances act in violation of G.L. c. 94C, § 40. Abreus was charged with two counts of conspiracy to violate the controlled substances act in violation of G.L c. 94C, § 40, one count of conspiracy to traffic firearms in violation of G.L. c. 274, § 7, three counts of being an armed career criminal in violation of G.L. c. 269, § 10G(b), and three counts of possessing a firearm or ammunition without a license in violation of G.L c. 269 § 10(h). Parra was charged with one count of trafficking in more than 100 grams of heroin in violation of G.L c. 94C, § 32E(c)(3) and three counts of conspiracy to violate the controlled substances act in violation of G.L. c. 94C, § 40.

firearm, ammunition, and other items associated with the distribution of drugs.

## RULINGS OF LAW

Aldana claims that all evidence derived directly or indirectly from information obtained through the wiretaps should be suppressed because Justice Muse lacked proper authority to issue the wiretap warrants. He argues that because Massachusetts did not update its wiretap statute after changes to the federal wiretap law, warrants issued pursuant to the law are invalid. Aldana also asserts that in obtaining the warrant, the police failed to demonstrate the necessity of the wiretap because of their inability to obtain the information using normal investigative procedures.[3]

## I.    Standing

The Commonwealth argues that Aldana's motion should be denied because he fails to demonstrate that he has the requisite standing to challenge warrants issued pursuant to the Massachusetts Wiretap Statute, G.L. c. 272, § 99P.

Any criminal defendant in a court of the Commonwealth may move to suppress the contents or fruits of any intercepted wire or oral communication. G. L. c. 272, § 99P; Commonwealth v. Blood, 400 Mass. 61, 66 (1987). As a criminal defendant to four counts of drug trafficking and conspiracy, Aldana satisfies the standing requirement in the Massachusetts

---

[3] In his motion, Aldana also challenges the validity of the wiretap warrants under the Fourth Amendment of the United States Constitution and Article 14 of the Massachusetts Declaration of Rights, but he fails to support these challenges in either his affidavit or his memorandum of law. In his affidavit, Aldana does not allege facts showing he had a reasonable expectation of privacy in telephone conversations conducted on Reyes' cellular telephones, nor does he present any other arguments in his memorandum of law as to why he should be granted standing to challenge the intercepts under the Fourth Amendment or Article 14.

The Supreme Judicial Court held that G.L. c 272, § 99 presents standing issues entirely separate from Article 14. Commonwealth v. Price, 408 Mass. 668, 674 (1990) citing Commonwealth Davis, 407 Mass. 1001 (1990). Here, as in Price, the police conducted the wiretaps pursuant to a warrant issued by a judicial officer, based on an affidavit demonstrating probable cause. Aldana presents no reasonable basis to grant him standing to challenge the evidence on Fourth Amendment or Article 14 grounds.

Wiretap Statute. Similarly, all the defendants joining in Aldana's motion to suppress, charged with multiple criminal counts by the Commonwealth, have standing to challenge the wiretap warrants. Consequently, the Commonwealth's argument fails.

## II.    **Massachusetts Wiretap Statute**

Aldana argues that all evidence derived from the police interceptions of conversations on Reyes' cellular telephones should be suppressed because the warrants were invalid based on Justice Muse's lack of authority as a state court judge to issue wiretap warrants for cellular telephones. Aldana based this claim on an erroneous interpretation of the effect of revisions to federal wiretap law upon the Massachusetts Wiretap Statute.

In 1968, Congress passed Title III of the Ominbus Crime Control and Safe Streets Act, 18 U.S.C. 2510, et seq. (Title III), outlawing the interception of wire and oral communications except in limited circumstances. As the legislative history indicates, the law provided a base level of protection for wire and oral communications and allowed states to pass more stringent protections if they wished. S. Rep. No. 1097 (1068), reprinted in 1968 U.S.C.C.A.N. 2112, 2187; Commonwealth v. Barboza, 54 Mass. App. Ct. 99 (2001). In Commonwealth v. Vitello, the Supreme Judicial Court (SJC) held that the Massachusetts Wiretap Statute did not conflict with or diminish federal wiretap requirements and upheld the statute as facially valid. 367 Mass. 224, 230 (1975); United States v. Smith, 726 F.2d 852, 858 (1st Cir. 1984), cert. denied, 469 U.S. 841 (1984).

In 1986, Congress, mindful of the many changes in communications technology, passed the Electronic Communications Privacy Act (ECPA) amending Title III to update and clarify privacy protections, and to extend protection to electronic communications. See S. Report No.

4

99-541, at 1 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3555. In the legislative history to the amendment Congress described cellular telephone technology and confirmed that cellular telephones were included in the definition of wire communications. S. Report No. 99-541 at 9, 12. "[A] wire communication encompasses the whole of a voice telephone transmission even if part of the transmission is carried by fiber optic cable or by radio–as in the case of cellular telephones and long distance satellite or microwave facilities. . . . the term 'wire communication' includes existing telephone service, and digitized communications to the extent that they contain the human voice at the point of origin, reception, or some point in between." Id. at 12.

In contrast, Congress defined "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in a photoelectronic or photooptical system." 18 U.S.C. § 2510(12) (1986).[4] As the legislative history makes clear, this definition of electronic communication did not include communications "carried by sound waves" or "containing the human voice," i.e., cellular telephone communications. S. Report No. 99-541, at 14.

Additionally, Congress gave states a two-year grace period to enact electronic communication intercept statutes at least as restrictive as the provisions of Title III. Pub.L.99-508 111(b); S. Report No. 99-541, at 35. After the expiration of two years, warrants issued pursuant to state statutes more lenient on law enforcement than Title III would be invalid. S. Report No. 99-541, at 35. "This special effective date rule is necessary because the provisions of

---

[4] The current version of 18 U.S.C. § 2510(12) defines electronic communication as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectric or photooptical system . . . but does not include any wire or oral communication . . ." 18 U.S.C. § 2510(12) (2003).

(ECPA) supercede state laws with respect to electronic communications. . . . because of the substantial changes made by this act it is appropriate to grant the states sufficient time to modify their laws." Id. (emphasis added).

Congress created the two-year grace period for states to bring their statutes regulating electronic communication intercepts, not wire communications, into conformance. Changes to federal law with respect to electronic communications were so extensive that Congress felt states needed time to enact complying statutes. In the legislative history, Congress did not specifically mention changes to wire communication regulations as substantial or necessitating time for state compliance. In fact, the House Committee report states, "It is possible that state laws will not need to be changed to accommodate revisions on interceptions of wire or oral communications." H. Rep. No. 99-647 at 62 (1986).

In this case, Aldana argues the Massachusetts Wiretap Statute was not amended after the 1986 revisions to Title III; thus, any intercept warrant issued by a state judge pursuant to the statute, after the expiration of the Title III grace period, is void. Aldana further claims that federal law and federal judges should govern cellular telephone intercept warrants. This argument, however, is not persuasive.

The Massachusetts Wiretap Statute did not require revisions to comply with the amendments to Title III. The Massachusetts law protects the same technology defined as wire communications in Title III. Compare G.L. c. 272, § 99(B)(1)("any communication made whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception") with 18 U.S.C. § 2510(1)("any aural transfer made in whole or in part through the use of facilities for the

transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception (including the use of such connection in a switching station)"). Moreover, the legislative history indicates Congress intended to afford cellular telephone communication protection as wire communications, not electronic communications.

Accordingly, cellular telephone communications constitute wire communications properly protected by the Massachusetts Wiretap Statute. As a result, state court judges may validly issue wiretap warrants for cellular telephone intercepts pursuant to the statute and any evidence discovered by police using information from such wiretaps need not be suppressed.

## III.    **Necessity of Wiretap**

Aldana also claims that Justice Muse invalidly issued the wiretap warrants because the police failed to make the necessity showing required by the Massachusetts Wiretap Statute.

A judge may issue a wiretap warrant "upon a showing by the applicant that normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried." G.L. c. 272, § 99.[5]  The Commonwealth need not show that traditional investigative techniques were wholly unsuccessful or that the police had exhausted all other investigative procedures before filing its application for a warrant authorizing a wiretap. Commonwealth v. Fenderson, 410 Mass. 82, 83 (1991)(citing Commonwealth v. Wilson, 405 Mass 248, 250

---

[5] G.L. c. 272, § 99(E) also requires a wiretap application include information that the affiant has "probable cause to believe that a designated offense has been, is being, or is about to be committed and that evidence of the commission of such an offense may thus be obtained or that information which will aid in the apprehension of a person who the applicant has probable cause to believe has committed, is committing, or is about to commit a designated offense may thus be obtained."
Aldana does not dispute that the Commonwealth satisfied the probable cause showing. Moreover, viewing the wiretap application as a whole in a common sense manner, investigators presented Justice Muse with probable cause to issue the wiretap warrants for Reyes' cellular telephones. See Commonwealth v. Wilson, 405 Mass 248, 251 (1989).

(1989)). Because wiretaps are so intrusive, the Commonwealth must make a good faith effort to "run the gamut of normal investigative procedures" before resorting to electronic surveillance of telephone calls. United States v. Ashly, 876 F.2d 1069, 1072 (1st Cir. 1989)(citing United States v. Hoffman, 832 F.2d 1299, 1306-07 (1st Cir. 1987)). Normal investigative procedures may include visual surveillance, undercover narcotic purchases, telephone records review, information from informants, and standard search warrants. See Fenderson, 410 Mass. at 85-86; Commonwealth v. Westerman, 414 Mass. 688, 693 (1993).

In this case, law enforcement officers conducted approximately four months of undercover investigation and physical surveillance of the defendants before applying for the first wiretap warrants. The affidavits submitted by Cepero and Ridlon detailed numerous undercover narcotic purchases from Reyes and Reyes Jr. by Cepero, Montanez, and a confidential informant. The affidavits also describe how the troopers and the confidential informant had been unable to obtain information about Reyes' supplier or stash locations because they were unable to penetrate the upper levels of the organization. Their interactions were limited to dealing with only Reyes or Reyes Jr., and those interactions were brief and specific to the drug transactions. In the affidavits, the troopers also state that even with the use of physical surveillance, they had failed to ascertain the location or locations where the defendants stored the bulk of their narcotics, thereby rendering search warrants for particular locations unlikely to be fruitful.

Additionally, in their affidavits the troopers describe the defendants' use of pre-paid cellular telephones with fictitious subscriber names and addresses. The investigators claim this payment scheme made it slow and difficult, if not impossible for investigators to identify incoming callers. The troopers also detail counter-surveillance techniques employed by the

8

defendants. These counter-surveillance methods allowed defendants to detect undercover police surveillance, thereby making it dangerous for the undercover officers and confidential informants to persist in their efforts to penetrate the upper levels of the drug trafficking organization.

Consequently, as the affidavits submitted in support of the wiretap warrants demonstrate, the investigators used normal investigative procedures to pursue the defendants' drug trafficking ring as far as possible. The procedures employed–undercover operations, physical surveillance and records review–provided enough information for the investigators to show probable cause to support the issuance of the wiretap warrants, but failed to produce the information necessary for investigators to obtain convictions for all the people involved in the operation. Thus, Justice Muse validly issued the wiretap warrants.

## **ORDER**

For the foregoing reasons, it is hereby **ORDERED** that the defendants' motion to suppress evidence derived from interceptions of wire and oral communications is **DENIED**.

Sandra L. Hamlin
Justice of the Superior Court

**DATE**: September 25, 2003

## COMMONWEALTH OF MASSACHUSETTS

**MIDDLESEX, ss.**

**SUPERIOR COURT
CRIMINAL ACTION
No. 2001-49-001, 002**

### COMMONWEALTH

### vs.

### FREDERICK SIMONE

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE DERIVED FROM WIRETAP WARRANTS AND BUGGING WARRANTS

The Grand Jury returned indictments against the defendant, Frederick Simone ("Simone"), on January 18, 2001 for violations of G.L. c. 269, § 10(h) (Illegal Possession of a Firearm and Ammunition) and G.L. c. 269, § 10G (Armed Career Criminal). This matter is before the court on Simone's motion to suppress evidence derived from wiretaps of the defendant's home and cellular phones and bugs placed in his residence at 32 Lowther Road, Framingham, Massachusetts. For the reasons discussed below, the defendant's motion to suppress is denied.

## I. FACTS

On September 1, 2000, Massachusetts State Police Trooper Pasquale Russolillo ("Trooper Russolillo") applied for and obtained a warrant, which authorized the police to intercept communications over Simone's cellular and home phones. On October 19, 2000, Trooper Russolillo applied for and obtained a second warrant authorizing the police to place recording devices inside Simone's residence, located at 32 Lowther Road, Framingham, Massachusetts. Trooper Russolillo

δ **3**

4/8/04 Both sid,.,

periodically filed renewal applications, which were granted through November 10, 2000.[1]

In his affidavits in support of the September 1 and October 19 search warrant applications, Trooper Russolillo alleged that probable cause existed to believe that Simone was engaged in extortion, criminal usury and illegal gaming activities.[2]  In his first wiretap affidavit, Trooper Russolillo relied primarily upon information provided by six confidential informants ("CI-1 – CI-6") and one named cooperating informant, Robert Luisi, Jr. ("Luisi"), to establish probable cause.

The Massachusetts State Police conducted a wiretap investigation from September 1, 2000 to December 7, 2000.  At the conclusion of the investigation, the police obtained search warrants for Simone's person, vehicle and residence.  During the search of Simone's residence at 32 Lowther Road, the police seized a .32 caliber Savage Arms semi-automatic pistol and eight rounds of ammunition.

## II. DISCUSSION

The Massachusetts wiretap statute, G.L. c. 272, § 99 generally prohibits the interception of wire communications except in explicit circumstances.  Section 99D(1)(d) permits any person authorized by a warrant in conformity with G.L. c. 272, § 99 to make specified interceptions.

The defendant argues four bases on which the evidence derived from the wiretap warrants should be suppressed.  First, the defendant argues that G.L. c. 272, § 99 does not permit the interception of communications that occur over cellular phones.  Second, the defendant contends

---

[1]  The wiretap warrant for Simone's home and cellular phones was renewed on September 19, October 4, 19, 24 and November 10, 2000.  The wiretap warrants for the 32 Lowther Road were renewed on October 24 and November 10, 2000.

[2]  Francis White, John DeMarco and Vincent Roberto were also targets of the September 1, 2000 search warrant.  In subsequent renewal applications, Michael Dezotell, Joseph Salvati, Robert Nardillo, Aldofo Bruno, Matthew Gugliemetti, Joseph Rosato, Anthony Musto and Vincent Gioacchini were also included as targets.

2

that the September 1st wiretap warrant was issued without probable cause because the Commonwealth failed to establish the basis of knowledge and reliability of its informants. Third, with regard to the bugging warrant, the defendant argues that the warrant application did not establish probable cause that the defendant's 32 Lowther Road residence was being used for illegal activity. Finally, the defendant argues that both the wiretap and bugging warrants violated the necessity requirement of G.L. c. 272, § 99.

## A.     Validity of the Wiretap Warrant for Simone's Cellular Phone

The defendant argues that the evidence derived from the wiretap warrant authorizing the police to intercept communications occurring over Simone's cellular phone should be suppressed because the judge did not have the authority to issue a warrant to intercept communications over a cellular telephone. The defendant's argument is based on his interpretation that the Electronic Communications Privacy Act ("ECPA"), enacted by Congress in 1986, preempted the Massachusetts wiretap statute and left state judges without authority to issue a wiretap warrant for cellular phones. This court finds the defendant's interpretation of the federal wiretap law to be erroneous.

In 1968, Congress passed Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. 2510, et seq. ("Title III"), prohibiting the interception of wire and oral communications except in limited circumstances. The legislative history indicates that the law provided a base level of protection for wire and oral communications and allowed states to pass more stringent protections if they wished. S. Rep. No. 1097 (1068), reprinted in 1968 U.S.C.C.A.N., 2112, 2187; *Commonwealth v. Barboza*, 54 Mass. App. Ct. 99 (2001).

In 1986, Congress enacted the ECPA, which extended privacy protections to electronic communications. See *United States v. Suarez*, 906 F.2d 977, 980 (4th Cir. 1990). When Congress passed the ECPA, it included a "special rule," granting the states a two-year period to enact

3

electronic communication intercept statutes at least as restrictive as the provisions of Title III. Pub.L. 99-508 § 111(b). At the end of the two-year period, warrants issued pursuant to state statutes more lenient than federal wiretap law would be considered invalid. S. Report No. 99-541, at 35.

The defendant argues that because the Massachusetts Legislature did not amend its wiretap statute to conform with the ECPA within the two year grace period, federal law preempted the state wiretap law. However, the two-year grace period for states to bring their statutes into conformance with federal law referred to statutes regulating *electronic communications*, not wire communications. In the legislative history to the ECPA, Congress included cellular telephone technology in the definition of wire communications. S. Report No. 99-541 at 9. ""[A] wire communication encompasses the whole of a voice telephone transmission even if part of the transmission is carried by fiber optic cable or by radio – as in the case of cellular telephones and long distance satellite or microwave facilities ... the term 'wire communication' includes existing telephone service, and digitized communications to the extent that they contain the human voice at the point of origin, reception, or some point in between." *Id.* at 12.

The Massachusetts Wiretap Statute protects the same technology defined as wire communications in Title III. *Commonwealth v. Aldana*, No. 2002-0213, (Mass. Super. September 25, 2003). ("Compare G.L. c. 272, § 99(B)(1) ('any communication made whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception') with 18 U.S.C. § 2510(1) ('any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception')." Furthermore, without having explicitly addressed the issue, the Supreme Judicial Court has upheld the issuance of a wiretap warrant for a cellular phone. *Commonwealth*

4

*v. D'Amour*, 428 Mass. 725, 732 (1999).

Accordingly, communications over cellular phones are included in the definition of wire communications under the state statute and a state court judge has the authority to issue a wiretap warrant for interception of communications over cellular telephones.

**B.      G.L. c. 272, § 99E – Probable Cause and Necessity Requirement**

The wiretap statute provides an exception for electronic surveillance performed pursuant to a warrant conforming to G.L. c. 272, § 99.[3] A wiretap warrant may only be issued where there exists "probable cause to believe that a designated offense has been, is being, or is about to be committed and that interception would lead to evidence of that offense. G.L. c. 272, § 99E(2); *D'Amour*, 428 Mass. 725, 735 (1999). The Commonwealth must also show that "normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried." G.L. c. 272, § 99E(3). The defendants argue that the warrant for electronic surveillance was not supported by probable cause and that the Commonwealth failed to establish the inadequacy of traditional investigative procedures.

1.      <u>Probable Cause</u>

The defendant argues that the reliability and veracity of the informants are insufficient to

---

[3]   General Law chapter 272, section 99E allows a warrant to be issued:

1.      Upon a sworn application in conformity with [section 99]; and

2.      Upon a showing by the applicant that there is probable cause to believe that a designated offense has been...committed and that evidence of the commission of such an offense may thus be obtained or that information which will aid in the apprehension of a person who the applicant has probable cause to believe has committed...a designated offense may thus be obtained; and

3.      Upon a showing by the applicant that normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried.

support a finding of probable cause under the two-prong test of *Commonwealth v. Upton*, 394 Mass. 363, 374 (1984), as set forth in *Aguilar v. Texas*, 378 U.S. 108 (1964) and *Spinelli v. United States*, 393 U.S. 410 (1969). The *Aguilar-Spinelli* standard requires that an affidavit in support of a warrant demonstrate that an informant has both a basis of knowledge and that the information provided is reliable.

In this case the police relied upon information from six confidential informants, as well as one named cooperating informant. If an informant's tip is insufficient to satisfy both prongs of the *Aguilar-Spinelli* test, "other independent, corroborating allegations in the affidavit may supplement the informant's tip to support a finding of probable cause." *Commonwealth v. Reddington*, 395 Mass. 315, 322 (1985). The test is relaxed where the informant is named and identified rather than anonymous. *Commonwealth v. Olivares*, 30 Mass. App. Ct. 596, 598 (1991). Information provided by a named informant is accorded more weight than that of a confidential informant. *Id.* at 598.

*Basis of Knowledge*

Named Informant (Luisi)

Luisi provided first-hand information sufficient to satisfy the basis of knowledge prong. Luisi was a captain in the Philadelphia La Cosa Nostra at the time of his arrest in 1999. He had personal knowledge based on his relationship with Simone. For instance, Luisi told the police that he spoke with Simone frequently over the telephone, during which time they would speak in "code."

Luisi participated in meetings with Simone and other organized crime members at which they discussed loansharking, extortion and bookmaking. Specifically, Luisi told the police about a meeting in 1998, which occurred after Simone was released from prison, between Simone, Luisi and two made members of the New England La Cosa Nostra to discuss extortion, loansharking and gaming.

6

Luisi provided the police with details about Simone's relationships with other organized crime members. For instance, Luisi provided information regarding who was making "rent" payments to Simone. This and other tips provided by Luisi were corroborated by a prior wiretap and independent police work. For example, Luisi told the police that Simone financed Joe Rosato to deal percocets in the North End. Rosato was later arrested for possession with intent to distribute percocet and cocaine.

Luisi provided first-hand knowledge as an organized crime member, as well as personal and detailed information. On this basis, this court finds that the information collected from Luisi is sufficient to satisfy the basis of knowledge prong of *Aguilar-Spinelli*.

The Six Confidential Informants

The six confidential informants also provided sufficient information to satisfy the basis of knowledge prong. All of the confidential informants are involved in gaming, extortion or loansharking. CI-1, CI-2 and CI-3 are bookmakers. CI-4 is involved in gaming. CI-5 is involved in loansharking. CI-6 had been paying "rent" to Simone.

CI-1 told the police that one bookmaker, Leonard Teperow, was forced to pay Simone rent to continue his bookmaking operations. Though the information was gleaned from Teperow's associate, it was corroborated by CI-2, CI-4 and Luisi, who provided information that Teperow and three other bookmakers, Vincent Roberto, Chris Kotsiopolous and Michael Dezotell pay rent to Simone. Both CI-2 and CI-6 were told personally by Simone that they would have to pay rent to him. CI-3 told the police that he contacted Simone to discuss gaming after Simone gave him his cellular telephone number. CI-3 also provided a tip, corroborated by Luisi, that Donato Fratarolli, the owner of the Boston restaurant, Artu, was paying rent to Simone. CI-5 tipped the police that he had personally observed Simone and Francis White together. Their relationship was confirmed by

7

Luisi, police surveillance and a previous wiretap investigation.

*Veracity*

Because Luisi is a named and identified informant his tips hold an inherent reliability. *Commonwealth v. Zuluaga*, 43 Mass. App. Ct. 629, 635 (1997) (the fact that an informant is identified strengthens his credibility and carries indicia of reliability). Even so, the information provided by Luisi contained details of a type not easily obtainable by a casual bystander. *Commonwealth v. Va Meng Joe*, 425 Mass. 99, 103 (1997). Specific and detailed information makes it "more probable that the information came from a reliable source than when the information is...the type of information which may have been picked up as a rumor in a bar." *Commonwealth v. Atchue*, 393 Mass. 343, 348 (1984).

The six confidential informants were all known by the police, which lent indicia of reliability to their tips. See *Commonwealth v. Bakoian*, 412 Mass. 295, 301 (1992) (that police knew informant's identity gave information indicia of reliability). CI-1 had been known by the police for over ten years, CI-2 for over five years and CI-3 for over seven years. Prior to this investigation, CI-1, CI-2, CI-3, and CI-4 had all provided information to the police regarding extortion, gaming and loansharking operations, which had proven to be reliable. CI-1's reliability is bolstered by the fact that information he has provided the police has resulted in the arrest and conviction of over ten persons for gaming-related crimes.

Many of the tips provided by the confidential informants are corroborated by information provided by other informants or independent police work. By providing the police with mutually corroborative and complementary tips, some of which are confirmed by independent police investigation, the information provided by the six confidential informants satisfies the veracity prong of the *Aguilar-Spinelli* test. *Commonwealth v. Russell*, 46 Mass. App. Ct. 513, 519 (1999). For

8

instance, information provided by CI-5 about Simone and White was corroborated by Luisi, police surveillance and wiretap interceptions. The police were able to confirm that telephone numbers provided by CI-2 were associated with the organized crime members he named. CI-4 provided a telephone number to the Boston Police Department, which resulted in interceptions and seizure of evidence relating to gaming.

This court finds that Trooper Russolillo's affidavit satisfied the knowledge and veracity prongs required by *Commonwealth v. Upton*. The affidavit submitted for a warrant, based on the information provided by Luisi and the six confidential informants, was supported by probable cause.

2.   Failure of Traditional Investigative Techniques

The defendant argues that the Commonwealth failed to show that normal investigative techniques were not successful as is required to obtain a warrant under the wiretap statute. General Laws c. 272, § 99E(3) requires "a showing by the applicant that normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried."

In meeting its burden to establish the necessity of a wiretap, the Commonwealth "need not show that traditional investigative techniques were wholly unsuccessful or that the police had exhausted all other investigative procedures before filing its application of a warrant authorizing a wiretap." *Commonwealth v. Fenderson*, 410 Mass. 82, 83 (1991), quoting *Commonwealth v. Wilson*, 405 Mass. 248, 250 (1989). The necessity requirement is intended to assure that the police do not resort to wiretapping in a situation where traditional investigative techniques would suffice to expose the crime. *Id.* at 83.

The police relied on several unnamed informants and one named cooperating informant to obtain information regarding Simone and other participants in organized crime. The police corroborated several pieces of information through their own police efforts. The affidavit also states

9

a multitude of reasons that further investigation using traditional procedures would be likely to fail or would jeopardize the objectives of the investigation: the refusal of witnesses to testify, that the informants were providing information on the condition that their identities remain concealed, the harm to cooperating informants who might be exposed, and the inability of informants to penetrate the organization.

These are not "boilerplate generalities" as the defendant contends. These are reasonable concerns specific to the type of crime being investigated. See *Commonwealth v. Westerman*, 414 Mass. 688, 693 (1993). The affidavit by Trooper Russolillo set forth the traditional investigative techniques that had been used, such as informants and surveillance, and provided sufficient information to show a reasonable likelihood that such techniques would fail to provide the police with sufficient information regarding the criminal activities being investigated. As such, this court finds that the September 1 and October 19 affidavits satisfy the necessity requirement.

## C.    Probable Cause of Criminal Activity at 32 Lowther Road

To establish probable cause, the affidavit in support of a warrant must establish a factual basis from which a nexus between the defendant and the location to be searched may be seen. *Commonwealth v. Ortiz-Peguero*, 51 Mass. App. Ct. 90, 97 (2001). In other words, there must be reasonable cause to believe that the place to be searched is connected to the underlying criminal activity and, thus, is a likely repository of evidence. *Commonwealth v. Cinelli*, 389 Mass. 197 (1991).

The October 19, 2000 affidavit in support of the warrant application to place electronic surveillance devices inside 32 Lowther Road provided a substantial basis to conclude that evidence of criminal activity, as outlined in the warrant, would be found there. The affidavit references numerous phone calls between Simone and other targets of the warrant, which were made from

Simone's home telephone registered to 32 Lowther Road. The affidavit notes a number of phone calls made to and from the phone registered to 32 Lowther Street to other targets of the warrant. The phone calls often involved extortion, loansharking and gaming. It is reasonable for the court to infer from the numerous phone calls that paperwork or other records of extortion, loansharking or gaming activities would be found at Simone's residence.

In addition to the phone calls to and from 32 Lowther Road, five targets of the warrant, specifically Dezotell, Salvati, Musto, Kotsiopoulos and Roberto, met with Simone at 32 Lowther Road. Dezotell was at Simone's residence on two occasions and Musto was observed at the residence on three occasions, twice talking to Simone outside of the residence and once inside. Information from Luisi, confidential informants CI-1 and CI-4, as well as interceptions from a previous wiretap investigation, indicate that Dezotell, Kotsiopoulos and Roberto pay Simone "rent."

Although probable cause to believe that a suspect has committed a crime does not necessarily translate into probable cause to search his home, see *Cinelli,* 389 Mass. at 213, Simone met and communicated with known organized crime members, using 32 Lowther Road as a base. The numerous phone calls to and from the phone registered to 32 Lowther Road and the presence of five organized crime members at Simone's residence is sufficient for this court to reasonably conclude that evidence of Simone's criminal activity would be found inside the 32 Lowther Road residence.

11

## **ORDER**

For the foregoing reasons, the defendant's motions to suppress evidence derived from the wiretap and bugging warrants are **DENIED**.

*Sandra L. Hamlin*

Sandra L. Hamlin
Justice of the Superior Court

Dated: June 8 , 2004.

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

SUPERIOR COURT
CRIMINAL ACTION
2000-1533, 1534, 1539

COMMONWEALTH

v.

SCOTT SANDERS
JAMES HAYES
ANTHONY CARDILLO

> FILED
> IN THE OFFICE OF THE
> CLERK OF THE COURTS
> FOR THE COUNTY OF MIDDLESEX
>
> AUG 19 2003
>
> *Edward J. Sullivan*
> CLERK

<u>MEMORANDUM OF LAW AND ORDER</u>
[On Defendants' Motions to Suppress Evidence Derived from a Warrant-based
Interception of Wire Communications]

Defendants Scott Sanders (Mr. Sanders), James Hayes (Mr. Hayes) and

Anthony Cardillo (Mr. Cardillo) were indicted by the Grand Jury for trafficking in Class B

controlled substance of 200 grams+ and conspiracy in violation of G.L. c. 94C

§§32E(b)(4) and 40[1].  They move to suppression evidence obtained from a wiretap.

They argue that the Superior Court had no authority to issue a wiretap warrant for

cellular communications.  In the alternative, they argue the government did not: (1)

have probable cause, (2) meet the necessity requirement, (3) identify the targets with

particularity, or (4) limit interception to the strictures of the warrant.  Information that

contributed to the indictments was intercepted via a warrant-based wiretap investigation

of two cellular phones and a pager belonging to Scott Sanders, pursuant to G. L. c.272

§ 99.  For the foregoing reasons, the defendants' motions are <u>denied</u>.

---

[1]Mr. Sanders faces two counts of conspiracy.  Mr. Cardillo was also indicted for trafficking in a Class D over 100 pounds and distribution of Class D, second/subsequent offense in violation of G.L. c. 94C §§32E(a)(2) and 32C(b).



*8/19/03 Both sides*

## BACKGROUND

I find the following facts based on the submissions in support of the application for the warrant and the reasonable inferences drawn therefrom[2].

The Attorney General submitted an application for two wiretaps on July 10, 2000. The wiretaps were for the following phone and pager, both belonging to one Scott Sanders: cellular phone 617-230-8200 ("Sanders Phone") and pager 617-604-6777 ("Sanders Pager"). Troopers Connors and Cummings, both of the Narcotics and Organized Crime Division of the Attorney General's Office, submitted an affidavit in support of the application for the warrants. The officers have over ten and twenty years experience, respectively, in the area of narcotics investigations[3]. Judge Ball issued the warrant later the same day, on July 10, 2000.

Two days later, on July 12, 2000, the Attorney General submitted a second similar application, supported by an affidavit by the same two troopers, for a wiretap on another Scott Sanders cellular phone 617-548-5488 ("Sanders Phone 2"). The affidavit incorporated the prior affidavit. The warrant issued on the same day. Several additional later wiretap warrants issued, though they are not the subject of these motions.

The troopers set forth in their affidavit that the primary goal was "not simply to arrest Scott Sanders but to penetrate the conspiracy or conspiracies to distribute Percocet, and to identify, apprehend, and bring about the successful prosecution of the

---

[2]I recite only some of the facts set forth in the affidavit but incorporate by reference the affidavit in its entirety.

[3]The training and experience of the two troopers speaks for itself and need not be repeated here but is incorporated by reference.

Percocet, and to identify, apprehend, and bring about the successful prosecution of the persons, including Scott Sanders, involved in all levels of the conspiracy or conspiracies". The troopers outlined the organization including names and position based on information gathered during the course of the investigation which they set forth in great detail. They included the criminal history of the identified persons within the organization.

The troopers obtained information from Voicestream Wireless Communications, the issuer of Sanders telephone, regarding the prepaid cellular telephone. A consumer may purchase a prepaid cellular telephone which provides a fixed amount of "air time". At the conclusion of the "air time minutes" the customer may pay for additional "air time" or discard the telephone or return it for another prepaid cellular telephone. Sanders used six (6) cellular telephones, five (5) prepaid, between March and July, 2000.

A consumer may purchase a prepaid pager. It operates similar to the prepaid cellular telephone. Sanders used three (3) prepaid pagers during the same time period. The troopers identified this type of activity being consistent with an attempt to avoid detection.

The service providers do not require reliable personal data, background check or credit reference before selling a prepaid device. The records of Voicestream Wireless Communications list five different names for each of Sanders prepaid cellular telephones each having as his address Bethlehem, Pennsylvania. Sanders name was never used. The troopers concluded these devices hinder and impair normal investigative procedures.

In the affidavit the troopers set forth that during 1998 and 1999, the police began

3

investigating a greater Boston percocet (oxycodone) distribution organization. An April, 1999 wiretap lead police to George Lubell, Robert Guthro, Donald Smoot and others. Smoot owned Advanced Automotive in East Boston. Guthro was identified as a top level dealer, while Smoot's involvement focused on money laundering, primarily from his automotive shop. Lubell and others met frequently at Advanced Automotive. The wiretaps demonstrated that Lubell and Guthro spoke almost on a daily basis with the majority of the conversations involving the distribution of Percocet. The wiretap ended on May 26, 1999 when Lubell was shot and critically wounded. Search warrants were executed at several locations on June 17, 1999 including Lubell's residence. Percocet, substantial sums of money and handguns were seized. Indictments followed.

Seized from Lubell's residence was an address/telephone book. There were two telephone numbers for "Donald". They both led to Donald Smoot at his automotive shop.

Around the same time, police learned through several unnamed informants of Dino D'Ambrosio and James Masciulli, low-level dealers. While working undercover, police made several buys from D'Ambrosio and Masciulli. Using several traditional investigatory techniques, including an analysis of the cell phone toll call records, police were also able to identify Scott Sanders, a mid-level dealer, and again learned of Guthro, the higher level dealer above Sanders. Police also connected Sanders to the Smoot automobile business in East Boston, through motor vehicle registrations and cell phone toll records.

During this time, police set up surveillance of D'Ambrosio and Masciulli before a planned undercover buy and observed them making a purchase from Sanders. Shortly

4

after making an undercover buy, D'Ambrosio and Masciulli began asking the undercover officers if they were police.

Several Massachusetts police departments made inquiries about the licenses plate numbers of the three undercover vehicles used by the police in the undercover buys. The response to the inquiries, which cannot be traced to specific individuals, indicated the license plates were assigned to undercover vehicles. Shortly thereafter, D'Ambrosio and Masciulli refused to sell to the officers, stating they knew the officers were the police. The troopers concluded someone had a strong connection to law enforcement which would hamper effective investigation.

The two men were arrested and indicted based on the percocet pills found in Masciulli's apartment. Immediately after their arrests, Sanders' toll call record showed calls to the East Boston District Court. Police believe the calls were made in an effort to learn the post-arrest status of the two low-level dealers. The affidavit also notes that the ability of two low-level dealers to run a license plate speaks to the sophistication of the organization.

During the three months leading up to these wiretap warrant applications, the police worked with at least two confidential informants, CIX and CIX-1, both of whom cooperated on the condition their identities not be revealed and they not be compelled to testify against Sanders and his associates. The affidavit indicates that the police descriptions of the information from the informants is purposely vague, to protect their identities.

CIX previously provided information that lead to an undercover purchase of cocaine and more than one seizure of cocaine, none of which has yet lead to an arrest.

5

At the time, CIX described the methods of drug storage and distribution, which was later corroborated by police.

CIX stated he knew Smoot for several years and they shared many of the same friends and personal relationships. One friend told CIX that Smoot had a floor safe in the bedroom of his townhouse in which he kept large amounts of both cash and Percocet. The friend observed the safe. CIX knew Smoot owned Advanced Automotive in East Boston. CIX gave the troopers the address of both Smoot's garage and residence and said Smoot lived with his girlfriend, Jennifer McLaughlin. CIX told the troopers Smoot was part owner in the casino boat "Horizon's Edge" and said the web site address was etched into the rear window of Smoot's Mercedes. The troopers confirmed all the information and even obtained a business card for "Horizon's Edge" with Smoot's name and cell phone number on it.

CIX personally observed Smoot and his girlfriend driving expensive luxury cars; a Mercedes sedan, an SUV and a red Ferrari. CIX also observed large quantities of Percocet in their possession. CIX told the troopers Smoot was known as the money man among his relatives and friends and would invest in both legitimate and illegitimate ventures for a portion of the profit.

The police corroborated Smoot's home address and motor vehicle information. They observed Smoot in the parking space assigned to his townhouse working on a red Ferrari. The two Mercedes' were leased to Advanced Automotive while the repair plate on the Ferrari was issued to Advanced Automotive.

6

CIX indicated that he[4] has known Sanders for twenty years, knew of his current address, and knew it to also be his family home. CIX was previously in the company of others when they arranged to purchase cocaine and marijuana from Sanders. CIX observed the sale from Sanders to these people. CIX was told by these individuals that Sanders also sold Percocet. The three controlled sales of Percocet by Sanders to CIX-1, as will be discussed below, corroborated the basis of CIX's knowledge.

CIX gave the troopers information that Sanders lived at 11 Dartmouth Street, Somerville. CIX gave them the telephone number Sanders gave CIX which was an unlisted number for Karen Golden, 11 Dartmouth Street, 1st floor. CIX identified Karen Golden as Sanders girlfriend. The troopers discovered an unlisted phone at that address in the name of Sanders mother, Joyce, but billed to Scott Sanders at 11 Dartmouth Street. Sanders' identity was confirmed by police corroboration of his address, phone numbers and vehicle registrations.

CIX provided information in the past which led to an undercover purchase by a state trooper from a suspected narcotics distributor. CIX also gave information which led to the seizure of cocaine on more than one occasions. During the prior investigations with the troopers form the Narcotics Unit of the Middlesex District Attorney's Office, CIX provided detailed information regarding the methods employed by the targets in storing and distributing cocaine. The information was corroborated by the subsequent purchases and seizures. The prior information provided by CIX was accurate. This supports a determination of CIX's veracity for providing reliable

---

[4]Both confidential informants are referred to as "he" for convenience, though the gender of neither informant is known.

7

information.

CIX-1 provided extensive information about Sanders Percocet distribution and his position within the distribution ring. CIX-1's knowledge comes both from his own participation in the ring over several years and his purchasing Percocet from Sanders on a number of occasions. CIX-1 has personal knowledge of Sanders, Guthro, David and Christian Kelley, also high level dealers, and others from "directly participating in the purchase and re-sale of Percocet with one or more of these individuals and from having conversations with them about their drug distribution activities" for several years. For several years CIX-1 bought 1200-1800 Percocet per week from Guthro for sale to CIX-1's customers.

CIX-1 said that David Kelley and Guthro were the leaders and would disburse Percocet to their mid-level dealers including Sanders at various motels in Saugus after receiving their shipment from New York. The transfer of Percocet was never done consecutively at the same motel in order to avoid detection. CIX-1 was sent on numerous occasions by Guthro to pick up and/or pay for orders of Percocet from "Scottie" who was later identified as Sanders. This arrangement continued until March, 2000 when Guthro died.

Guthro told CIX-1 that either David Kelley or his brother Chris Kelley went weekly to New York City to buy about 25,000 to 30,000 Percocet. They took between $80,000.00 and $90,000.00 in cash per each delivery. Guthro said Kelley paid between $2.25 and #2.50 per pill and sold them for $4.25 and $4.50 each.

Sanders told CIX-1 he, Sanders, sold upwards 5,000-8,000 Percocet per week. Through the business relation CIX-1 learned of another individual, Jimmy Tracia, who

like Sanders was a mid-level dealer. Sanders also told CIX-1 that as result of Guthro's death David Kelley assumed the position held by Guthro while his brother Chris took over David's position.

Sanders who sold Percocet to CIX-1 told CIX-1 he could sell CIX-1 cocaine and marijuana. CIX-1 completed three controlled buys of Percocet from Sanders. Clearly, both the basis of CIX-1's knowledge and veracity was established to satisfy the Aguilar-Spinelli test.

In early 2000, arrangements shifted so that CIX-1 would receive delivery from Sanders rather than Guthro. CIX-1 was knowledgeable regarding the pill price paid in New York and the pricing structure down through the low-level dealers. Guthro often met mid-level dealers such as Sanders at various motels in Saugus, changing the meeting location regularly to avoid detection. Most recently, CIX-1 made purchases directly from Sanders, particularly while Guthro was ill and following his death in March, 2000. CIX-1's conversations with Sanders revealed that Sanders was selling roughly 5,000-8,000 percocet pills per week at that point, as well as cocaine and marijuana. CIX-1 was also aware of additional individuals in the organization, in both higher and horizontal levels of the organization. CIX-1 said Sanders stated he regularly changed beepers/pagers, cell phones, and vehicles in an effort to avoid detection and capture. Police corroborated Sanders' address, and telephone and pager numbers, though he often used information from his sister, girlfriend and mother.

In the months just before the warrant applications, police orchestrated several controlled buys of percocet between CIX-1 and Sanders. With surveillance, police observed Sanders meet CIX-1 at a designated place, arriving in his Smoot registered

9

vehicle. Sanders' identity was confirmed with a Registry of Motor Vehicle picture. The two would get into Sanders' vehicle, drive around the block, then CIX-1 was dropped off back at the starting point. During the buys, Sanders was seen looking around frequently, closely examining everyone walking or driving by. Sanders' vehicle was often seen at Smoot's automobile business.

Prior to the second controlled buy in early May, CIX-1 learned that Sanders had terminated his old set of contact telephones, and replaced them with a new set. These phones were prepaid cellular phones, which require no verifiable identification when acquired. They were usually registered to a fictitious name most often with a an address of Bethlehem, Pennsylvania.

The police listened as CIX-1 placed the call and arranged the buy with Sanders. Again, CIX-1 and Sanders met at an agreed upon location, with Sanders arriving in the same vehicle. After the exchange, Sanders drove away at a high speed.

In late May, CIX-1 indicated Sanders again changed telephones. Sanders began packaging the pills in U.S. Postal Service envelopes as he said to avoid suspicion. The late May buy was again arranged by CIX-1 calling Sanders, placing an order, arranging a pick-up time and place, and indicating he would be driving a particular vehicle. This time, CIX-1 got into the front seat of Sanders' vehicle. Again, Sanders was intently staring at all people in the area. They drove around the block while Sanders continuously checked all mirrors, consistent with counter-surveillance techniques, while they were followed by police. Police did not follow Sanders after he dropped CIX-1 off, due to his high level of awareness. CIX-1 turned over the postal package containing percocet.

10

Two weeks before the warrant application, Sanders again changed numbers. His new pager number was 617-604-6777. His new cell number was 617-230-8280. The police went to the cellular store known to be frequented by Sanders, and asked for a new pager number in the 617-604 area. They were given 617-604-6781, just four digits from Sanders' number. Cell number 617-230-8280 was confirmed by police as a prepaid phone, registered to a Timothy Kerry, of Bethlehem, Pennsylvania.

Police met with CIX-1 to arrange the fourth buy, and confirmed that CIX-1 again reached Sanders at the newest cell number. Sanders instructed CIX-1 to first call his pager and insert a call back number. The troopers observed CIX-1 follow Sanders' instructions. When Sanders called back his number was identified on the caller identification. Sanders' phone was recorded calling CIX-1 to confirm the buy. Surveillance was set up. Sanders arrived in another vehicle; CIX-1 got in and Sanders drove away. The postal envelope received from Sanders contained percocet. The next morning Trooper Connors drove by 11 Dartmouth Street and observed the vehicle Sanders used during the controlled buy the day before. Shortly thereafter, the warrant application was submitted.

As part of this investigation, police analyzed telephone toll records, and considered further surveillance and trash analysis. Telephone records are always up to one month old, do not always list all calls, particularly not those incoming or long distance, and are becoming more difficult to obtain due to out-of-state providers requiring a subpoena from their home state. Police analyzed the available call data from Sanders' phones between February and June, 2000. The records showed Sanders communicated with Smoot 300 times and with Hayes 313 times during this

time period. Roughly four other individuals had between 175-447 communications with Sanders during the same time. However, the data revealed no calls between Sanders and either Kelly brother, which police believe reflects the great lengths the highest level members go to, to protect their identity. There were also no calls with James Barooshian, another mid-level dealer similar to Sanders. Police believe this reflects the nature of the vertical communication in the organization; horizontal communication is unnecessary and rare.

The troopers set forth in the affidavit that the police had no individual willing to testify, and no access to the higher levels of the organization. Additionally, Sanders home was on a one-way street in a close neighborhood. The cars are parked on the street belong to the locals. There are only a few small driveways. The home backs up to another similar street. The physical character of the area make surveillance as well as trash analysis virtually impossible without detection. The police were also not convinced any percocet evidence would appear in Sanders' home trash. Sanders was observed driving many different vehicles, in very erratic ways, such as speeding, not obeying traffic signs or signals, frequently changing lanes, and driving the wrong way on one-way streets. Finally, Sanders indicated to CIX-1 that he "would not be surprised if police arrested him in the near future."

Similar difficulties exist with surveillance of the residences of others involved in the enterprise. This includes the residence of Smoot and both the Kelleys. The surveillance difficult is coupled with the knowledge that two low level dealers were able to verify the registration number of the undercover vehicles.

<u>DISCUSSION</u>

12

The defendants argue that the Superior Court has no authority to issue wiretap warrants to intercept cellular calls because such calls do not move over wire-based communication lines, and are thus not covered by statute. In the alternative, defendants argue that the affidavit supporting the warrant application for the wiretap:(1) did not establish probable cause, (2) failed to show that normal investigatory techniques had either failed or were unlikely to succeed, (3) provided no specificity for targeted individuals, and (4) some of the calls were illegally intercepted.

A.  Wiretap Authority for Cellular Telephones

The pre-1986 version of the federal Wiretapping and Electronic Surveillance statute protected the "privacy of wire and oral communication" when obtained by electronic surveillance. Bartnicki v. Vopper, 532 U.S. 514, 523 (2001); Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 82 Stat. 211; Clifford S. Fishman and Anne T. McKenna, Wiretapping and Eavesdropping § 2:10 at 2-16 (2nd ed. 1995). Interception of such communication is illegal, with strict exceptions for police surveillance. 18 U.S.C. § 2510. The federal statute is generally viewed as establishing the lowest level of protection, with states being able to provide greater protection if they so choose. Commonwealth v. Vitello, 367 Mass. 224, 247 (1975); Fishman, § 1:12 at 1-22-23.[5]

As originally written, the federal statute did not cover radio transmissions, only land-based wire communication. Bartnicki, 532 U.S. at 524. In 1981, the FCC

---

[5]The Massachusetts statute provides greater protection than the federal statute in some regards, though ones not relevant here. Vitello, 367 Mass. at 259, 268; Commonwealth v. Thorpe, 384 Mass. 271, 288 (1981); United States v. Smith, 726 F.2d 852, 862 (1st Cir. 1984).

13

authorized cellular communication. Jose L. Nunez, Regulating the Airwaves: The Governmental Alternative to Avoid the Cellular Uncertainly on Privacy and the Attorney-Client Privilege, 6 St. Thomas L. Rev. 479, 483-85 (1994). At that time, given that cellular calls traveled over radio waves and land-line calls over wires, the federal statute was interpreted to *not* apply to calls between two cellular phones because neither phone consisted of land-based wire communication. <u>Bartnicki</u>, 532 U.S. at 524; <u>New Jersey</u> v. <u>Tango</u>, 287 N.J. Super 416, 419 (1996) (cert. denied 144 N.J. 585 (1996)); <u>Nunez</u>, supra at 483-84.[6] That is, a call that moved between a cellular phone and a land-based number was covered by the statute, but cell-to-cell calls were not covered under federal law. <u>Id</u>. The statute was updated in 1986, and now clearly covers cellular telephones under the expanded definition of wire communication. <u>Bartnicki</u>, 532 U.S. at 524; 18 U.S.C. § 2510(1).

Massachusetts generally reads its wire tap statute "'in accordance with the construction given the cognate Federal statute by the Federal courts.'" <u>Dillon</u> v. <u>Massachusetts Bay Transportation</u>, 49 Mass. App. Ct. 309, 314 (2000) (rev. denied 432 Mass. 1105 (2000)) (quoting <u>O'Sullivan</u> v. <u>NYNEX Corp.</u>, 426 Mass. 261, 264 n.5 (1997)). The purpose of the Massachusetts statute is to avoid unreasonable intrusions on individual privacy, while allowing controlled interception by the police. <u>Vitello</u>, 367 Mass. at 231. The relevant "wire communications" section applies to "any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of *wire, cable, or other like connection*

---

[6]There was then no protection against the interception of cellular calls, and thus privacy was eroding. <u>Nunez</u>, supra at 483-84. However, many courts view cellular calls as carrying a lower expectation of privacy. <u>Id</u>.

14

between the point of origin and the point of reception." G. L. c. 272, § 99(B)(1)

(emphasis added). Massachusetts has yet to update its statute to include the language

of the 1986 federal version.

Many of the calls intercepted in this case occurred between two cellular phones.

Defendants argue that because the State statute has not been updated, it does not

cover the pertinent cell-to-cell calls, and thus the wire tap warrant was unauthorized.[7]

This argument cannot stand. While there is no question that our statute does not

include language addressing the most up-to-date technology, that does not mean the

Massachusetts courts have not interpreted the statute to include cell-to-cell

communications.[8]

The Supreme Judicial Court has yet to rule on the precise cellular phone issue

raised by the defendants. However, it has considered and upheld the validity of a

wiretap for a cellular phone on different grounds.[9] Commonwealth v. D'Amour, 428

Mass. 725, 732 (1999); Commonwealth v. Westerman, 414 Mass. 688, 691 (1993)

---

[7]Defendant's also argue that the 1986 update to the Federal Wiretap Statute, the Electronic Communications Privacy Act, established a two-year grace period after which the new federal statute would preempt the state statute and thus make all state-authorized wiretaps invalid. The Court finds this argument to be without merit. The two-year preemption requirement applied specifically to the newly added statutory section for electronic communications, 18 U.S.C. § 2510(12), and not to wire and oral communications in § 2510(1). Wire and oral communication is specifically excluded from § 2510(12). Pub.L.No. 99-508, § 111(b), 100 Stat. 1848, 1859 (1986); Tango, 287 N.J. Super. at 419-20 (stating the special effective date rule "is irrelevant to the authorization of [] cellular telephone taps"); Fishman, § 3:2 at 3-3. As discussed below, this Court interprets that Massachusetts has held cell-to-cell wiretaps to be valid under the "wire communications" definition of the statute, making adoption of the newer federal language irrelevant to the issues in this case.

[8]When considering issues of possible preemption, "we must look at the relationship of state and federal laws as they are interpreted and applied, not merely as they are written." Smith, 726 F.2d at 859 (citation omitted) (interpreting the Massachusetts wiretap statute).

[9]The Court assessed the District Attorney's authorization to seek the wiretap warrant, and the evidence of organized crime. D'Amour, 428 Mass. at 732-35.

15

(considering a wiretap of an automobile phone). It is reasonable to infer that the Court would thus sanction wiretaps for cellular phones, regardless of the type of telephone at the other end of a transmission. A land-based versus radio-based distinction would required the police and the courts to sort through all calls to and from a cellular phone, to weed out and eliminate those calls that move from cell to cell.

The Supreme Judicial Court has previously interpreted the wiretap statute to include a more updated definition than was originally written.[10] Dillon, 49 Mass. App. Ct. at 315; Commonwealth v. Hyde, 434 Mass. 594, 601 n.8 (2001). Though the Court does not "depart lightly from the express working of a statute," it does so in "unusual circumstances." Id. "The fact that there has been no amendment of the Massachusetts statute comparable to the Congressional action of 1986 does not bar us from reading [the statute] so as to preserve it in its intrinsic intended scope and maintain its viability in the broad run of cases." Id. A court should follow the tenet that an "interpretation should tend to preserve the substance of a statute rather than diminish it." Id. In this case, as well as in Dillon, the departed from the words of the statute is required to preserve the Legislature's intent. Hyde, 434 Mass. at 601 n.8. The statutory interpretation set forth by the defendants argument would produce untenable results and due violence to the Legislative intent set forth in the Preamble which reads in part "...[N]ormal investigative procedures are not effective in the investigation of illegal acts committed by organized crime. Therefore, law enforcement officials must be permitted

---

[10]The Dillon case examined and adopted an expanded definition of communications common carrier, based on the rapid changes in technology, to now also include statutory coverage for equipment obtained from non-telephone companies. Dillon, 49 Mass. App. Ct. at 314-16.

to use modern methods of electronic surveillance...".

Additional support is found in <u>Tango</u>, 287 N.J. Super at 419 wherein the Court held the state wiretap laws were modeled on the federal act when the Electronic Communication Privacy Act of 1968 (ECPA) already covered cellular phones and did not need to be amended. The Court finds that the wiretaps in this case were issued based upon valid judicial authority of the Massachusetts Superior Court, properly founded in G. L. c. 272, § 99.

The defendants argue the in applicability of the statute to cellular phones based on Judiciary Senate Bill 933, April 10, 2003, "An Act Updating the Massachusetts Wiretap Statute". The Attorney General of Massachusetts advocated for the adoption of an updated version of §99 to comport with the federal changes. <u>See</u> Testimony of Bill Bloomer, Assistant Attorney General, before Joint Committee. Attorney Bloomer stated the focus of the updated statute is four fold: to allow wiretaps for many new crimes; to allow wiretaps for individuals crimes, not just organized crime; to update the statutory definitions; and to allow for emergency wiretaps. <u>Id</u>. While discussing the update of definitions, Bloomer stated "[w]hile Massachusetts' prosecutors and judges have routinely applied the 1968 law to more modern forms of communication, such as cellular telephones, a revision of the definition is decades overdue." <u>Id</u>. Certainly, if the Attorney General perceived any limitation in his ability to secure cellular telephone wiretaps, he would have made the point clearly to the Senate at that time.

B. Probable Cause to Issue Warrant

The Massachusetts wiretap statute requires that affidavits in support of a warrant establish probable cause. G. L. c. 272, § 99 F(2). Probable cause based on

17

information from an unnamed informant requires the prosecution to show: "(1) some of the underlying circumstances from which the informant concluded that the contraband was where he claimed it was (the basis of knowledge test), and (2) some of the underlying circumstances from which the affiant concluded that the informant was 'credible' or his information 'reliable' (the veracity test)." Commonwealth v. Allen, 406 Mass. 575, 577 (1990); (applying the Aguilar-Spinelli test). "Reasonable inferences and common knowledge are appropriate considerations for determining probable cause." Commonwealth v. Rosario, 54 Mass. App. Ct. 914, 915 (2002) (rev. denied 437 Mass. 1105 (2002)) (quoting Commonwealth v. Welch, 420 Mass. 646, 650 (1995)). Police corroboration can compensate for deficiencies in satisfying either prong of the test. Allen, 406 Mass. at 577.

The facts as set forth within the four corners of the affidavit and the reasonable inferences therefrom must be sufficient to establish probable cause. Id. at 578. The probable cause analysis for wiretaps is the same as for physical searches. Commonwealth v. Wallace, 22 Mass. App. Ct. 247, 248 (1986) (rev. denied 398 Mass. 1101 (1986)). Affidavits accompanying the warrant application must be considered as a whole, and not dissected. Commonwealth v. Alvarez, 422 Mass. 198, 207 (1996).

The affidavits in this case contained information gathered from two different confidential informants. The defendants challenge the information supplied by the first informant CIX because of the lack of knowledge and reliability of CIX. The defendants challenge to CIX-1 is a single assertion that CIX-1's information alone is not sufficient,

and that wiretaps are rarely issued based on the involvement of only one informant.[11]
Defendants cite no case law and articulate no further argument relative to probable
cause and CIX-1.

Without holding on whether the information from CIX alone established probable
cause, the affidavit as a whole provides more than sufficient support to establish
probable cause to issue the wiretap warrant. CIX-1 directly participated in the drug
organization for many years as a low-level dealer, and the police orchestrated several
controlled buys with this informant immediately prior to applying for the warrant. Police
extensive corroboration of details including telephone numbers, criminal record
background checks of several individuals and their observations during the limited
surveillance. These facts alone are sufficient to establish the informant's basis of
personal knowledge, as well as the troopers' and the warrant Judges' assessments that
CIX-1 was reliable.

C.  Normal Investigatory Techniques Had Failed or Were Unlikely to Succeed

In addition to a showing of probable cause, Massachusetts requires the affidavit
set forth a showing that "normal investigative procedures have been tried and have
failed or reasonably appear unlikely to succeed if tried," referred to as the necessity
requirement. G. L. c. 272, § 99 E(3); Commonwealth v. Fenderson, 410 Mass. 82, 83
(1991). The Supreme Judicial Court has interpreted this provision to mean that "the
Commonwealth need not show that traditional investigative techniques were wholly

---

[11] Compare Commonwealth v. Zuluaga, 43 Mass. App. Ct. 629, 634-36 (1997) (establishing probable cause with one informant, though named, and police orchestration of a controlled buy). The Court finds no case law requiring a higher threshold of two confidential informants for wiretaps.

19

unsuccessful or that the police had exhausted all other investigative procedures before filing its application for a warrant authorizing a wiretap." Id. (quoting Commonwealth v. Wilson, 405 Mass. 248, 250 (1989)). The necessity assessment ensures that police do not resort to wiretaps when normal techniques will suffice. Id. The affidavits, when read in a "practical and commonsense manner," must meet a standard of "reasonable likelihood." Id. 83-4 (citations omitted). The judge must conclude that other techniques will not succeed. Wilson, 405 Mass. at 250; Federson, 410 Mass. at 83-84.

As in Westerman, the defendants' asserted the affidavit contains "boilerplate generalities". 414 Mass. at 693. The affiants' lengthy recitation describes sophisticated and secretive drug dealers who routinely employ counter-surveillance techniques. In particular, Sanders was described as watching and assessing everyone that goes by while he is conducting a sale, continuously circling the block, and driving erratically. He regularly had three mobile phones and pagers, and obtained new ones every few weeks. He used prepaid cell phones and pagers giving the provider fictitious names and addresses. Surveillance of Sanders residence was next to impossible not only due to physical constraints but the fact low level dealers were able to access through law enforcement the identification of the undercover license plates.

In granting the warrant, Judge Ball articulated the effective dead-ends that had been reached by the investigative team. Keeping in mind the ultimate goal of dismantling the whole, multi-level organization, not just of indicting one or two individuals, Judge Ball cited the lack of informants willing to testify, the limited information and access to higher levels of the organization, and the likely continuing illegal operations as satisfying the necessity requirement. See also Westerman, 414

20

Mass. at 693.  In addition, several physical locations central to this case are difficult to

set up surveillance without detection, and the telephone toll records are continuously

out-of-date and limited based on the type of phone plan purchased.  <u>Fenderson</u>, 410

Mass. at 84-85.  As the troopers wrote in their affidavit, "[I]n evaluating whether normal

techniques might be successful in taking down this entire Percocet distribution

operation, it is important to note that we have considered that even 'low-level'

distributors of Percocet within this organization (Masciulli and D'Ambrosio) appear to

have fairly sophisticated ties to law enforcement that have the capacity to 'run' license

plate information and bring an abrupt end to a successful, long term investigation of the

entire enterprise".

The defendants detailed, at great length, all of the successful traditional

techniques that were employed by the troopers in this investigation.  The defendants

also pointed to several traditional techniques that were not employed.  While their

recitation appears to be accurate, it does not defeat the necessity prong.  The statute

does not negate obtaining a wiretap because of the earlier successful use of traditional

techniques.  Neither does it negate a wiretap if every traditional technique is not

exhausted.

The affidavit established the reasonable likelihood that continued use of

traditional investigative techniques would no longer be successful.  Issuance of a

warrant for the more sophisticated wiretap technique was justified, and the warrant

affidavit appropriately satisfied the statutory necessity requirement.

<u>D.  No Specificity of Targeted Individuals</u>

Defendants Hayes and Cardillo argue that because they were not identified

21

particularly in the July 10, 2000 affidavit, the evidence against them was illegally intercepted and must be suppressed. Their argument cannot stand.

Wiretap applications must specify "a particularly described designated offense," "of a particularly described person," "over particularly described telephone or telegraph lines." G. L. c. 272, § 99F(2)(a, b, and c); Westerman, 414 Mass. at 692; Wilson, 405 Mass. at 250. As discussed above, the court considers the validity of the warrant affidavit on its face. In interpreting § 99F(2)(b), the SJC held when "the intercepted communications of unidentified parties [is] sufficiently limited to (1) [the] subject matter which concerned the crimes being investigated, and (2) conversations with named conspirators, there [is] no violation of the statute or privacy rights." Westerman, 414 Mass. at 693-94. In the case at bar, the July 10, 2000 affidavit of Troopers Cummings and Connors identifies with particularity Sanders and Smoot as the targets, percocet distribution as the offense, and Sanders' telephones as the specific communication vehicles.

The defendant, Cardillo, correctly asserts he was not noticeably mentioned in the affidavit. There is nothing on the face of the affidavit to suggest he should have been identified as a target. His identity and role became known only during the course of the wiretap for Percocet. Both he and Hayes were involved in a cocaine venture.

The defendant, Hayes, was identified in the affidavit. He made a significant number of prior telephone calls to Sanders. He was described as a cocaine and marijuana dealer, and not as being involved in the percocet chain. It would have been

22

inappropriate to list him as a target in the July 10, 2000 warrant application.[12]

Even if there was probable cause to identify either Cardillo or Hayes as targets the failure of the troopers to name them does not require suppression.  United States v. Donovan, 429 U.S. 413, 437 (1977).  Additionally, there is no showing by the defendants that the Commonwealth acted in bad faith.

E.  Illegally Intercepted Calls

Finally, the defendants argue that 251 of the calls intercepted on Sanders' second cellular phone were illegally intercepted, and must be suppressed.  They argue that because these calls do not appear on the related telephone bill log, the calls must have been illegally intercepted from some other source.  Contrary to the other arguments above which required the Court to assess the information contained in the affidavit, this argument requires a review of a significant volume of data which was attached to the motion.  No testimony or evidence was entered at the hearing.

The moving party carries the burden in a motion to suppress, including submitting appropriate affidavits, in order to show that evidence was illegally obtained. Mass. R. Crim. P. 13(a)(2); Commonwealth v. Antobenedetto, 366 Mass. 51, 56 (1974) (citing Commonwealth v. Fancy, 349 Mass. 196, 202-203 (1965)).  The wiretap statute, § 99P, calls for the suppression of evidence if the interception does not conform to the

---

[12]Hayes further argues that the Massachusetts statute must be held to the stricter federal standard under 18 U.S.C. § 2518(1)(b)(iv).  Without assessing possible differences between this aspect of the two statutes, the federal statute is equally focused on identifying individuals with probable cause committing the *offense*, whose communications are to be intercepted.  United States v. Kahn, 415 U.S. 143, 152-53 (1974).  The identified offense in the July 10th affidavit is percocet, *not* cocaine or marijuana.  Even if there were a difference between the statutes, Hayes' argument would not be successful.

Hayes' motion also references a quote from a later August 15, 2000 affidavit, which describes his daily phone conversations with Sanders regarding cocaine.  Again, this is irrelevant to the analysis of the validity of the earlier warrant and the appropriateness of whether Hayes should have been listed as a target back on July 10, 2000.

23

with which. The defendants' identification of certain calls on the police log with yellow highlighting hardly proves the calls came from another line or that they were illegally intercepted. In fact Sanders contradicts his assertion by pointing to an intercepted call on his phone on August 8, 2000 at 1839 hours which did not appear on his bill.

<u>ORDER</u>

For the foregoing reasons, the defendants' motions to suppress are <u>DENIED</u>.

Elizabeth Bowen Donovan
Justice of the Superior Court

Date: August 18, 2003

24